*EXECUTION COPY*

THE OWNERSHIP INTERESTS EVIDENCED HEREBY (OR BY CERTIFICATES, IF ANY ARE ISSUED) HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES EXCHANGE ACT OF 1933 (15 U.S.C. ɜ77a *et seq.*), AS AMENDED (THE "1933 ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE. SAID INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED AT ANY TIME EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS CONTAINED IN THIS AGREEMENT AND PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT AND ANY APPLICABLE STATE SECURITIES LAW OR AN EXEMPTION THEREFROM. FURTHER, THE SALE OR OTHER DISPOSITION OF THE OWNERSHIP INTERESTS EVIDENCED HEREBY ARE RESTRICTED, AS SET FORTH IN THIS AGREEMENT AND THE COMPANY HAS THE RIGHT TO REQUIRE AN OPINION OF COUNSEL, IN FORM AND SUBSTANCE SATISFACTORY TO IT, THAT SUCH TRANSFER CAN BE LAWFULLY MADE WITHOUT REGISTRATION OR OTHER COMPLIANCE WITH SUCH STATUTES AND OTHER RULES AND REGULATIONS THEREUNDER.

AMENDED AND RESTATED

LIMITED LIABILITY COMPANY AGREEMENT

OF MILFORD POWER COMPANY, LLC

Dated as of March 25, 1999

By and Among

EL PASO MILFORD POWER I COMPANY

EL PASO MILFORD POWER II COMPANY

AND

PDC MILFORD POWER LLC

Milferdllc1.dot
BUSDOCS:728102.1

ARTICLE  V  MANAGEMENT OF COMPANY ................................................-7-
    5.1    Management by Members ................................................-7-
    5.2    Member Decisions ................................................-7-
        (a)    Actions Requiring Unanimous Consent ..............................-7-
        (b)    Actions Requiring Super-Majority in Interest Consent ............-8-
        (c)    Actions Requiring Majority in Interest Consent ..................-10-
    5.3    Committees ................................................-10-
        (a)    Construction Committee ..........................................-11-
        (b)    Operations Committee ............................................-11-
        (c)    Commercial Committee ............................................-11-
    5.4    Member Management Agreements ................................................-11-
    5.5    Management by Officers ................................................-11-
    5.6    Fuel Manager ................................................-12-
    5.7    Power Marketer ................................................-12-

ARTICLE VI  CAPITAL CONTRIBUTIONS ................................................-12-
    6.1    Capital Account ................................................-13-
    6.2    Capital Contributions ................................................-13-
        (a)    Capital Contributions for the Construction of the Plant ..........-13-
        (b)    Additional Capital Contributions ...............................-13-
    6.3    Ownership Interest ................................................-14-
        (a)    Initial Ownership Interest ......................................-14-
        (b)    Revision of Ownership Interests Following the Flip Point .........-14-
        (c)    Flip Point ................................................-14-
    6.4    Consequences of Default in the Payment of Capital Contributions .....-15-
        (a)    Mandatory Capital Contributions .................................-15-
        (b)    Additional Capital Contributions ................................-15-
    6.5    Return of Capital ................................................-16-

ARTICLE VII  ALLOCATIONS AND DISTRIBUTIONS ................................................-16-
    7.1    Cash Distribution ................................................-16-
    7.2    Allocations of Profits and Losses ................................................-16-
    7.3    Curative Amendment ................................................-18-
    7.4    Section 704(c) ................................................-18-
    7.5    Transfers ................................................-18-
    7.6    Withholdings ................................................-18-

ARTICLE VIII  ACCOUNTING AND TAXATION ................................................-19-
    8.1    Fiscal Year ................................................-19-
    8.2    Location of Records; Inspection ................................................-19-
    8.3    Books of Account ................................................-19-
    8.4    Financial Statements and Reports ................................................-20-
    8.5    Taxation ................................................-20-
    8.6    Tax Returns and Audits ................................................-21-
    8.7    Other Reports ................................................-21-
    8.8    Inspection of Records ................................................-22-
    8.9    Deposit and Withdrawal of Funds ................................................-22-

(d)    Litigation ........................................................................................... -34-
(e)    Regulation .......................................................................................... -34-

**ARTICLE XIV  CONFIDENTIALITY OF COMPANY AFFAIRS** .................................... -34-
    14.1   Disclosure of Confidential Information ................................................ -34-
    14.2   Use ........................................................................................ -34-
    14.3   Procedures ....................................................................................... -34-
    14.4   Survival ........................................................................................... -35-
    14.5   Remedies .......................................................................................... -35-

**ARTICLE XV  MISCELLANEOUS** ...................................................................... -35-
    15.1   Entirety of Agreement ...................................................................... -35-
    15.2   Notices .............................................................................................. -35-
    15.3   Further Assurances ........................................................................... -36-
    15.4   APPLICABLE LAW AND CHOICE OF FORUM ............................... -37-
    15.5   Counterparts ..................................................................................... -37-
    15.6   Laws and Regulatory Bodies ........................................................... -37-
    15.7   Force Majeure ................................................................................... -37-
    15.8   Notice of Litigation .......................................................................... -37-
    15.9   Severability ...................................................................................... -37-
    15.10  Third-Party Beneficiaries ................................................................ -37-
    15.11  Remedies .......................................................................................... -37-
    15.12  Non-Waiver of Rights ...................................................................... -37-

**EXHIBIT A** ......................................................................................................... -1-

**ARTICLE 1  DEFINITIONS AND INTERPRETATIONS** ......................................... -1-
    1.1    Definitions ........................................................................................ -1-
    1.2    Interpretations .................................................................................. -4-

**EXHIBIT B - Member Management Agreements** ................................................... -1-

**EXHIBIT C - Form of Certificate** ......................................................................... -1-

under the name "Milford Power Company, LLC."

(b)   Member's Rights and Liabilities - The rights, privileges, liabilities and obligations of the Members shall be as provided in this Agreement to the extent permitted under the Act. it being understood that the Members intend to govern all of their rights and obligations in accordance with the terms set forth in this Agreement.

(c)   Qualification in Other Jurisdictions - Prior to transacting business in Connecticut or any jurisdiction other than the State of Delaware, the Company shall qualify to do business in Connecticut and any such other jurisdiction if such a procedure is required and provided by statute or regulation in such other jurisdiction. The Members (or where appropriate, an officer of the Company) shall execute and deliver such certificates and documents and perform such acts consistent with the terms of this Agreement as may be necessary to comply with the requirements of the assumed or fictitious name statutes and any other applicable law for the qualification and operation of a limited liability company in each jurisdiction in which the Company will conduct business.

2.2   Name - The name of the Company shall be MILFORD POWER COMPANY, LLC and all Company business shall be conducted in that name or such other names that comply with applicable law as the Members may select from time to time.

2.3   Offices - The office of the Company required by the Act to be in the State of Delaware shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Members may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other Person(s) as the Members may designate from time to time in the manner provided by law. The principal place of business of the Company shall be at 300 Bic Drive, Milford, Connecticut or such other location as the Members shall designate from time to time. The Company shall maintain its books and records at the principal place of business of the Member Manager assigned responsibility for maintaining such books and records in accordance with the Member Management Agreements in accordance with Section 5.4. The Company may have such other offices as the Members may designate from time to time. Written notice of any change in the Company's principal place of business and the designation of any other offices of the Company shall be given to each Member.

2.4   Term - The Company commenced on December 11, 1998 and shall continue in existence until December 31, 2048, unless the Company is dissolved earlier in accordance with this Agreement or the Act.

2.5   Authorized Number of Units of Membership Interest - Subject to Section 6.4(b)(iii), the aggregate number of Units of Membership Interest that the Company is authorized to issue is 100. The following Units of Membership Interest that the Company issued at the time of the original formation of the Company and on the date of this Agreement are as follows:

| Member | Units of Membership Interest |
|---|---|
| El Paso I | 5 |
| El Paso II | 90 |
| PDC | 5 |

2

3.2    Powers of the Company - The purposes of the Company set forth in Section 3.1 may be accomplished by taking any action permitted under the Act that is customary or directly related to the business of the Company.  The Company shall possess and may exercise all powers and privileges necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the Company.

3.3    Other Business Opportunities - The Members may engage, directly or indirectly, without the consent of any other Member or the Company, in other business ventures of any nature or description, independently or with others, including without limitation, businesses that may be competitive with or the same as or similar to the business of the Company.  Each of the Members waives any rights it might otherwise have to share or participate in such other interests, businesses, opportunities, or ventures and in all income or profits that may be derived therefrom.

3.4    Affiliate Transactions - The Company will not enter into any agreement or arrangement with any Member or Affiliate, unless (a) there has been a full disclosure of the terms of such agreement or arrangement and the affiliation of the Members and (b) the terms of such agreement or arrangement are substantially equivalent to the terms that are available on an arms-length basis. The Members and the Company expressly agree that, with respect to the Member Management Agreements, the Fuel Purchase Agreement, the Power Marketing Agreement, the Fuel Subordination Agreement and any other agreements or documents contemplated by the Financing Agreements (i) the Members have complied with the disclosure requirements set forth in (a) above and (ii) the terms of such agreements comply with the standard set forth in (b) above.

## ARTICLE IV
## MEMBERSHIP

4.1    Initial Members - The Members of the Company are El Paso I, El Paso II and PDC, each of which was admitted to the Company as a Member effective on the date of the filing of the Certificate of Formation.  The name and principal office address of each initial Member is set forth in Section 15.2.

4.2    Additional Members - Additional parties may be admitted to the Company as Members and Units of Membership Interest may be issued to those parties and to existing Members on such terms and conditions as may be determined upon approval by all of the Members. In the case of an assignee of a Membership Interest, such assignee shall be admitted as a Member only upon the consent of all the Members in accordance with the provisions of Article IX; provided, however, that any assignment of a Membership Interest (including any associated Ownership Interest) shall be subject to the restrictions set forth in Article IX.

4.3    Withdrawal - Except as provided in Section 11.9, no Member has the right or power to resign or withdraw from the Company as a Member.

4.4    No State-Law Partnership - Except for federal and state tax purposes, the Members do not intend the Company to be a partnership, limited partnership or joint venture.  No Member shall be a partner or joint venturer of any other Member solely on account of this Agreement and the transactions contemplated hereby, for any purpose other than federal and state tax purposes.

4.5    Meetings of Members - The following procedures and rules will apply with regard to the

4

the determination of the Members entitled to notice of or to vote at such meeting, including any adjournment thereof.

4.6    Voting List - At least ten (10) days before each meeting of the Members, the Chairman shall make a complete list of the Members entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Units of Membership Interests (and associated Ownership Interests) held by each. For ten (10) days prior to such meeting, the list shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during normal business hours and shall be produced in writing upon the request of any Member. The list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima-facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this Section shall not affect the validity of any action taken at the meeting.

4.7    Proxies - A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section 4.7. Proxies for use at any meeting of Members shall be filed with the Members, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Members, who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more Persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Ownership Interests that are the subject of such proxy are to be voted with respect to such issue.

4.8    Conduct of Meetings - All meetings of the Members shall be presided over by the Chairman of the Company. The nominee of the Member with the largest Ownership Interest shall be designated as the Chairman for so long as it owns the largest Ownership Interest in the Company. The Chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him in order; provided that the Chairman shall conduct meetings of the Members in accordance with such rules of procedure as shall be agreed upon by the Members attending such meetings. The Chairman shall not have any additional vote by virtue of his capacity as Chairman.

4.9    Action by Written Consent or Telephone Conference

    (a)    Written Consent - Any action required by or permitted to be taken at any annual or

6

5.2    <u>Member Decisions</u> - All matters requiring the approval or consent of the Members shall require the level of votes by the Members as set forth below:

    (a)    <u>Actions Requiring Unanimous Consent</u> - A Member, committee, management personnel or any other agent, representative or employee of the Company shall not have the power or authority, and may not cause the Company, to do any of the following without obtaining the unanimous approval of the Members:    .

        (i)    sell, lease, exchange or otherwise dispose of all or substantially all of the Company's property and assets in a single transaction or series of related transactions;

        (ii)    except as described in Section 2.1, cause the Company to be a party to (A) a merger or consolidation, or (B) an exchange or acquisition of the type described in Section 18-209 of the Act;

        (iii)    except as expressly provided in this Agreement, amend or restate the Certificate of Formation or this Agreement;

        (iv)    change, or authorize a transaction, agreement or action of the Company that is unrelated to, the scope or nature of the Company's business purpose as set forth in Section 3.1;

        (v)    cause the Company to repurchase Units of Membership Interest or, except as set forth herein, issue additional Units of Membership Interest;

        (vi)    cause the Company to accept the resignation of a Member;

        (vii)    cause the Company to make an assignment for the benefit of creditors of the Company, file a voluntary petition in bankruptcy, appoint a receiver for the Company or agree to voluntarily dissolve the Company;

        (viii)    cause the Company to enter into the Financing Agreements with the Lenders or any refinancing of such agreements that would have an adverse impact on the net present value of the future cash flows of the Company or any of its Members, discounted at 12% per annum or any other material adverse impact to the Company or any of its Members;

        (ix)    cause the Company to provide a notice to proceed under the EPC Contract;

        (x)    change the location of the principal place of business of the Company to a place outside of the United States; or

        (xi)    any other action that requires the consent of all the Members by the express terms of this Agreement.

    (b)    <u>Actions Requiring Super-Majority in Interest Consent</u> - The approval by a Super-Majority in Interest of the Members or the representatives of the committee to which such

8

(x)     entering into, amending or terminating any contract or commitment to acquire or transfer any asset, the fair market value or aggregate consideration (including assumed actual and contingent liabilities) of which exceeds $2,000,000;

(xi)    approving the distribution of Company property to Members in accordance with Article VII;

(xii)   executing or otherwise entering into, or amending, modifying, or terminating, any agreement with a Member, officer or employee of the Company, an Affiliate of a Member, or a person related by blood or marriage to an Officer or employee of the Company, involving aggregate consideration (including assumed actual and contingent liabilities) or fair market value or actual or contingent liability in excess of $500,000, except that this Section 5.1(c)(xii) shall not apply to the Member Management Agreements, Fuel Purchase Agreement or the Power Marketing Agreement;

(xiii)  (A) filing any claim or lawsuit against any third party in an amount claimed in excess of $500,000, or (B) settling any claim or lawsuit where the fair market value of the settlement amount exceeds $500,000;

(xiv)   incurring any Company indebtedness for borrowed money in excess of $2,000,000;

(xv)    authorizing the acquisition by the Company of the assets of another entity as a going concern in an amount in excess of $2,000,000;

(xvi)   subject to any requirements of the Lenders under the Financing Agreements, establishing any reserves of the Company in excess of $4,000,000;

(xvii)  causing the Company to change its name; or

(xviii) establishing any committee pursuant to Section 5.2, subject to the limitations set forth herein, or delegating any authority to any such committee.

(c)     <u>Majority in Interest</u> - The approval by a Majority in Interest of the Members or the representatives of the committee to which such matters may be delegated shall be required for all other matters not set forth in Sections 5.2(a) and (b) above.

5.3     <u>Committees</u> - The Members hereby establish (a) a Construction Committee to provide oversight over the construction of the Plant, (b) an Operations Committee to provide oversight over the operations of the Plant, (c) a Commercial Committee to provide oversight over the key commercial issues and contracts affecting the Company. The Members may, by unanimous consent, establish other committees after the date of execution of this Agreement. Unless otherwise agreed to by the Members, each such committee shall be comprised of one representative of each Member ("Committee Representative"), designated by such Member by written notice to each other Member. Each Member shall have the right to designate one or more alternate Committee Representatives to act in the place of the designated Committee Representative, if such Member's designated Committee Representative is or becomes

10

have such authority and perform such duties as provided in this Agreement or as the Members may, from time to time, delegate to them. The initial officer of the Company shall consist of a general manager. Unless delegated otherwise by the Members and subject to the control of the Members and the Members in accordance with the Member Management Agreement and the contractor under the Service Agreement, the general manager shall have the responsibility for the general supervision of the employees of the Company, the general direction of the operational affairs of the Company (including without limitation the direction of the O&M Contractor) and the responsibility for the day-to-day affairs, business, administration and operations of the Company (including without limitation the discretionary authority to take any action or enter into any transaction, agreement or arrangement on behalf of the Company to be taken or entered into in the ordinary course of business of the Company, except to the extent that such action or transaction is of the type that would otherwise require the approval of the Members, the Committees, the Members pursuant to the Member Management Agreements, the Fuel Manager, the Power Marketer, or any other body or representative established by the Members in accordance with this Agreement. The general manager may sign and execute in the name of the Company (a) all contracts or other instruments authorized by the Members, the Members pursuant to the Member Management Agreements or delegated representatives in accordance with this Agreement or (b) all contracts or instruments in the usual and regular course of business, except in cases when the signing and execution thereof shall be expressly delegated or permitted by the Members or by this Agreement to some other representative. In addition, the general manager shall perform all duties incident to the office of the chief executive officer of a Company and such other duties as from time to time may be assigned to him by the Members. The Members may establish such other officer positions and when establishing such other positions, the Members will expressly state what authority is delegated to such officers. The salaries or other compensation of the officers shall be fixed from time to time by the Members.

5.6    Fuel Marketer - The Company and El Paso Gas Marketing Company ("EPGM") have entered into on the date of execution of this Agreement a Fuel Purchase Agreement, pursuant to which EPGM shall sell natural gas and fuel oil as a source of fuel for the Plant.

5.7    Power Marketer - The Company and El Paso Power Services Company ("EPPS") have entered into on the date of execution of this Agreement a Power Marketing Agreement, pursuant to which EPPS shall manage the purchase, sale and transmission of the electrical output of the Plant (or any futures contract or derivative contract relating to electricity).

## ARTICLE VI
## CAPITAL CONTRIBUTIONS

6.1    Capital Accounts - A "Capital Account" shall be established for each Member, which shall, for avoidance of doubt, be used to allocate distributions to the Members in accordance with Section 704(b) of the Code. In this regard, a Member's Capital Account shall be adjusted and maintained in the following manner:

(a)    To each Member's Capital Account there shall be credited the amount of cash and the value as determined by all of the Members of any asset contributed to the Company by such Member, such Member's distributive share of Profits, any items in the nature of income or gain which are specially allocated pursuant to Sections 7.2, 7.3 or 8.5(b) of this

12

third party sources. To the extent that there is a shortfall in the funds available from such third party sources (with such shortfall referred to as the "Additional Capital Contributions"). then the Chairman in accordance with the determination of the Members pursuant to Section 5.2 shall give written notice to the Members stating: (i) the aggregate amount of the Additional Capital Contributions that are required, (ii) the purpose or purposes for which such Additional Capital Contributions are proposed to be used, (iii) the portion of such Additional Capital Contribution that are required to be contributed by each Member based upon each Member's Ownership Interest, and (iv) the date on which the Additional Capital Contribution must be made, which shall be not less than the earlier of (A) ninety (90) days from the giving of such notice or (B) the date the expenditure associated with the Additional Capital Contribution must be incurred to avoid an adverse impact on the Project.

6.3    Ownership Interests - Subject to the provisions of this Agreement, the interests of the Members in the profits, gains and losses of the Company ("Ownership Interests") shall be as follows:

(a)    Initial Ownership Interests - The initial Ownership Interests of the Members in the Company shall be as follows:

| | |
|---|---|
| El Paso I | 5% |
| El Paso II | 90% |
| PDC | 5% |

(b)    Revision of Ownership Interests Following the Flip Point - From and after the occurrence of the Flip Point, the Ownership Interests of the Members shall be as follows:

| | |
|---|---|
| El Paso I | 60% |
| El Paso II | 10% |
| PDC | 30% |

(c)    Flip Point - The Flip Point shall occur at the point which the Discounted Distributions and Allocations equals the Discounted Contributions. For purposes of this section, "Discounted Distributions and Allocations" shall mean the discounted sum of (i) distributions made to El Paso II and its successors pursuant to Section 7.1 or Section 11.7, less (ii) allocations of Profit made to El Paso II and its successors pursuant to Section 7.2(a) (including any amounts that are specially allocated pursuant to Sections 7.2, 7.3 or 8.5(b) and specifically excluding any Profit exempt from taxes) multiplied by the Corporate Tax Rate, plus (iii) allocations of Losses made to El Paso II and its successors pursuant to Section 7.2(b) (including any amounts that are specially allocated pursuant to Sections 7.2, 7.3 or 8.5(b)) multiplied by the Corporate Tax Rate, with such amounts discounted at a rate of fifteen percent (15%) per annum from the date such amounts are distributed or allocated in accordance with this Agreement back to the date of the initial Capital Contribution by El Paso II or its successors. For avoidance of doubt, "Discounted Distributions and Allocations" shall include distributions and allocations associated with the sale or liquidation of the Company or sale of all or substantially all of the assets of the Company, including without limitation, liquidations pursuant to Section 11.7, up to that portion of such proceeds from such sale or liquidation of the Company or all or substantially all of the assets of the Company that cause the Flip Point to occur. In addition, for purposes of this section, "Discounted Distributions and Allocations" shall

BUSDOCS:728102.1

Non-Contributing Member of the failure to pay its Unpaid Contribution in accordance with Section 6.2(b);

(ii)    within five (5) days of receipt of a Contribution Notice each Non-Contributing Member shall provide written notice to the Company and each Contributing Member stating whether it intends to pay the Unpaid Contribution. If there is more than one Non-Contributing Member, each Non-Contributing Member shall provide written notice of whether it intends to pay the portion of the Unpaid Contribution equal to the amount of the Unpaid Contribution times a fraction, the numerator of which is the Ownership Interest of the Non-Contributing Member and the denominator of which is the Ownership Interest of all of the Non-Contributing Members in the same manner and form as was required with respect to the relevant Unpaid Amount.

(iii)    if the Non-Contributing Member (A) does not provide written notice that it intends to pay the Unpaid Contribution, (B) provides written notice that it does not intend to pay the Unpaid Contribution or (C) fails to contribute the Unpaid Amount when due, then each Contributing Member shall have the right, but not the obligation, to pay (on a pro rata basis based upon their relative Ownership Interests) all or part of the Unpaid Contribution of the Non-Contributing Member. The Company shall issue additional Units of Membership Interest to the Contributing Members making such additional capital contributions such that the Ownership Interests of each of the Members shall be adjusted in proportion to the aggregate Capital Accounts of all Members after such additional Capital Contributions have been made. In the event that compliance with this Section 6.4(b)(iii) requires the Company to issue Units of Membership Interest in excess of that which the Company is expressly authorized to issue under the terms of this Agreement, the number of Units of Membership Interest shall automatically be amended and increased, without further action by or notice to any party, to the number necessary to allow the Units of Membership Interest of the Contributing Members making such additional Capital Contributions to be increased in accordance with this Section 6.4(b)(iii).

6.5    <u>Return of Capital</u> - No Member shall have any personal liability for the repayment of the Capital Contributions of any other Member. No Member shall be entitled to the withdrawal or return of its Capital Contributions except to the extent, if any, that distributions made pursuant to this Agreement or upon the dissolution of the Company may be considered as such by operation of law, and then only to the extent provided for in this Agreement. Except as otherwise expressly set forth in this Agreement, no Member shall have priority over any other Member either as to the return of capital or as to profits, losses or distributions or be entitled to receive any interest on its Capital Contributions or to receive or demand any property from the Company other than cash.

## ARTICLE VII
### ALLOCATIONS AND DISTRIBUTIONS

7.1    <u>Cash Distribution</u> - Subject to Sections 18-607 and 18-804 of the Act, the Company shall distribute to the Members its available cash on hand (including without limitation available cash from a sale of property of the Company, proceeds available from refinancings and proceeds from

16

computed by reference to the Gross Asset Value of the property disposed of in accordance with IRS Regulation Section 1.704-1(b) for the purpose of determining the Members' Capital Accounts, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v)    In lieu of the depreciation, amortization or other cost recovery deductions taken into account in computing such taxable income or loss, for the purpose of determining the Members' Capital Accounts there shall be taken into account Depreciation for such taxable year or other period, computed in accordance with the definition of Depreciation in this Agreement; and

(vi)   Notwithstanding any other provision of this definition of Profits and Losses, any items which are specially allocated pursuant to Sections 7.4 or 8.5(b) shall not be taken into account in computing Profits and Losses but shall be taken into account in computing the Members' Capital Accounts.

(d)    As used in this Agreement, "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the other Members;

(ii)   The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by all of the Members, as of the following times: (a) the acquisition of any additional interest in the Company in exchange for more than a de minimis Capital Contribution, (b) the distribution by the Company to a Member of more than a de minimis amount of Company assets as consideration for an interest in the Company, and (c) the liquidation of the Company within the meaning of IRS Regulation Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to Clauses (a) and (b) of this Section shall be made only with the consent of all the Members;

(iii)  The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as determined by the Company; and

(iv)   The Gross Asset Value of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Sections 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to IRS Regulations Section 1.704-1(b)(2)(iv)(m) and Section 6.1.

As used in this Agreement, "Depreciation" means, for each taxable year, or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to any asset for such year or other period, except that if the Gross Asset Value of an asset differs form its adjusted basis for federal income tax purposes as the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax

18

8.1    <u>Fiscal Year</u> - The Fiscal Year of the Company shall be the calendar year. The first Fiscal Year of the Company commenced on December 11, 1998 and shall end on December 31, 1998.

8.2    <u>Location of Records; Inspection</u> - The books, records and accounts for the Company shall be kept and maintained at the principal office of the Member who is responsible for maintaining such books and records pursuant to the Member Management Agreement in accordance with Section 5.4 or at such other place as the Members may determine by a Super-Majority in Interest of the Members. Each Member, at its own expense, shall have the right and power to examine and inspect, or cause to be examined and inspected, at any and all reasonable times, the books, records and accounts of the Company and any tax returns prepared for the Company prior to the filing of such returns.

8.3    <u>Books of Account</u> - The books of account for the Company shall be (a) maintained by a Member pursuant to the Member Management Agreement entered into pursuant to Section 5.4 on an accrual basis in accordance with GAAP and (b) audited annually by a certified public accountant, which shall be PricewaterhouseCoopers or other public accounting firm acceptable to the Lenders for so long as the Company is indebted to Lenders pursuant to the Financing Agreements and, thereafter, such other public accounting firm agreed to by a vote of the Super-Majority in Interest of the Members. A copy of the annual audit shall be provided to all Members. An individual Member may request the auditor to provide it any additional reports that such Member may want generated for its own account and at its own cost.

8.4    <u>Financial Statements and Reports</u> - As soon as practicable following the end of each Fiscal Year and in any event within the time specified below or such other times as may be required by the Lenders, the Company shall cause the Member with responsibilities pursuant to the Member Management Agreements pursuant to Section 5.4, to prepare and deliver to each Member:

   (a)    Within forty-five (45) days following the end of each calendar quarter in each Fiscal Year, a report containing information regarding changes to the Capital Accounts of each Member during such Fiscal Year, including (i) the amount of Capital Contributions credited to each Member's Capital Account during such quarter, (ii) any distributions received by a Member during such quarter, and (iii) any items, such as income or loss from the Company's activities, allocated to each Member's Capital Account during such quarter;

   (b)    Within sixty (60) days following the end of such Fiscal Year (or such later time as the Members shall permit), a report containing information regarding changes to the Capital Account of each Member during such Fiscal Year, including (i) the amount of Capital Contributions credited to each Member's Capital Account during such Fiscal Year, (ii) any distributions received by a Member during such Fiscal Year under this Agreement, and (iii) any items, such as income or loss from the Company's activities, allocated to each Member's Capital Account during such Fiscal Year under this Agreement; and

   (c)    Such other reports and information reasonably requested by any Member having a Ownership Interest of 5% or more for the period prior to the Flip Point or 10% or more for the period on and after the Flip Point.

8.5    <u>Taxation</u>

BUSDOCS:728102.1

or liability arising therefrom.

8.6   Tax Returns - The Tax Matters Member shall prepare and file such federal and state partnership income tax returns and reports as may be required to report the operations of the Company. The Tax Matters Member shall use its best efforts in the preparation and filing of such returns; provided, however, that in so doing it shall incur no liability to any Member with regard to such returns in the absence of fraud, gross negligence or willful misconduct. The Tax Matters Member may, in addition to its own tax and accounting staffs and those of its affiliates, employ outside consultants to prepare such returns, the cost of which shall be borne by the Members in proportion to their Ownership Interests. The other Members shall cooperate with the Tax Matters Member in furnishing information necessary to prepare such returns and the Tax Matters Member shall provide the other Members with preliminary copies of such returns for review and approval in advance of their due date (as extended). A copy of all federal and state partnership income tax returns prepared and filed by the Tax Matters Member shall be provided to all Members.

8.7   Other Reports - The Member designated such responsibility pursuant to the Member Management Agreement entered into in accordance with Section 5.4 shall prepare and file all reports prescribed by any other commission or governmental agency having jurisdiction over the business or properties of the Company, the costs of which shall be paid by the Company.

8.8   Inspection of Records - Each Member shall have the right, individually at its own cost and expense, to audit the books and records of the Company; provided, however, the Members agree to coordinate any outside audits so that there will be no more than one such audit in any given Fiscal Year. Additionally, in the event that a governmental or regulatory authority having jurisdiction over a Member requires that such Member audit the Company's books, such Member shall be allowed to audit the Company's books to the extent required by such governmental or regulatory authority. In addition to the above, each Member shall have the right to inspect and copy at its own cost and expense, the books and records of the Company upon reasonable notice, during normal business hours.

8.9   Deposit and Withdrawal of Funds - Funds of the Company not needed, in the opinion of the Members, for the operation of the Company shall be deposited in a segregated account or accounts in the name of the Company that are maintained in one or more national or state banks or other depositories as shall be designated from time to time by the Company. Such funds may be withdrawn by properly authorized representatives as designated from time to time of the Members or pursuant to the Member Management Agreement entered into pursuant to Section 5.4. The Members shall not commingle funds of the Company with any other funds of the Members.

8.10   Record Retention - The Company shall cause all records that are required under this Agreement or under any other agreement entered into pursuant to this Agreement to be retained by the Company for such period of time as required by law, but in no event for less than seven (7) years.

8.11   Company Level Tax Audits - El Paso II is designated as the "Tax Matters Member" which shall have the same meaning as the "Tax Matters Partner" as defined in Section 6231(a)(7) of the Code. The general duties of the Tax Matters Member shall be to inform the other Members of all matters which shall come to its attention in its capacity as Tax Matters Member by giving the other Members notice thereof within 10 days after becoming so informed. In general, the Tax Matters Member shall not take any action contemplated by Sections 6221 through 6233 of the

22

(f)    The Tax Matters Member shall not enter into settlement negotiations with respect to the tax treatment of partnership items without first giving reasonable advance notice of such intended action (including any proposal for settlement) to the other Members. The Tax Matters Member shall not bind any other Member to a settlement agreement without obtaining the written concurrence of any such Member who would be bound by such agreement. Unless prohibited, any other Member who enters into a settlement agreement with the Internal Revenue Service or the Secretary of the Treasury with respect to any partnership items shall notify the other Members of such settlement agreement within ninety days from the date of settlement.

(g)    The Tax Matters Member shall have the right to engage legal counsel, certified public accountants, or other assistance without the prior written consent of a majority of the Members with respect to Company level tax audits and contests. Any reasonable item of expense with respect to such matters, including but not limited to fees and expenses for legal counsel, certified public accountants, and other experts which the Tax Matters Member incurs in connection with any Company level audit, assessment, litigation, or other proceedings regarding any "partnership item," shall be borne by the Company.

(h)    The provisions of this Section 8.11, including but not limited to the obligation to pay fees and expenses contained in Section 8.11(g), shall survive the termination of the Company and the termination of any Membership Interest and shall remain binding for a period of time necessary to resolve with the Internal Revenue Service or the Department of Treasury any and all matters regarding the federal income taxation of the Company for the applicable tax year.

(i)    The provisions of this Section 8.11 shall extend to other taxes measured by or computed with respect to income to the extent rules similar to Code Sections 6221 through 6223 are applicable to such taxes (including state and local taxes).

## ARTICLE IX
## TRANSFER OR PLEDGE OF OWNERSHIP INTERESTS

9.1    Transfers or Pledges Generally - Subject to Sections 9.2, 9.3 and 9.4 and any applicable provisions in the Financing Agreements, a Member may not sell, assign, pledge, hypothecate or otherwise transfer all or any part of its Units of Membership Interest or its interest this Agreement to any third party (including, without limitation, an assignment by operation of law), without the prior written consent of the other Members, which shall not be unreasonably withheld, conditioned or delayed. Notwithstanding anything to the contrary in this Agreement, it is expressly agreed that any Member may withhold its consent in its sole discretion with regard to any proposed sale, assignment or transfer of another Member's Unit of Membership Interest where the transferring Member proposes to sell, assign or transfer less than a ten percent (10%) Ownership Interest, except in the case of PDC prior to the Flip Point, less than all of its Units of Membership Interest.

9.2    Right of First Offer

(a)    Any Member (the "Transferring Member") that proposes to sell, transfer or assign all or part of its Membership Interest (the portion to be sold or otherwise disposed of referred to

24

entitled to do so (whether upon the other Members' failure to offer to purchase the entire Transferred Interest within 30 days of receipt of a Notice of Proposed Transfer or upon receipt of the last offer by the other Members), such sale shall once again be subject to the procedures set forth in this Section 9.2.

(d)    It is the intent of the Members that the procedures set forth in this Section 9.2 shall also apply to the issuance, sale or other transfer of the stock or other interest in any entity that, directly or indirectly, owns any Units of Membership Interest if such Units of Membership Interest comprise all or substantially all of the assets of such entity. In furtherance of such intent, the Members covenant to take whatever action may be necessary to cause this restriction to be incorporated into their respective constituent documents so as to be enforceable under applicable law and the Members agree that the transfer of shares in such an entity will constitute a transfer of the Units of Membership Interest for which the provisions of this Section shall apply. Notwithstanding any of the provisions of Sections 9.1 and 9.2 above, with regard to (i) transfers of stock or interests in PDC between existing members of PDC or their Affiliates as of the date of this Agreement or (ii) transfers of stock or interests in PDC to third parties that are not competitors of the Company or any of the other Members, PDC shall not be required to obtain the consent of the Members; provided that with regard to (ii) above, PDC shall be required to comply with the duty of first offer set forth in this Section 9.2

9.3    Permitted Transfers - Nothing in Sections 9.1 and 9.2 shall prevent, no consents or approvals of the other Members are required and no rights of first offers apply with regard to the following assignments or transfers:

(a)    an assignment by a Member of its Membership Interest in the Company to an Affiliate of such Member without the other Member's consent, provided that (i) the ultimate parent company of the assigning Member shall continue to own and control 50% or more of the outstanding securities of such Affiliate and (ii) the assigning Member remains personally obligated for its duties and obligations hereunder;

(b)    an assignment, pledge or other transfer creating a security interest to Lenders under the Financing Agreements or, to the extent not in conflict with the Financing Agreements, to any other financial institution or bona fide lender (and any transfer made in foreclosure or other enforcement of such security interest and admission in this Agreement) in all or any portion of a Member's right, title or interest in the Company for the purpose of securing indebtedness for borrowed money by the Company (and not to such Member); and

(c)    an assignment, sale or other transfer of up to 70% of the Membership Interest in the Company owned by El Paso I and/or El Paso II to a third party, subject to any required approvals of the Lenders pursuant to the Financing Agreements.

9.4    Requirements Applicable to All Dispositions and Admissions - In addition to the requirements set forth in Sections 9.1 and 9.2, the following documents must be delivered to the Members and must be satisfactory, in form and substance, to a Majority in Interest of the Members:

(a)    Ratification of this Agreement - An instrument, executed by the Transferring Member and its assignee, containing the assignee's ratification of this Agreement and its confirmation that the representations and warranties contained in this Agreement with

26

"LLC Interest Certificate") substantially in the form attached as Exhibit C, in the name of each Member certifying that the Member named therein is a Member of the Company pursuant to this Agreement. The LLC Interest Certificate shall also include as a part thereof, a form of assignment sufficient, subject to the terms of this Agreement, to effectuate a disposition of such Member's LLC Interest to an assignee. Each LLC Interest Certificate shall bear a legend in substantially the following form: "This certifies that, subject to adjustments as set forth in the Amended and Restated Limited Liability Company Agreement of Milford Power Company, LLC, dated as of _____ __, 1999, as amended, modified and supplemented from time to time (the "LLC Agreement"), _____ is the owner of a fully paid and non-assessable LLC Interest in the Company consisting of a ____% Membership Interest in connection therewith and certain other rights in the Company, all as set forth in the LLC Agreement. This LLC Interest Certificate, including the rights attendant thereto, shall be a security governed by Article 8 of the Uniform Commercial Code in any jurisdiction (a) that has adopted revisions to Article 8 of the Uniform Commercial Code substantially consistent with the 1994 revisions to Article 8 adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and (b) the laws of which may be applicable, from time to time, to the issues of perfection, the effect of perfection or non-perfection and the priority of a security interest in membership interests of the Company."

10.2 <u>Certificate Transfer Book and Members of Record</u> - The clerk of the Company (or, if none, the Chairman) shall maintain or cause to be maintained, among other records, a Unit transfer book containing certificates evidencing the Units of Membership Interest, the stubs in which shall set forth the names and addresses of the holders of all issued Units of Membership Interest of the Company, the number of Units of Membership Interest held by each such holder, the number of certificates representing such Membership Interest, the Ownership Interest held pursuant to each Member's Units of Membership Interest, the date of issue of such certificates, and whether or not such Membership Interest derives from original issue or transfer. The names and addresses of Members as they appear on the Unit transfer book shall be the official list of Members of record of the Company for all purposes except as otherwise provided in this Agreement. The Company shall keep record of Members at its registered office or principal place of business, or at the office of its transfer agent or registrar. The Company shall be entitled to treat the holder of record of any Units of Membership Interest as the owner thereof for all purposes, and shall not be bound to recognize any equitable or other claim to, or interest in, such Units of Membership Interest or any rights deriving from such Units of Membership Interest on the part of any other Person, including, but without limitation, a purchaser, assignee, or transferee, unless and until such other Person becomes the holder of record of such Units of Membership Interest, whether or not the Company shall have either actual or constructive notice of the interest of such other Person.

10.3 <u>Member's Change of Name or Address</u> - Each Member shall promptly notify the Members of the Company, at its principal business office, by written notice sent by certified mail, return receipt requested, of any change in name or address of the Member from that as it appears upon the official list of Members of record of the Company. The secretary of the Company (or, if none, the Chairman) shall enter such changes into all affected Company records, including, but not limited to, the official list of Members of record.

10.4 <u>Transfer of Membership Interests</u> - Units of Membership Interests represented by any certificate of the Company are transferable only on the books of the Company by the holder of record thereof or by his duly authorized attorney or legal representative upon surrender of the certificate for such Units of Membership Interest, properly endorsed or assigned. The Members may make

28

enters an order, judgment or decree appointing, without the consent of said Member, a receiver, custodian or a trustee for such Member, or for all or any part of its property, and such order, judgment or decree shall not be discharged or stayed, or (iii) either Member is otherwise adjudicated a bankrupt;

(c)    Immediately if any Member is ordered by the Securities Exchange Commission under the PUHCA to divest such Member's Units of Membership Interest;

(d)    At the election of any Member (an "Electing Member"), by giving written notice thereof to the other Member (the "Nonelecting Member") if (i) the interest of the Nonelecting Member in the Company is seized, attached or otherwise encumbered by a creditor of the Nonelecting Member and the same is not released from seizure or bonded out within 30 days from the date of notice of such seizure or (ii) El Paso II or its successors shall default in the performance of their obligations to make the Equity Contribution to the Company in accordance with Section 6.2(a), in which case El Paso II or its successors shall be deemed to be a Nonelecting Member.

11.3    Damages - The Members each agree not to voluntarily withdraw from the Company, except as permitted by this Agreement, including Section 11.9. If the Company is dissolved as a consequence of any such withdrawal, the Defaulting Member shall be in breach of this Agreement and shall be liable to each other Member for all damages such other Member may incur as a result thereof.

11.4    Date of Dissolution - The dissolution shall be effective on the day specified in Section 11.1 or the day on which notice of dissolution is given, whichever occurs first, but the Company shall not terminate until its affairs have been wound up and its assets distributed as provided in Section 11.6 or the Electing Member acquires the other Units of Membership Interest in the Company as provided in Section 11.2(d).

11.5    Control After Dissolution - The Electing Member, if the Company is dissolved under Section 11.2(d), or the Member not causing the dissolution if the Company is dissolved under Sections 11.2(a), 11.2(b) or 11.2(c) may either:

(a)    proceed with winding up and liquidating as provided in Sections 11.6 and 11.7, or

(b)    acquire the Units of Membership Interest held by the other Member as provided in Section 11.8

In any event, from the date of dissolution to the date of termination, the Member entitled to make the election under this Section (the "Liquidation Member") shall have sole control of the operations and assets of the Company.

11.6    Dissolution and Winding Up - After the date of dissolution contemplated by Section 11.4, and, if applicable, in the event the Liquidation Member elects to proceed with the winding up and liquidation of the Company as provided in Section 11.7, the Company shall not enter into any contract or undertake any business not then subject to contract or which is not related to the winding up of the Company. Upon dissolution and subsequent winding up, a proper accounting shall be made of the Company's assets, liabilities and operations from the date of the last previous accounting to the date of dissolution. The profits and losses realized subsequent to the date of

30

receive payment of such price.

11.9    Voluntary Withdrawal Rights

(a)    Right to Withdraw - Subject to the provisions of Article XI, a Member (in this Agreement called a "Withdrawing Member") shall have the right to withdraw from the Company at any time after the commencement of commercial operations of the Plant by ten days written notice to the other Members (in this Agreement called a "Withdrawal Notice"). The Withdrawing Member shall assign all its rights and interests in the Company to the remaining Members or their designees and the Withdrawing Member waives any and all rights that it might otherwise have had pursuant to the Act arising from its withdrawal from the Company.    The Withdrawing Member hereby irrevocably appoints the Company its attorney-in-fact, with full authority in its place and stead and its name or otherwise, to take any action and to execute any instrument which the Company may deem necessary or advisable to accomplish such assignment of the Withdrawing Member's rights and interests in the Company to the remaining Members or their designees.    Upon thirty days' prior written notice, the Company may terminate any contracts or agreements with the Withdrawing Member or any of its Affiliates, pursuant to which the Withdrawing Member or its Affiliates provide materials or services to the Company, and the Company shall have no further liability to the Withdrawing Member or its Affiliates under such contracts or agreements, other than the payment of any obligations incurred prior to the date of such termination.

(b)    Reimbursement Rights - In the event of such withdrawal, the Company shall retain all contributions theretofore made by the Withdrawing Member, and such Withdrawing Member shall pay its share of such further obligations and commitments that are due and payable at the time of the giving of the Withdrawal Notice including any obligations attributable to the work performed or actions taken by the Members or any Committee of the Company prior to the date of withdrawal including termination costs.

(c)    Indemnification of Withdrawing Member - The remaining Members shall indemnify and hold harmless the Withdrawing Member:

(i)    For all amounts due and payable in connection with the Company and its business after the date of withdrawal that were not incurred prior to the date of withdrawal; and

(ii)    For all amounts or damages arising out of activities of the non-withdrawing Members or the Company undertaken after the date of withdrawal.

**ARTICLE XII**
**LIMITATION OF LIABILITY AND INDEMNIFICATION**

12.1    Limitation of Liability - Neither the officers of the Company, the Members, nor their respective shareholders, officers, directors, agents, employees and representatives ("Member Representatives") shall be liable, responsible or accountable in damages or otherwise to the Company or to each other for any loss suffered by the other or by the Company arising out of any action or omission by such parties, so long as such action or omission (a) was in good faith, (b)

32

company duly organized, validly existing and in good standing under the laws of the state of its organization and has the requisite power and authority (i) to carry on its business as presently conducted and to own or hold under lease its properties, where the failure to have such power and authority would have a material adverse effect on its ability to perform its obligations under this Agreement, and (ii) to enter into and perform its obligations under this Agreement.

(b)  <u>Authorization</u> - The execution, delivery and performance by such Member of this Agreement have been duly authorized by all necessary action on the part of such Member. This Agreement has been duly authorized, executed and delivered by such Member and is a legal, valid and binding obligation of such Member, enforceable against such Member in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, liquidation, moratorium or similar laws affecting creditors' or lessors' rights generally and the application of general equitable principles may limit the availability of certain remedies.

(c)  <u>Effect of this Agreement</u> - Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby nor compliance by such Member with any of the provisions of this Agreement, will: (i) conflict with or result in a breach of any provision of the constituent documents of such Member; (ii) require the approval or consent of, or filing of registration with, any foreign, federal, state, local or other governmental or regulatory body or the approval or consent of any other Person the failure of which to make or obtain would have a material adverse effect on the ability of such Member to perform its obligations under this Agreement; (iii) violate any provision of any law or regulation or violate, breach or, with the giving of notice or passage of time, constitute an event of default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, agreement or other instrument or obligation to which such Member is a party, or by which it may be bound, which violation, breach or default (or right of termination, cancellation or acceleration) would have a material adverse effect on the ability of such Member to perform its obligations under this Agreement and the transactions contemplated hereby, except in the case of (ii) and (iii) as to which requisite waivers or consents have been obtained.

(d)  <u>Litigation</u> - There is no action, suit or proceeding pending or, to the knowledge of such Member, threatened against such Member which, if adversely determined could, individually or in the aggregate, materially and adversely affect the ability of such Member to perform its obligations under this Agreement.

(e)  <u>Regulation</u> - No Member nor any of its Affiliates is subject to regulation under (i) the ICA, as amended, or (ii) the PUHCA, as amended.

## ARTICLE XIV
## CONFIDENTIALITY OF COMPANY AFFAIRS

14.1  <u>Disclosure of Confidential Information</u> - Except as in this Agreement provided, each Member shall treat, and cause its Affiliates to treat, as confidential, and shall not disclose to any third party not authorized by the Members to receive confidential information, any confidential information

34

Settlement Agreement, this Agreement reflects the whole and entire agreement among the Members and their Affiliates with respect to the subject matter in this Agreement and supersedes all previous agreements and understandings among the Members and their Affiliates (including the Joint Development Agreement) and the Articles of Association of PDC – El Paso Milford LLC, and may be amended, restated or supplemented only by the written agreement of all Members.

15.2    <u>Notices</u> - Unless otherwise specifically provided in this Agreement, any written notice or other communication given pursuant to this Agreement shall be sufficiently delivered if delivered personally or mailed or if given by telegram, telex, telecopy or similar means of visual data transmission:

(a)    to each of the Members at the address set forth below or at such other address as may be designated from time to time by the Member by written notice to each other Member and to the Company:

if to El Paso I:

El Paso Milford Power I Company
1001 Louisiana Street
Houston, Texas  77002
Telephone: 713-420-6234
Facsimile:  713-420-5487
Attention: Director of Finance & Planning

if to El Paso II:

El Paso Milford Power II Company
1001 Louisiana Street
Houston, Texas  77002
Telephone: 713-420-6234
Facsimile:  713-420-5487
Attention: Director of Finance & Planning

if to PDC:

PDC Milford Power LLC
c/o Power Development Company, LLC
200 High Street, 5th Floor
Boston, Massachusetts 02110
Telephone: 617-747-9100
Facsimile: 617-747-9101
Attention: Michael J. Armitage
          Kevin P. Joyce

with a copy to:

Rubin and Rudman LLP
50 Rowes Wharf

36

BUSDOCS:728102.1

authorities and, in the event of conflict, such laws, rules, orders and regulations of governmental authorities shall control.

15.7    Force Majeure - If either Member is rendered unable, wholly or in part, by force majeure to carry out its obligations under this Agreement, other than the obligation to make money payments, the obligations of such Member, so far as they are affected by such force majeure, shall be suspended during the continuance of such force majeure.  The term "force majeure," as used in this Agreement, shall mean an act of God (which does not include a Year 2000 compliance matter), strike, lockout, or other industrial disturbance, act of public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental restraint, unavailability of equipment or supplies and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of such Member.  The requirement that any force majeure shall not be reasonably within the control of such Member shall not require settlement of strikes, lockouts, or other labor difficulty by such Member, contrary to its wishes; and all such difficulties shall be handled entirely at the discretion of such Member.

15.8    Notice of Litigation - Either Member that becomes aware of any litigation pending against the Company shall give timely notice of such to the Company and the other Member.  Additionally, any Member against which any litigation is filed in its capacity as a Member shall give the other Member and the Company timely notice of such litigation.

15.9    Severability - Any provision of this Agreement prohibited by applicable law shall be invalid to the extent of such prohibition and severed from this Agreement unless it is determined by the Members by unanimous vote that such prohibition invalidates the purpose or intent of this Agreement, in which case the Company shall be dissolved and its business and affairs wound up, liquidated and terminated.

15.10   Third-Party Beneficiaries - The representations, warranties, covenants and obligations of the Members are made for the express benefit of the Members, and parties that are not express signatories to this Agreement are not intended to have, nor shall have, the benefit of, or any right to seek enforcement or recovery under, any of such covenants or obligations.

BUSDOCS:728102.1

15.11 <u>Remedies</u> - All rights and remedies under this Agreement are cumulative and in addition to other rights or remedies under this Agreement or any applicable law.

15.12 <u>Nonwaiver of Rights</u> - The failure of either Member to enforce any provision of this Agreement or right granted hereby shall not in any way be construed to be a waiver of such provision or right, nor in any way affect the validity of this Agreement or any part thereof, or limit, prevent or impair the right of either Member subsequently to enforce such provisions or exercise such right in accordance with its terms.

**IN WITNESS WHEREOF,** the Members have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**EL PASO MILFORD POWER I COMPANY**

By: _____
Title: Senior Vice President
Randolph L. Wu

**EL PASO MILFORD POWER II COMPANY**

By: _____
Title: Senior Vice President
Randolph L. Wu

**PDC MILFORD POWER, LLC**

By: _____
Title: Manager
Michael J. Armitage

## NOTICE OF DISPOSITION OF COLLATERAL

## BY OVERNIGHT COURIER AND FACSIMILE

TO:     PDC Milford Power LLC
200 High Street
5th Floor
Boston, Massachusetts 02110
Attention: Michael Armitage,
  Manager and Kevin Joyce

-and-

c/o PDC, LLC
12727 Kimberly Lane, Suite 303
Houston, Texas 77024
Attention: Douglas Gorbett,
  Vice President and General
  Manager

-and-

c/o Power Development Company
1900 West Loop South
Houston, Texas 11027
Attention: Mr. Douglas Corbert

-and-

Milford Power Company, LLC
55 Shelland Street
Milford, Connecticut 06460
Attention: General Manager

-and-

200 High Street, 5th Floor
Boston. Massachusetts 02110
Attention: Michael Armitage

El Paso Milford Power I Company,
  LLC
1001 Louisiana Street
Houston, Texas 77002
Attention: Director – Treasury

El Paso Merchant Energy North
  America
1001 Louisiana Street
Houston, Texas 77002

El Paso Gas Market Company
c/o El Paso Energy Corporation
1001 Louisiana Street
Houston, Texas 77002

Transalta Usa Inc.
913 Big Hanaford Road
Centralia, Washington 98531

Comptroller of Public Accounts
111 East 17th Street
Austin, Texas 78774-0100

Milford Holding, LLC
c/o CPV Milford Management, LLC
8403 Colesville Road, Suite 915
Silver Spring, Maryland 20910
Attention: Douglas F. Egan

FROM:   KBC Bank N.V., New York
  Branch, as collateral agent
125 West 55th Street
New York, New York 10019
212-541-0612

NY1:\1235295\01\QH5R01!.DOC\66032.0003

Yours faithfully,

KBC BANK N.V., NEW YORK BRANCH,
as Collateral Agent

By: _____
        Name:       SUSAN M. SILVER
        Title:       VICE PRESIDENT
                     & TEAM LEADER

By: _____
        Name:       WIM VERBRAEKEN
        Title:       HEAD OF PROJECT FINANCE
                     THE AMERICAS

cc:

El Paso Corporation
100 Louisiana Street
Houston, TX 77002
Attention: Director-Treasury