# EXHIBIT 3

1

Volume I
Pages 1 to 53

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Eastern Division)

- - - - - - - - - - - - - - - -x
                                    :   Chapter 11
 In re:                             :
    PDC MILFORD POWER, LLC,         :   Case No.
              Debtor.               :   04-11521(WCH)
                                    :
- - - - - - - - - - - - - - - -x


PRESENT:

    Office of the U.S. Trustee
         (By Paula Bachtell, Esq.)
         10 Causeway Street, Boston, MA 02222.

    Rubin and Rudman, LLP
         (By Jay F. Theise, Esq., Stephen
         DeLisle, Esq. and Gary Crossen, Esq.)
         50 Rowes Wharf, Boston, MA 02110,
         for the Debtor.

    Weil, Gotshal & Manges, LLP
         (By Danielle Krause, Esq.)
         100 Federal Street, Boston, MA 02110,
         for the creditor KBC Bank.


              Held at:
         Tip O'Neil Federal Building
            10 Causeway Street
            Boston, MA 02222
            March 31, 2004

    (Transcription of hearing tape by Laura E.
    Antoniotti, Registered Professional Reporter)

              *  *  *  *  *

2

```
1                    P R O C E E D I N G S
2           MS. BACHTELL:  This is the 341 meeting in
3    Case Number 04-11521(WCH), PDC Milford Power, LLC.
4    My name is Paula Bachtell.  I will be conducting
5    this meeting on behalf of the United States Trustee,
6    and I'd like to start by asking the parties present
7    to identify themselves for the record.  Go ahead,
8    sir.
9           MR. CORBETT:  My name is Douglas Corbett,
10   and I am the manager of the debtor.
11          MS. BACHTELL:  Manager, okay.  Go ahead.
12          MR. THEISE:  Good afternoon.  My name is
13   Jay Theise, T-h-e-i-s-e.  I'm counsel for the debtor
14   with my colleague Attorney Stephen DeLisle,
15   D-e-L-i-s-l-e.
16          MS. BACHTELL:  Thank you.  And Danielle?
17          MS. KRAUSE:  Danielle Krause representing
18   the creditor KBC Bank.
19          MS. BACHTELL:  KBC Bank.  Okay.
20   Mr. Corbett, would you raise your right hand,
21   please.  Do you swear or affirm to tell the truth?
22          MR. CORBETT:  I do.
23          MS. BACHTELL:  Okay.  And I'd ask you to
24   speak up because we're taping this session.
```

3

1    Mr. Corbett, could you tell me a little bit about

2    the nature of the debtor's business?

3           MR. CORBETT:  The debtor owns 5 percent of

4    a company that owns a power plant in southwestern

5    Connecticut, specifically in Milford, Connecticut.

6    The ownership of that 5 percent interest, which is a

7    membership interest in an LLC --

8           MS. BACHTELL:  What's the name of the

9    entity that it owns a 5 percent interest in?

10          MR. CORBETT:  Milford Power Company, LLC.

11          MS. BACHTELL:  Okay.  If there's a flow

12   chart or a way for me to understand the ownership

13   interests, that would be fabulous.

14          MR. THEISE:  Can we go off the record a

15   second and I'll just go over this?

16          MS. BACHTELL:  Yes.

17          (Discussion off the record)

18          MS. BACHTELL:  Okay.  We're back on the

19   record.  What we're going to do is take a moment for

20   Attorney Theise to explain a little bit about the

21   chain of ownership of the entities owned by the

22   debtor and also the entities which own the debtor.

23          MR. THEISE:  That's correct.  Thank you

24   very much.

4

1        MS. BACHTELL:  Okay.  Go ahead.

2        MR. THEISE:  The debtor in this case, PDC

3   Milford Power, itself a limited liability

4   corporation, a Massachusetts limited liability

5   corporation, owns a 5 percent membership interest in

6   another limited liability corporation which is an

7   operating or operational power plant fully built and

8   completed in Milford, Connecticut.

9        MS. BACHTELL:  Is it operating?

10        (Pause)

11        MS. BACHTELL:  Hi, do you want to sign in?

12   Can you do that for me, please?  Welcome.

13        MR. THEISE:  My colleague, Gary Crossen.

14        MS. BACHTELL:  Oh, another colleague.

15   Okay.  I wasn't sure if he was the creditor.

16        MR. THEISE:  Mr. Crossen is the chief

17   litigation counsel in connection with the adversary

18   proceeding that you acknowledged a minute ago.

19        MS. BACHTELL:  Okay.  Anyway...

20        MR. CORBETT:  I do not know whether the

21   plant is operating -- it is operational, but there

22   is some additional work that we had heard was going

23   to be done this spring with a target of going

24   operational -- fully operating by June 1st.  I don't

5

1   know where those plans are.

2          MS. BACHTELL:  Is that because you're not

3   involved in the --

4          MR. CORBETT:  That's correct.

5          MS. BACHTELL:  -- daily operations of

6   Milford Power Company, LLC?

7          MR. CORBETT:  That is correct.

8          MS. BACHTELL:  How are you involved with

9   the debtor and the entity in which the debtor owns a

10  5 percent interest, membership interest?

11         MR. THEISE:  How is Mr. Corbett

12  specifically involved?  Mr. Corbett is the manager

13  of the debtor.

14         MS. BACHTELL:  And what does that really

15  mean on a day-to-day basis?

16         MR. CORBETT:  You answer the what-ifs.  You

17  pay attention to what's going on.

18         MS. BACHTELL:  What's going on?

19         MR. CORBETT:  Well --

20         MR. THEISE:  That's what brought us here.

21  What's going on --

22         MR. CORBETT:  Oh, well, yes.  In that

23  particular sense?

24         MR. THEISE:  To return to the flow chart

6

1  which is in fact --

2          MS. BACHTELL:  Going to lead into that

3  conversation?

4          MR. THEISE:  -- related to that exact

5  conversation, that's correct.  Just to finish the --

6          MS. BACHTELL:  The flow chart, yes.

7          MR. THEISE:  -- flow chart, the debtor owns

8  a 5 percent membership interest in a virtually

9  complete power plant in Milford, Connecticut.

10         MS. BACHTELL:  Thank you.

11         MR. THEISE:  Itself owned -- itself an LLC.

12  The debtor is in turn owned by a 1 percent

13  individual member and a 99 percent member LLP.

14         MS. BACHTELL:  And they are?

15         MR. THEISE:  The 1 percent owner is

16  Mr. Michael Armitage.  The 99 percent membership

17  owner of the debtor is Power Development Company,

18  LLC.

19         I'm going to refer to Milford -- PDC

20  Milford Power, LLC as the debtor for simplicity now.

21  And to put it in very simple terms, the debtor is a

22  part owner of an operating company, and the debtor

23  in essence exists to own that partial interest in

24  the operating company.

7

1          And it came to that partial interest

2    because of significant contributions that it made to

3    the overall structuring and initial movement which

4    culminated in the construction of the operating

5    company.

6          MS. BACHTELL:  What did the debtor do?

7          MR. THEISE:  At that particular time?

8          MR. CORBETT:  We're a development company,

9    and we provided the expertise in terms of the

10    permitting and we located the site.

11          MS. BACHTELL:  Does the debtor have

12    employees?

13          MR. CORBETT:  No.

14          MS. BACHTELL:  How does all this

15    (inaudible)?

16          MR. CORBETT:  Well, let's back up.  The

17    parent had employees at the time.

18          MS. BACHTELL:  The parent meaning the

19    debtor?

20          MR. CORBETT:  The parent of the debtor.

21          MR. THEISE:  No, the 99 percent --

22          MS. BACHTELL:  The parent of the debtor?

23          MR. THEISE:  -- member of the debtor.

24          MS. BACHTELL:  Okay.  I think we should go

8

1    back to the flow chart and finish up who all of the

2    others are and then start with the beginnings of the

3    debtor and go from there.

4           MR. THEISE:  Let me say that in the

5    vernacular, in its simplest form, the debtor qua

6    entity exists to own an interest in the operating

7    company.

8           It was awarded as a result of the activity

9    that took place not in the debtor, per se, but in a

10   parent of the debtor which because of its expertise

11   was able to provide for the formation of the

12   operating company --

13          MS. BACHTELL:  Is that this parent?

14          MR. THEISE:  Correct.

15          MS. BACHTELL:  Power Development Company?

16          MR. THEISE:  -- was awarded 5 percent in

17   essence for those efforts, but that 5 percent is and

18   always has been booked in the debtor company.

19          Now I don't intend that to be a legal

20   characterization of how this came to occur or to be

21   without -- to be with prejudice to a different

22   scenario of how it finally came to be that this is

23   where the 5 percent reposes, but in essence the

24   debtor is a holding company.  It lives to hold an

9

1    interest in a power plant.

2            MS. BACHTELL:  Can we just back up and you

3    can explain to me who all the parents of the --

4            MR. THEISE:  Well, I don't know that

5    they're relevant to the discussion but --

6            MS. BACHTELL:  I'd like to know.

7            MR. THEISE:  My pleasure.  The 99 percent

8    LLC, that is to say the 99 percent member of the

9    debtor LLC --

10           MS. BACHTELL:  Power Development Company,

11   LLC?

12           MR. THEISE:  Um-hmm.

13           MS. BACHTELL:  Is --

14           MR. THEISE:  In fact owned by a group of

15   entities and/or individual which collectively own

16   100 percent of it.

17           MS. BACHTELL:  Okay.  And how many are

18   there?

19           MR. THEISE:  There are one, two, three,

20   four, five, six, seven, eight, nine, ten, eleven,

21   twelve --

22           MS. BACHTELL:  Twelve members.

23           MR. THEISE:  -- individuals and/or entities

24   that are members of the 99 percent member.

10

1          MS. BACHTELL:  Okay.  And can we just go

2    through them and you can give me the percentages?

3          MR. THEISE:  Of course.

4          MS. BACHTELL:  One.

5          MR. THEISE:  Mr. Michael Armitage.

6          MS. BACHTELL:  Can you spell his name.

7          MR. THEISE:  A-r-m-i-t-a-g-e.

8          MS. BACHTELL:  Yes.  Percentage?

9          MR. THEISE:  Owns 24 percent of the 99

10   percent member.

11         MS. BACHTELL:  Yes.  Two.

12         MR. THEISE:  The DeTore, D-e-T-o-r-e,

13   Family Trust owns 22 percent.  And that one you

14   ought to star because it's in essence the underlying

15   subject of the Weil Gotshal's motion to disqualify

16   us.

17         MS. BACHTELL:  And this is so far removed

18   that it's not in the statement of financial affairs.

19   I'm not asking you to --

20         MR. THEISE:  That's correct.

21         MS. BACHTELL:  -- repeat anything you've

22   already done.

23         MR. THEISE:  That's correct.

24         MS. BACHTELL:  Okay.  Then let's go through

11

1    this.

2            MR. THEISE:  We think this is both removed

3    and not required by the information required by the

4    forms.

5            MS. BACHTELL:  Okay.  I just wanted to

6    know.

7            MR. THEISE:  Douglas Corbett, who is

8    sitting to my right, in his individual capacity owns

9    14 percent.

10           MS. BACHTELL:  Yes.

11           MR. THEISE:  In order of descending

12   magnitude, the next owner is Z, that is the letter

13   Z, Electric LLC owns 13 percent.  10 percent is

14   owned by V. Kathleen with a "K," Kroboth also with a

15   "K," K-r-o-b-a-t-h, Irrevocable Trust.

16           MR. CORBETT:  b-o.

17           MR. THEISE:  I'm sorry?

18           MR. CORBETT:  b-o-t-h.

19           MR. THEISE:  K-r-o-b-o-t-h.  Thank you.

20           MS. BACHTELL:  Irrevocable Trust, yes.

21           MR. THEISE:  Correct.

22           MS. BACHTELL:  Um-hmm.

23           MR. THEISE:  Michael Zarin, Z-a-r-i-n, 6

24   percent.  Thomas Atkins, A-t-k-i-n-s, 5 percent.

12

1    Ron Melbye, M-e-l-b-e, 2 percent.

2            MR. CORBETT:  b-y-e.

3            MR. THEISE:  I'm sorry.

4            MR. CORBETT:  We have tricky spellings in

5    our group.

6            MR. THEISE:  That's b-y-e.  Dennis Murphy,

7    M-u-r-p-h-y, owns 1 percent.

8            MS. BACHTELL:  Yes.

9            MR. THEISE:  And then the following three

10   trusts each own 1 percent.  They are The 1997 Dina,

11   D-i-n-a, Barbara Zarin Porter Trust.  The next trust

12   is The -- I can't read my own writing.

13           MR. CORBETT:  The 1997.

14           MR. THEISE:  The 1997 Cynthia Rebecca Zarin

15   Trust.  And the final 1 percent is owned by The

16   Daniel Jacob Zarin Trust.

17           MS. BACHTELL:  They're all related to

18   Michael Zarin?

19           MR. THEISE:  I don't know, but I presume

20   they are.

21           MS. BACHTELL:  Are you connected in any way

22   to any of the other members of this entity other

23   than through business ventures?

24           MR. CORBETT:  No, ma'am.  I have no

13

1    ownership interest or interest in any of these

2    trusts.

3            MS. BACHTELL:  Okay.  How about any of the

4    other members?

5            MR. THEISE:  I can specifically tell you

6    that I asked Mr. DeTore because I knew it would

7    become an issue in relation to the Weil Gotshal's

8    motion, and he answered that he is not related in

9    any fashion or controls in any fashion any of the

10   other interests in this limited -- in this LLC.

11           MS. BACHTELL:  And you're not related to

12   any of the other people that were just identified?

13           MR. CORBETT:  I am not.

14           MS. BACHTELL:  Okay. All right.  So that's

15   the chain of ownership.  Does it end there?

16           MR. THEISE:  To my knowledge it does.  I

17   mean obviously there are entities here that must be

18   owned by somebody --

19           MS. BACHTELL:  Right.

20           MR. THEISE:  -- also.

21           MS. BACHTELL:  But that's all the

22   information you have for me today.

23           MR. THEISE:  That is correct.

24           MS. BACHTELL:  Okay.

14

1        MR. THEISE:  And that's all of the

2   generations of immediacy I think in relation to who

3   controls the decisions.

4        MS. BACHTELL:  Okay.  So when was this

5   organizational structure facilitated?  When did this

6   all begin?

7        MR. CORBETT:  The particular structure that

8   we have here was set up at the time or coincident

9   with the closing of the construction loan financing

10  of the Milford Power plant.

11       MS. BACHTELL:  And when was that, sir?

12       MR. CORBETT:  The closing occurred in 1999

13  though the first efforts towards closing occurred in

14  the fourth quarter of 1998, so we show the LLC --

15  the debtor being formed in 1998, but the first pass

16  you might say at financial closing, we were not able

17  to do it in 1998 and not able to complete that until

18  March of 1999.

19       MS. BACHTELL:  Okay.  So what's happened

20  since 1999?

21       MR. CORBETT:  The beginning of 1999, the

22  Milford Power Company which is the --

23       MR. THEISE:  Operating company.

24       MR. CORBETT:  -- the operating company.

15

1          MS. BACHTELL:  The operational power plant

2     in Milford, Connecticut.

3          MR. CORBETT:  Right, the one that we --

4          MS. BACHTELL:  It may not be operating.

5          MR. CORBETT:  The company that we own 5

6     percent of commenced the construction of the

7     Milford -- of the plant, the power plant, a nominal

8     570 -- excuse me, 540 megawatt facility in Milford,

9     Connecticut, and it began drawing down on its

10    construction loan.

11         MS. BACHTELL:  How much was the total

12    balance on the construction loan?

13         MR. CORBETT:  The total commitment on that

14    loan was going to be -- it came in a couple of

15    pieces but around $270 million plus I believe there

16    was an equity bridge loan.  The total cost of the

17    project was estimated at closing to be $350 million.

18         MS. BACHTELL:  Okay.  So the construction

19    began in 1999 of the 540 megawatt facility.

20         MR. CORBETT:  Right.  And draw-downs on the

21    construction loan commenced to pay the contractor as

22    the work proceeded.  There were -- there was an

23    industrial accident on the site, and there were some

24    very serious problems.

16

1        MS. BACHTELL:  What kind of industrial

2   accident?

3        MR. CORBETT:  A structure called the heat

4   recovery steam generator, HRSG, collapsed when

5   sufficient care was not taken and two people were

6   killed and several were very seriously injured.

7        MS. BACHTELL:  Okay.  When was that, sir?

8        MR. CORBETT:  I believe that was a year

9   later.  I think that was in the spring of 2000 that

10  that occurred.

11       MS. BACHTELL:  Okay.  Significant setback.

12       MR. CORBETT:  Yes, a significant setback.

13  Obviously for the human beings we're not talking

14  setbacks here, we're talking catastrophe.  So that

15  began -- created a scheduling problem in the

16  business sense of the word, and I have to emphasize

17  we're now talking business and I don't mean to

18  suggest that the human cost --

19       MS. BACHTELL:  No, it was a terrible

20  tragedy and significant setback.

21       MR. CORBETT:  But now we're talking on the

22  business side that led us to this particular

23  meeting.  The schedule was therefore set out of

24  kilter.  People had to come in and investigate the

17

1    nature of the accident and of course the structure

2    had to be rebuilt to the point at which it had

3    collapsed and that started.

4            In addition to that, substantial problems

5    began to arise in the equipment itself that was

6    being supplied and the fabrication of the equipment.

7    Questions began to arise with the fabrication,

8    whether it was being done correctly.

9            MS. BACHTELL:  Construction equipment or

10   the equipment that needed to be installed in the

11   facility?

12           MR. CORBETT:  The power plant itself.  The

13   power plant itself.  There was questions about

14   whether the headers on the HRSG had been designed

15   correctly and had been put in place correctly.  And

16   so you come to -- all right.  So let's stop and I

17   should --

18           MS. BACHTELL:  Is it unique equipment?

19           MR. CORBETT:  The HRSG is fabricated on

20   site and should not be all that unique because

21   there's a standard design to these power plants.

22   The turbines, the gas turbines that are the first

23   stage of generation at the plant are a manufactured

24   item and are standardized by the manufacturer.

18

1          MS. BACHTELL:  Okay.

2          MR. CORBETT:  So the original contract

3     called for the construction to be complete within

4     two years, and it had a requirement in the loan that

5     it be done within two years and six months.  There

6     was you might call it a grace period for the

7     construction loan before you converted --

8          MS. BACHTELL:  To a --

9          MR. CORBETT:  Permanent loan.

10         MS. BACHTELL:  Permanent loan, yes.

11         MR. CORBETT:  And that would have been a

12    long-term finance.

13         MS. BACHTELL:  Okay.

14         MR. CORBETT:  That sort of thing.  All

15    right.  As we got into the year 2001, the

16    constructor was never able --

17         ·  (Sneeze)

18         MS. BACHTELL:  Bless you.

19         MR. CORBETT:  -- to get back on schedule,

20    and by the time you get to 2001, you start to get

21    disputes between the person who is managing the

22    project, which was the 95 percent owner -- previous

23    owner, El Paso Corporation, a subsidiary of --

24         MS. BACHTELL:  I'm sorry.  I missed that.

19

1    El Paso is the previous owner of --

2            MR. CORBETT:  The 95 percent interest.

3            MR. THEISE:  Previous to the entities

4    that --

5            MS. BACHTELL:  Power Development Company,

6    LLC?

7            MR. THEISE:  No, previous to the entities

8    that the bank secured creditor now is the owner of.

9            MR. CORBETT:  Here is your 5 percent.

10   Where is your 95 percent line?

11           MS. BACHTELL:  Here is my 95 percent owner

12   of the Milford Power Plant.

13           MR. CORBETT:  Right.  That outfit used to

14   be owned by El Paso Corporation of Houston.

15           MS. BACHTELL:  Okay.

16           MR. THEISE:  But now by KBC Bank.  I'm

17   compressing, but that's in essence correct.

18           MS. BACHTELL:  What did you say it was?  El

19   Paso --

20           MR. CORBETT:  Energy Corp., subsidiaries of

21   El Paso Energy Corp.

22           MS. BACHTELL:  Okay.  Go ahead.

23           MR. CORBETT:  And so there -- a set of

24   interactions began involving the lenders and El Paso

20

1    and the contractor and things then started from

2    PDC's point of view going seriously off the rails

3    and essentially --

4              MR. THEISE:  The debtor.

5              MR. CORBETT:  The debtor's point of view

6    went off the rails and progress became very slow,

7    maybe even non-existent and --

8              MS. BACHTELL:  At what stage of

9    construction were we -- were you?

10             MR. CORBETT:  Well, that was the matter of

11   a subject of a lot of litigation because the

12   contractor repeatedly told us that we were 85

13   percent done or 90 percent done or 94 percent done

14   and then when you said well, okay, we're two years

15   into it and we're 94 percent done.  I guess in a

16   couple of months this thing ought to be ready.

17   Maybe a year and that sort of -- and in essence --

18   well, not in essence --

19             MS. BACHTELL:  So there was litigation?

20             MR. CORBETT:  Big litigation ensued because

21   the EPC contract which you know dovetailed with the

22   loan --

23             MS. BACHTELL:  The EPC?

24             MR. CORBETT:  Engineering procure and

21

1   construct --

2         MS. BACHTELL:  Um-hmm.

3         MR. CORBETT:  -- contract was set up to

4   track the loan.  It's supposed to be done in two

5   years and if they hadn't done it in 30 months, we

6   had the right to throw them off the job.

7         MS. BACHTELL:  Okay.

8         MR. CORBETT:  As we get into the -- and I

9   was not the manager, so I'm not exactly sure about

10  this, but the lenders began to be concerned about

11  the rate of progress.  The lender stopped advancing

12  money at approximately $226 million.

13        MS. BACHTELL:  They stopped?

14        MR. CORBETT:  They stopped advancing money.

15        MS. BACHTELL:  And what time was that, what

16  date?

17        MR. CORBETT:  I think around -- it would be

18  in the 2001 time frame.

19        MS. BACHTELL:  Excuse me.

20        (Pause to change the tape)

21        MS. BACHTELL:  The lender stopped at $226

22  million?

23        MR. CORBETT:  That's correct.

24        MS. BACHTELL:  Okay.  Go ahead.

22

1          MR. CORBETT:  And they required El Paso to

2     put in the amount of equity that they were supposed

3     to put in at the conversion to a term loan which is

4     approximately $80 million, $78.75 million.

5          They said as we go forward because this

6     thing is falling so far behind schedule, we want

7     you, El Paso, to start putting your equity into this

8     project.

9          MS. BACHTELL:  And what?  After that

10    commitment was made by El Paso, the lender agreed to

11    continue to loan?

12         MR. CORBETT:  Well, the lender did not

13    declare the loan in default.

14         MS. BACHTELL:  Okay.

15         MR. CORBETT:  So --

16         MS. BACHTELL:  So in lieu of calling the

17    loan.

18         MR. CORBETT:  So the -- and --

19         MR. THEISE:  Well, we're not sure.  There's

20    a lot of issues yet to be determined --

21         MR. CORBETT:  To determine what's going on

22    there.

23         MR. THEISE:  -- in this case.  But in

24    essence that's one of the trails that we're very

23

1   interested in pursuing by the litigation.

2          MS. BACHTELL:  Okay.

3          MR. CORBETT:  And so we -- this was put in

4   place in the spring of 2001, in that time frame,

5   yes.  And so work continued, and El Paso funded the

6   continuing work that needed to be continued and the

7   expenditures that we needed to keep Milford Power

8   Company's permits and contractual rights in place

9   and that continued throughout the summer.

10          As we came up to the 30th of September, we

11  came up to a date on which the loans could be

12  declared to be in default, and a plan had to be put

13  in place for how to go forward.

14          And so a construction services management

15  agreement or something like that was entered into

16  and the lenders were on it and the project company

17  was on it, and essentially El Paso agreed to

18  continue funding that which was necessary to keep

19  the project going and in addition began to pay

20  interest and part of the obligations that the

21  Milford Power Company took on and began to pay were

22  interest and principal payments on the $226 million

23  as if it had been converted to the long-term debt.

24          MS. BACHTELL:  Who was the lender?

24

1          MR. CORBETT:  Well, that's KBC, et al., the
2     people listed --
3          MS. BACHTELL:  They were dealing with the
4     construction loan?
5          MR. THEISE:  That are a consortium.
6          MR. CORBETT:  And the agreement called
7     for -- after the construction loan period for that
8     to be converted into a permanent loan, long-term
9     loan, this being the language.
10          MS. BACHTELL:  Excuse me.  Oh, okay.
11          MR. THEISE:  I think that KBC is the --
12          MS. BACHTELL:  Is that the schedules?
13     That's the schedules you have in front of you where
14     that's listed?
15          MR. THEISE:  Yes, that's correct.
16          MR. CORBETT:  KBC acted as agent for the
17     group.
18          MS. BACHTELL:  Okay.  So what happened
19     then?
20          MR. CORBETT:  Well, so then the -- let's
21     see.  So now we're in the fall of 2001.
22          MS. BACHTELL:  Yes.
23          MR. CORBETT:  And we -- so then efforts
24     continued to correct the problems at Milford.  And

25

1    to give you an idea, there were discussions well,

2    does this agreement need to be six months long or

3    three months long, and inside the ownership

4    structure of the El Paso and debtor discussions, El

5    Paso said well, let's just make it a year, what the

6    heck; it being at that point in time inconceivable

7    to anybody that the plant would not be done by that

8    period.

9         And in fact the whole year went by and the

10   plant was not completed, and so we got all the way

11   around another year later and we get to September

12   30th of 2002 and the plant is not ready.

13        Now, we have reserved our rights with

14   respect to what happened in the year -- in that year

15   that we're talking about, and our understanding is

16   that in the agreement when El Paso finally left the

17   project --

18        MS. BACHTELL:  When did they leave the

19   project, sir?  When did they leave the project, El

20   Paso?

21        MR. CORBETT:  El Paso formally left the

22   project I guess in January of this year, December of

23   last year.  That's when all of the documentation was

24   finally done transferring their interest to the

26

1  lenders.

2      MS. BACHTELL:  Okay.  So there was another

3  year of disputes and activity and --

4      MR. CORBETT:  Or inactivity.

5      MS. BACHTELL:  -- efforts to get the plant

6  running.

7      MR. CORBETT:  Let's say that with respect

8  to what happened in the year from October I mean 1st

9  2001 to October 1st, 2002, part of the agreement in

10  which El Paso transferred its rights to the bank,

11  they got a release from any liability as far as the

12  lenders were concerned, and PDC has not been willing

13  to sign such a release because we are not satisfied

14  at this point of El Paso's discharge of its duties.

15      MS. BACHTELL:  Okay.  When did they

16  transfer their rights to KBC?

17      MR. CORBETT:  In the fourth quarter of 2003

18  followed by -- was when the documents were executed,

19  maybe even in September, but I don't think they were

20  final in terms of FERC approval until perhaps

21  January but maybe December.

22      MS. BACHTELL:  What happened between 9/02

23  and 10/03?

24      MR. CORBETT:  Well, a long, painful series

1    of negotiations began.  We were also at that time

2    trying to negotiate a settlement to the litigation

3    with the contractor/constructor, who was also -- who

4    was beginning to suffer financial embarrassment of

5    its own, and into this mix dropped another issue

6    that is a matter of some importance to the history

7    of the project.

8         One of the main credit supports that was

9    intended for the plant once it went operational was

10   an agreement that involved the El Paso companies

11   involving something called -- in the fuel supply,

12   they were going to be the fuel supplier and the

13   marketer of the output of the plant.

14        And there was in association with the fuel

15   contract what was called a fuel subordination

16   agreement in which El Paso had agreed to subordinate

17   the payment of a certain portion of each fuel bill

18   to the payment of senior debt and interest on that

19   debt.  The view of the lenders was that that was in

20   fact contingent equity.

21        MS. BACHTELL:  Contingent equity.  And the

22   lender is KBC?

23        MR. THEISE:  We use KBC to mean the entire

24   consortium of which KBC is to our knowledge the

28

1  agent.

2         MS. BACHTELL:  Okay.

3         MR. CORBETT:  And the amount of that

4  contingent equity was above $70 million, $72

5  million, something in that nature.  Now, the

6  agreement -- the base underlying fuel agreement and

7  therefore at least arguably the fuel subordination

8  agreement had a date that allowed El Paso to get out

9  of the agreement if the plant were not operational

10  by December 31st of the year 2002.

11         MS. BACHTELL:  Okay.

12         MR. CORBETT:  And that date, December 31,

13  2002, came and went without the plant being

14  operational, and though that date was extended by

15  mutual agreement several times, negotiations went

16  back and forth but finally in the first quarter of

17  2003, El Paso decided as a corporate matter that

18  they were going to start an exit from the power

19  industry, and they began specific negotiations with

20  the lenders for an exit from this project.

21         We were privy to the beginning of the

22  negotiations.  We were not privy to the end and have

23  not been provided with the final document that -- in

24  which transfer occurred.

29

1          MS. BACHTELL:  So is that the activity that

2     was engaged in during the year 2003?

3          MR. CORBETT:  Yes.  Now work on the plant

4     essentially came to a halt as the negotiations

5     ground down with the contractor and finally in the

6     summer of two --

7          MS. BACHTELL:  Who was the contractor?

8          MR. CORBETT:  Well, the company sued the

9     contractor for failure to live up to the contract.

10          MR. THEISE:  Not the debtor, the operating

11     company.

12          MS. BACHTELL:  The operating company --

13          MR. CORBETT:  Milford Power Company sued.

14          MS. BACHTELL:  Who was the contractor?

15          MR. CORBETT:  Well, it started out ABB and

16     with Blackenbeach (phonetically), and ABB sold its

17     turbine business to a company called Alstom,

18     A-l-s-t-o-m, a French heavy industry -- heavy

19     industrial firm.

20          MS. BACHTELL:  Each was identified as a

21     defendant in the suit?

22          MR. CORBETT:  Yes.

23          MS. BACHTELL:  Okay.  So the work on the

24     plant came to a halt because there was a pending

30

1   suit by Milford against the contractors and El Paso

2   had started to engage in an exit strategy?

3          MR. CORBETT:  Well, and there were a number

4   of factors that went into that.

5          MS. BACHTELL:  What was the debtor's role

6   during all of this?

7          MR. CORBETT:  Well, when we had a chance to

8   voice an opinion, we voiced our opinion but we had

9   no executive authority -- we were not the people who

10  were managing the construction.

11         MS. BACHTELL:  What did the debtor do

12  during this period of time?

13         MR. CORBETT:  Well, it attended some

14  meetings and in every forum that we were allowed, we

15  voiced our opinion.

16         MS. BACHTELL:  Okay.  But there was no

17  involvement in the day-to-day construction to the

18  extent it was ongoing anymore?

19         MR. CORBETT:  That's right.

20         MS. BACHTELL:  The strategies and the

21  litigation or the relationship with the lender or

22  the --

23         MR. CORBETT:  We had a right to voice our

24  opinion, but we were not the decisive voice.

1          MS. BACHTELL:  Okay.

2          MR. CORBETT:  Well, finally in the summer

3    of 2003 --

4          MS. BACHTELL:  May I ask one more question?

5          MR. CORBETT:  Sure.

6          MS. BACHTELL:  Who is "we"?  When you refer

7    to the debtor as "we," who is "we"?

8          MR. THEISE:  The debtor.

9          MR. CORBETT:  The debtor.

10         MR. THEISE:  Colloquialism.

11         MS. BACHTELL:  Okay.

12         MR. CORBETT:  Yes.  PDC was the parent --

13   it started out simply as individuals.  There were no

14   trusts at the beginning, and so it was a

15   collaborative effort so you get used to thinking --

16   I just did it again.  We thought of ourselves as

17   "we," not "it."

18         MS. BACHTELL:  Was it a group of people

19   similar to the twelve members of the --

20         MR. CORBETT:  Yes.

21         MS. BACHTELL:  -- Power Company

22   Development, LLC?

23         MR. CORBETT:  Yes.

24         MS. BACHTELL:  Okay.

32

1           MR. CORBETT:  So in 2003 in the summer,

2    there finally -- agreement to settle the litigation

3    with the contractor occurred, and so the efforts

4    then restarted to finish the plant and the lender --

5           MS. BACHTELL:  A different contractor, sir?

6           MR. CORBETT:  Same contractor.

7           MS. BACHTELL:  Okay.  Go on.

8           MR. CORBETT:  And the lender and El Paso

9    concluded their negotiations on El Paso's exit from

10   the project and El Paso exited.  The lenders took

11   over El Paso's interest and some of their roles,

12   specifically the management of the plant day to day.

13          The lenders filed with the Federal Energy

14   Regulatory Commission, commonly called FERC, to

15   authorize the transfer and ownership structure, and

16   that's why I was hesitating on exactly when the

17   transfer occurred because I do not recall when FERC

18   acted, whether it was late December or whether it

19   was January.  But by the winter, this past winter,

20   the transfer was complete and El Paso was out of the

21   project.

22          MS. BACHTELL:  Okay.  Transfer of ownership

23   interest El Paso to PDC consortium?

24          MR. CORBETT:  To the lenders, yes, to KBC.

33

1       MS. BACHTELL:  Oh, KBC.

2       MR. CORBETT:  And then -- all right.  So at

3   that point, Milford Power Company was owned 95

4   percent by an entity I believe called Milford

5   Holdings, and I can't remember whether it's company

6   or corporation, an LLC, which is KBC/the lenders, 5

7   percent by the debtor.

8       MS. BACHTELL:  Which is the current

9   membership structure?

10      MR. CORBETT:  Right.  And then KBC acting

11  in its -- purporting to act in its role as lender

12  foreclosed -- attempted to foreclose on our -- on

13  the debtor's 5 percent interest in the power plant.

14          And the debtor filed for bankruptcy

15  protection to stop the foreclosure and is filing a

16  suit to make that permanent.

17      MS. BACHTELL:  Okay.  A couple of quick

18  questions.  On Schedule B, Milford Power Company,

19  LLC, the 5 percent interest is listed with a value

20  of up to $10 million.

21      MR. THEISE:  Well, it could be --

22      MS. BACHTELL:  What's the basis for that?

23      MR. THEISE:  It could be more because

24  what's happened is that the regulatory environment

34

1   has changed.  And as of approximately June or July

2   next, there will be something called a capacity

3   payment that will become available to this plant and

4   others, but this plant particularly because it's in

5   a negative -- that's to say it's in a greater demand

6   in part of the northeast grid, power grid, than

7   there presently is capacity as I understand it.

8           I'm not a regulatory lawyer, but I've

9   consulted regulatory lawyers in our office.  The

10  result of this fee will be to fuse some --

11          MS. BACHTELL:  It will be a receipt for the

12  debtor -- no, a receipt for Milford to the extent

13  Milford is operating.

14          MR. THEISE:  No, it doesn't depend on

15  operating.  It depends on existence because it

16  has -- it's a capacity payment.  In other words,

17  it's -- in the vernacular, it's a reward for the

18  existence of the facility.

19          MS. BACHTELL:  Even if it's not doing

20  anything?

21          MR. THEISE:  Even if it's not doing

22  anything to contribute toward the power supply in

23  the northeast power grid in a critical area of this

24  that grid.  That calculation could be in the $30- to

35

1    $40 million range.

2          MS. BACHTELL:  Is it possible that the

3    value could be less than $10 million?

4          MR. THEISE:  No, I'm sorry.  I'm speaking

5    now of what the effect of --

6          MS. BACHTELL:  Of the upside.

7          MR. THEISE:  -- the regulation will be to

8    the plant.

9          MS. BACHTELL:  Potential upside of the

10   value.

11         MR. THEISE:  The potential upside of the

12   plant is then unknown but it could be enormous.

13         MS. BACHTELL:  I guess I'm wondering if --

14         MR. CORBETT:  Wait a minute.

15         MS. BACHTELL:  -- it could be less than $10

16   million, too, because I don't know enough about --

17         MR. CORBETT:  Right.  Let me -- I think

18   there may be some slight confusion.  The $30- or $40

19   million is not an upside valuation of the 5 percent

20   interest.

21         MS. BACHTELL:  No, it's a flow of money.

22         MR. CORBETT:  That is revenue to --

23         MS. BACHTELL:  Flow of monies into the

24   Milford Power Company, LLC.

36

1          MR. THEISE:  What we believe is that when

2     the operating company is valued at a capitalized

3     basis based on the stream of revenue that it should

4     produce as an operational plant --

5          MS. BACHTELL:  But is the stream of revenue

6     assured?

7          MR. THEISE:  Just to finish that sentence,

8     as augmented by the capacity fee, the value of that

9     plant should be quite significant.

10         MS. BACHTELL:  Is the capacity fee assured?

11         MR. THEISE:  As long as the regulatory

12    environment is funded, the answer is yes.

13         MS. BACHTELL:  Funded by?

14         MR. THEISE:  The federal government.

15         MS. BACHTELL:  Okay.

16         MR. THEISE:  Is that correct?

17         MR. CORBETT:  Well, let's -- you've asked a

18    tricky question.  What we're talking about is a

19    capacity payment that will be paid by location in

20    New England.

21         The location that we are in is a location

22    where you would expect -- now that locational price

23    will be set by an auction.  In most of New England,

24    that auction will produce fairly low results but

37

1  because of the capacity situation in southern

2  Connecticut, it is expected that the auction will

3  produce results at a cap.

4       The capacity payments are capped but

5  beginning June 1st, that cap will begin to increase,

6  and every year it will increase.  And so with the

7  current situation, we're expecting over the next

8  couple of years for those capacity revenues to

9  increase, and so that is the basis of there being

10  value to the plant.

11       MS. BACHTELL:  So first we need funding by

12  the federal government?

13        MR. CORBETT:  No, no, no.

14       MS. BACHTELL:  Capacity payments in

15  general?

16       MR. THEISE:  The capacity payments will be

17  paid by the electric consumers of New England.

18       MS. BACHTELL:  Okay.

19       MR. THEISE:  I misspoke about the payment.

20       MR. CORBETT:  But it is a plan which the

21  federal government has required New England to

22  institute, and it will be a plan that the federal

23  government oversees and will be in control of.

24       MS. BACHTELL:  And then there's an auction

38

1   with various locations throughout New England

2   receiving different sums of payment, and the

3   expectation is because of Milford's location that it

4   will receive the upward end of capacity payments?

5           MR. CORBETT:  That is correct.

6           MS. BACHTELL:  Okay.  I'm sorry.  Is there

7   anything else that you want to say about the

8   potential for an upward valuation of the 5 percent

9   interest?  To the extent there is one, it will be

10  because of these capacity payments that you expect

11  to occur beginning in June of '05?

12          MR. CORBETT:  That's correct.

13          MR. THEISE:  Yes, because that cash flow we

14  believe and the value of the plant from a

15  capitalized point of view will make the actual debt

16  if there still is any debt a serviceable debt and in

17  any event produce a significant equity in excess of

18  the debt.

19          MS. BACHTELL:  There's quite a bit of --

20  well, it's difficult for me to know about the extent

21  of the liabilities of this debtor.

22          MR. THEISE:  Yes, because --

23          MS. BACHTELL:  The word "unknown" is used

24  quite frequently.

39

1              MR. THEISE:  Say that again.

2              MS. BACHTELL:  The word "unknown" is used

3    quite frequently on the schedule.

4              MR. THEISE:  Well, the debtor only has one

5    debt that it's actually aware of and that's the --

6              MS. BACHTELL:  The El Paso obligation?

7              MR. THEISE:  -- El Paso obligation.

8              MS. BACHTELL:  Okay.

9              MR. THEISE:  And even that is subject to

10   some controversy because we don't know what occurred

11   between El Paso and KBC, but we think that what

12   occurred was a material breach of the obligations

13   that are under a series of documents which we are a

14   party to and that have materially enhanced our

15   liability.

16              We also believe and the lawsuit speaks to

17   this more poignantly than the schedules, the

18   statements that (inaudible) that if the results of

19   the lawsuit are as we believe them to be, it's

20   entirely possible that there is no more debt on the

21   operational company.

22              MS. BACHTELL:  Well, this lawsuit is

23   referenced by the other asset listed on Schedule B,

24   correct, which is claims for breach of fiduciary

40

1   duty and accounting, KBC Bank N.V. and other

2   lenders?

3        MR. THEISE:  Yes, that's true.  So our 5

4   percent -- if our 5 percent was only worth $1.37,

5   which it wouldn't be but just to use the extreme

6   example of where you --

7        MS. BACHTELL:  Which was my question to

8   you.  What's the likelihood that the $10 million

9   valuation is too high?

10       MR. THEISE:  I think it's the wrong

11  question with all due respect.

12       MS. BACHTELL:  That's okay.  Don't worry.

13       MR. THEISE:  Because the issue really is

14  whether or not there is any impingement of our

15  equity at all, and the answer would be if the

16  project was either debt free --

17       MS. BACHTELL:  Is there any equity?

18       MR. THEISE:  Is there something that the

19  lender had done that makes the debt no longer

20  enforceable or because the lender is no longer a

21  lender but in fact is a partner and/or even if there

22  was still enforceable debt, if there is a solvent

23  operational company with equity, that our equity,

24  our 5 percent, has value.

41

1          MS. BACHTELL:  Well, what are the debts of

2    the operational company?  I don't want to say

3    solvent because I don't know that it is.

4          MR. THEISE:  Well, we don't know that there

5    are any anymore, and that's one of the propositions

6    that the lawsuit is going to test.

7          MS. BACHTELL:  Okay.  Can you explain a

8    little bit about the lawsuit?

9          MR. THEISE:  Well, I invite my colleague,

10   Attorney Crossen, who is the principal litigation

11   counsel, to speak to that.

12         MS. BACHTELL:  Sure.  Speak up, please.

13   We're taping this session.

14         MR. CROSSEN:  You are Paula Bachtell, is

15   that right?

16         MS. BACHTELL:  That's correct, sir.

17         MR. CROSSEN:  Okay, fine.  The lawsuit that

18   we filed, Paula -- or Ms. Bachtell, excuse me.

19         MS. BACHTELL:  That's fine.  Paula is fine.

20         MR. CROSSEN:  -- is predicated in a variety

21   of different notions, if you will.  It appears first

22   off that the relationship between El Paso and the

23   lenders, let's say KBC as the agent for the lenders,

24   is a relationship that we are so in the dark to that

42

1   we do not know whether in fact the underlying

2   lending relationship has been satisfied.

3          We believe that it has in fact been

4   satisfied by the tender of the 95 percent interest

5   in the power plant.

6          MS. BACHTELL:  From El Paso to the KBC --

7          MR. CROSSEN:  Correct.  Correct.  And

8   therefore we believe that there is no basis for the

9   lenders to foreclose on the 5 percent pledged shared

10  of PDC, the debtor.  Secondly --

11         MS. BACHTELL:  And that was the reasoning

12  for foreclosure?  I should have asked that because I

13  want to --

14         MR. CROSSEN:  Yes.  Their theory of

15  foreclosure is that the loan is in default and that

16  the shares are pledged as one of the items of

17  collateral to guaranty payment on the loan.

18         MS. BACHTELL:  Okay.

19         MR. CROSSEN:  And our position on the

20  litigation is that in fact the loan has now been

21  satisfied by the 95 percent transaction for the El

22  Paso (inaudible).

23         MS. BACHTELL:  Okay.

24         MR. CROSSEN:  Furthermore, and I think this

43

1  is fairly clear at this point under breach of duty

2  law, once the lenders decided to become, if you

3  will, partners by taking the 95 percent interest,

4  they're no longer just lenders.  They have a duty to

5  the minority shareholders under whatever state's law

6  we may apply to the situation.

7          And if Delaware law applies, which I

8  believe it does because this is a Delaware

9  corporation, then it is their responsibility to

10 satisfy the courts that their action in foreclosing

11 on the 5 percent interest of the minority

12 shareholder, the debtor here, is in the best

13 interest of the corporation; not in their own best

14 interest, but rather in the best interest of the

15 corporation and is not a breach of their duty to the

16 minority shareholder, the debtor here, PDC.  That

17 sort of in a nutshell is what the litigation is all

18 about.

19          MS. BACHTELL:  Okay.  I want

20 to -- just because we're at a point where I think

21 it's sort of an interesting (inaudible), do you have

22 any questions for any of the people here to speak on

23 behalf of the debtor --

24          MS. KRAUSE:  Sure.

44

1          MS. BACHTELL:  -- understanding Mr. Corbett

2    is the one who is under oath.

3          MS. KRAUSE:  Yes.  I have a couple of

4    questions for you.  You stated before that you

5    didn't have any outstanding obligations.

6          What about the obligations with respect to

7    the IRS, the Massachusetts Department of Revenue?

8    Do you sill have those obligations?  And if so, what

9    type of obligations are those?

10          MR. CORBETT:  The LLC has to pay a

11    Delaware --

12          MS. BACHTELL:  "The LLC" means the debtor,

13    correct?

14          MR. CORBETT:  The debtor, excuse me.  The

15    debtor has to pay a franchise tax to the State of

16    Delaware on an annual basis, and the parent of the

17    debtor pays that tax.

18          As to the IRS, the debtor has no employees,

19    so there are no unemployment or Social Security or

20    Medicare taxes.

21          MS. BACHTELL:  Are tax returns filed?

22          MR. CORBETT:  Yes.

23          MS. BACHTELL:  Okay.  Are they currently

24    filed?

45

1          MR. CORBETT:  Well, they will be filed in

2    the next -- they'll be filed before April 15th.

3          MR. THEISE:  All returns that are due have

4    been filed currently.

5          MS. BACHTELL:  Everything but 2003 is

6    currently filed?

7          MR. THEISE:  That is correct.

8          MS. BACHTELL:  But 2003 will be filed --

9          MR. CORBETT:  Filed shortly.

10          MS. BACHTELL:  -- timely?

11          MR. THEISE:  Timely.

12          MR. CORBETT:  Yes.

13          MS. BACHTELL:  Okay.  Go ahead.  Sorry to

14    interrupt you.

15          MR. CORBETT:  So that's it with taxes.

16          MS. KRAUSE:  Okay.  And since when have you

17    guys -- since when has the debtor not had any

18    employees when it's been operating?

19          MR. CORBETT:  The debtor has never had

20    employees.

21          MS. KRAUSE:  Never, okay.  Okay.  I think

22    we touched on this a little bit before about what

23    sort of value your statement still has if you don't

24    prevail on your LLC claim.  Is it just what you

46

1   mentioned before about this other money coming in?

2            MR. CORBETT:  Well, let's put it this

3   way --

4            MR. THEISE:  It calls for a legal

5   conclusion.  I think it's beyond the debtor's --

6            MS. BACHTELL:  Well, we

7   start -- what you start with on Schedule B is a

8   valuation of up to $10 million.  Correct me --

9            MS. KRAUSE:  Correct.

10           MS. BACHTELL:  -- if I'm wrong.  Where does

11  that come from?

12           MR. THEISE:  It's management's belief as to

13  what its 5 percent ought to be minimally valued at

14  once the plant comes on line and the capacity fee is

15  paid on the basis of --

16           MS. BACHTELL:  Once the plant comes on line

17  which is expected to be when?

18           MR. CORBETT:  The last word that we had,

19  our expectation is June 1st.  Let me make --

20           MS. BACHTELL:  6/1/05 or '04?

21           MR. CORBETT:  '04.  I said something which

22  I was not clear on from some of your comments.  The

23  plant could operate today on natural gas, and the

24  hope or the last word that we had is that the hope

47

1    is by June 1st that the plant will be capable of

2    operating both on natural gas and -- I really should

3    say or fuel oil.

4         MS. BACHTELL:  The preferred or the more

5    profitable or you explain to me would be fuel oil?

6         MR. CORBETT:  No, the -- well, that's a

7    very interesting question.  Most of the time it is

8    more profitable to operate on natural gas, but there

9    are times during the winter when the price of

10   natural gas exceeds the price of fuel oil.

11        Now also the environmental permits limit

12   the operation of the plant to 720 hours of operation

13   on fuel oil and limit that to the wintertime.

14        MS. BACHTELL:  Okay.  Plus environmental

15   limits.

16        MR. CORBETT:  There are environmental

17   constraints.

18        MS. BACHTELL:  Constraints regarding

19   operations on fuel oil?

20        MR. CORBETT:  Correct.

21        MS. BACHTELL:  Okay.  But it can't operate

22   utilizing fuel oil at this point in time?  It's not

23   --

24        MR. CORBETT:  That is the work -- our last

48

1   word was that that work is -- what is going on right

2   now is making it capable of doing that.

3          MS. BACHTELL:  Okay.  So as a best guess

4   based upon a completed and operating plant in

5   Milford and capacity payments that come to fruition

6   and are at the upside of the cap, that

7   is --

8          MR. THEISE:  In an industry --

9          MS. BACHTELL:  -- auctioned in New

10  England --

11         MR. THEISE:  In a mature industry which is

12  well susceptible to valuation, so I would

13  characterize it as a highly educated belief founded

14  in the reality of the empirical evidence of the

15  industry.

16         MS. BACHTELL:  Okay.

17         MR. THEISE:  As augmented by the capacity

18  fee which will become available which is a

19  significant amount of cash flow.

20         MS. BACHTELL:  And who participated in the

21  valuation of the 5 percent interest in Milford

22  Power?

23         MR. CORBETT:  I did.

24         MS. BACHTELL:  You did, Mr. Corbett?  Okay.

49

1    Go on.  I'm sorry to interrupt you.

2              MS. KRAUSE:  The last question which I

3    actually think you touched on, too, is --

4              MR. THEISE:  Can you speak up, please?

5              MS. KRAUSE:  Sure.

6              MR. THEISE:  Thank you.

7              MS. KRAUSE:  This will be the last question

8    which I think we touched upon is for you to please

9    state all of your current assets.

10             MR. CORBETT:  The assets of the debtor --

11             MS. KRAUSE:  Yes.

12             MR. CORBETT:  -- are all related to its 5

13   percent interest in the Milford Power Company, LLC.

14   It has of course that 5 percent interest and then it

15   has the assets that are listed in a formal sense of

16   the lawsuit that has been filed which is -- has been

17   described, and then there is a potential but unfiled

18   claim or defense and set-off to El Paso considering

19   on a question of the nature of their management of

20   the project which has not been foreclosed but which

21   has not ever been formalized in a lawsuit.

22             But those are the -- that's the only

23   business of the debtor is the -- its 5 percent

24   ownership interest in Milford Power Company, and all

50

1    of its assets are either that or the defense of that

2    interest.

3         MS. BACHTELL:  And who are the creditors

4    listed on Schedule D?  They're actually entities

5    that hold a security interest in the assets of

6    Milford Power Company, LLC?  Is that what this says?

7         MR. THEISE:  Well, we think that's correct.

8    In other words, they're participants in the

9    syndication of the participation in which the bank

10   is the agent.

11        MS. BACHTELL:  Okay.  KDC?

12        MR. THEISE:  KBC.

13        MS. BACHTELL:  KBC is the agent.  Okay.  Do

14   you have any other questions?

15        MS. KRAUSE:  I don't.

16        MS. BACHTELL:  Okay.  Does anyone else have

17   any questions?  You're welcome to join us and take a

18   minute to ask questions if you'd like.  No?  Okay.

19   What are the parameters for the plan of

20   reorganization?

21        MR. THEISE:  Well, I think they are

22   litigation dependent.  I think that's evident from

23   the nature of the case.

24        MS. BACHTELL:  And the expectation is that

51

1    Judge Hillman will do what?

2            MR. THEISE:  Say again.

3            MS. BACHTELL:  The expectation is that

4    Judge Hillman will do what?  I haven't read the

5    complaint.  I apologize.

6            MR. THEISE:  Rule for us is the

7    expectation.

8            MS. BACHTELL:  Rule for you, and that will

9    result in what?  What's the demand?

10           MR. THEISE:  Well, we would be without debt

11   virtually.  The principal asset is the 5 percent

12   interest in the operating company.  That asset is

13   the subject of a non-recourse pledge to KBC.

14           If that pledge is discharged either because

15   there is no longer any debt that it secures or

16   because of a conduct-driven liability determination

17   adverse to KBC, we own that free and clear of

18   anything, and we think it's worth ten or more

19   million dollars, the discussion we had a minute or

20   two ago.

21           And then there is yet the debt to El Paso,

22   but even if there were no defenses to that debt, it

23   would be minuscule in relation to the value of the

24   company, and we think there are defenses to that

52

1    debt as well.

2           MS. BACHTELL:  Okay.  All right.  I don't

3    have any further questions.  Thank you very much.

4           MR. THEISE:  We thank you.

5           (Whereupon the hearing was concluded)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

53

1                C E R T I F I C A T E

2          I, Laura E. Antoniotti, Registered

3    Professional Reporter, do hereby certify that the

4    foregoing transcript, Volume I, is a true and

5    accurate transcription to the best of my ability of

6    the hearing tape recorded on March 31, 2004.

7

8

9    _Laura E. Antoniotti_____

10               Laura E. Antoniotti

11          Registered Professional Reporter

12

13

14               -    -    -    -

15

16

17

18

19

20

21

22

23

24

DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813