# EXHIBIT A

# LIMITED LIABILITY COMPANY

# AGREEMENT

# OF

# MILFORD HOLDINGS LLC

**Dated as of**
**December 31, 2003**

TABLE OF CONTENTS

ARTICLE I        DEFINITIONS......... ......................................................... 2
    SECTION 1.01.        Definitions........................................................... 2
ARTICLE II        ORGANIZATIONAL AND OTHER MATTERS ............................... 9
    SECTION 2.01.        Formation; Admission ........................................ 9
    SECTION 2.02.        Name.................................................................. 9
    SECTION 2.03.        Office ................................................................ 9
    SECTION 2.04.        Term.................................................................. 9
    SECTION 2.05.        Fiscal Year ....................................................... 9
ARTICLE III        PURPOSE AND POWERS ...................................................... 9
    SECTION 3.01.        Purpose of the Company..................................... 9
ARTICLE IV        CAPITAL CONTRIBUTIONS ................................................. 10
    SECTION 4.01.        Initial Capital Contributions ............................. 10
    SECTION 4.02.        Percentage Interests ......................................... 10
    SECTION 4.03.        Admission of TCW ............................................ 10
    SECTION 4.04.        Additional Capital Contributions...................... 10
    SECTION 4.05.        Capital Accounts............................................... 11
    SECTION 4.06.        No Interest........................................................ 11
    SECTION 4.07.        Withdrawals ..................................................... 11
    SECTION 4.08.        Negative Capital Accounts ................................ 11
    SECTION 4.09.        Liability of Members ........................................ 11
ARTICLE V        ALLOCATIONS AND DISTRIBUTIONS........................................ 12
    SECTION 5.01.        Allocations and Distributions ........................... 12
    SECTION 5.02.        Withholding of Certain Amounts....................... 14
    SECTION 5.03.        Tax Indemnification.......................................... 15
    SECTION 5.04.        Restricted Distributions .................................... 15
ARTICLE VI        MANAGEMENT AND OPERATION OF BUSINESS ................... 15
    SECTION 6.01.        Management....................................................... 15
    SECTION 6.02.        Powers of the Class B Member Manager ........................ 17
    SECTION 6.03.        Class A Members, Actions Related to the Company....... 17
    SECTION 6.04.        Other Activities of the Members........................ 19

SECTION 6.05.    Company Funds and Company Assets ............................ 20

SECTION 6.06.    Exculpation ...................................................................... 20

SECTION 6.07.    Indemnification ................................................................ 20

SECTION 6.08.    Duties of the Members ...................................................... 21

ARTICLE VII    BOOKS, RECORDS, ACCOUNTING AND OTHER
INFORMATION ..................................................................... 21

SECTION 7.01.    Books of Account; Access ................................................. 21

SECTION 7.02.    Reports to Members .......................................................... 21

SECTION 7.03.    Tax Controversies ............................................................ 21

SECTION 7.04.    Accounting Methods; Elections ........................................ 21

SECTION 7.05.    Confidentiality .................................................................. 22

ARTICLE VIII    TRANSFERS OF MEMBERSHIP INTERESTS ............................. 23

SECTION 8.01.    Transfer of a Member's Interest ....................................... 23

SECTION 8.02.    Additional or Substitute Member ...................................... 23

SECTION 8.03.    Transferee's Rights ........................................................... 24

SECTION 8.04.    Tag-Along Rights .............................................................. 24

SECTION 8.05.    Drag-Along Rights ............................................................ 24

SECTION 8.06.    Distributions Subsequent to Transfer ................................ 25

SECTION 8.07.    Satisfactory Written Assignment Required ..................... 25

SECTION 8.08.    Bankruptcy of a Member ................................................. 25

ARTICLE IX    ADDITIONAL MEMBERS ....................................................... 26

SECTION 9.01.    Additional Members .......................................................... 26

ARTICLE X    DISSOLUTION AND LIQUIDATION ........................................... 26

SECTION 10.01.    Dissolution ...................................................................... 26

SECTION 10.02.    Final Accounting ............................................................. 26

SECTION 10.03.    Liquidation ...................................................................... 26

SECTION 10.04.    Cancellation of Certificate .............................................. 27

SECTION 10.05.    Waiver of Action for Partition ........................................ 27

ARTICLE XI    AMENDMENT OF LIMITED LIABILITY COMPANY
AGREEMENT ....................................................................... 27

SECTION 11.01.    Amendments .................................................................... 27

ARTICLE XII    GENERAL PROVISIONS ....................................................... 28

SECTION 12.01.    Notices ........................................................................ 28
SECTION 12.02.    Specific Performance .................................................... 28
SECTION 12.03.    No Third Party Beneficiaries ......................................... 28
SECTION 12.04.    Successors and Assigns ................................................. 28
SECTION 12.05.    Entire Agreement .......................................................... 28
SECTION 12.06.    Severability .................................................................. 29
SECTION 12.07.    Headings ....................................................................... 29
SECTION 12.08.    Gender and Number ...................................................... 29
SECTION 12.09.    Applicable Law ............................................................. 29
SECTION 12.10.    Counterparts .................................................................. 29
SECTION 12.11.    PUHCA Status ............................................................... 29

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## MILFORD HOLDINGS LLC

This Limited Liability Company Agreement of Milford Holdings LLC (the "Company") is entered into as of December 31, 2003 by and among the Persons who have executed this Agreement and whose names and addresses are set forth on the signature pages hereto, as initial members of the Company (the "Initial Members") and such other Persons as may from time to time enter into this Agreement in accordance with its terms.  Capitalized terms used herein and not otherwise defined herein have the meanings defined in Article I hereof.

### RECITALS:

WHEREAS, the Company was formed for the purposes hereinafter stated on October 8, 2003 by the filing of the Certificate of Formation with the office of the Secretary of State of the State of Delaware pursuant to the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq., as amended and in effect from time to time, the "Act"); and

WHEREAS, each of the Designating Lenders is the beneficiary of a pledge, pursuant to the Pledge Agreement, of membership interests in and of Milford Power Company, LLC (the "Milford Interests"), a Delaware limited liability company ("Milford"); and

WHEREAS, in connection with the Restructuring Agreement and subject to satisfaction of certain conditions stated therein, the Designating Lenders collectively, each to the extent of its interest under the Pledge Agreement in the Milford Interests, are entitled to acquire the entire right, title and interest in and to all the El Paso Milford Interests, subject to the Security Interests; and

WHEREAS, in connection with the Restructuring Agreement and subject to satisfaction of certain conditions stated therein, the Designating Lenders collectively, each in the same proportion of their share of Milford's debt under the Construction Loans, are entitled to acquire the CMSA Rights; and

WHEREAS, each of the Designating Lenders and TCW intend that, in accordance with the Restructuring Agreement, the Company acquire on behalf of all the Designating Lenders and TCW all of the CMSA Rights pursuant to the CMSA Rights Assignment and all of the El Paso Milford Interests pursuant to the El Paso Assignment, in each case as the Initial Capital contribution to the Company of, and in consideration of the Company's issuance of a Class A Membership Interest to, the Initial Class A Member

designated by the Designating Lenders, as listed on Schedule I hereto, and the nominee of TCW upon admission as a Class A Member hereunder; and

WHEREAS, the Members intend that the ordinary business and affairs of the Company be managed by the Class B Member Manager;

NOW, THEREFORE, in consideration of the mutual promises of the parties hereinafter set forth and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned parties agree as follows:

## ARTICLE I
## DEFINITIONS

SECTION 1.01.   Definitions.  For purposes of this Agreement, the following terms have the meanings ascribed to them in this Section 1.01.

"Act" has the meaning specified in the recitals.

"Additional Capital Contribution" means any amount contributed by a Member to the Company in excess of the Initial Capital contributed by such Member.

"Affiliate" of a subject Person means a Person that, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with the subject Person.

"Agent" has the meaning ascribed to such term in the Credit Agreement.

"Aggregate Contributions" means the aggregate amount of Initial Capital and Additional Capital Contributions, if any, contributed to the Company by or on behalf of the Initial Class A Members.

"Agreement" means this Limited Liability Company Agreement and the schedules and exhibits hereto, as they may be amended, restated or supplemented from time to time.

"Applicable Law" means any federal, state or local laws (including common and criminal law), codes, statutes, directives, ordinances, by-laws, regulations, rules, judgments, consent orders and agreements with Governmental Authorities, proclamations or delegated or subordinated legislation of any Governmental Authority, that are applicable to this Agreement, the Members, Milford or the Project.

"Asset Manager" has the meaning ascribed to such term in the Milford Management Services Agreement.

"Assumed Tax Rate" means, for or in respect of any Tax Period and any item of income the lesser of (i) the maximum U.S. federal income tax rate applicable to a Class A Member's taxable income that arises from being a Class A Member and (ii)

38.6%. If any Class A Member is a flow-through entity for U.S. federal income tax purposes, the Assumed Tax Rate shall be the weighted average U.S. federal income tax rate(s) of the taxable Person(s) who are beneficial owner(s) of such Class A Members.

"Authorized Representative" has the meaning specified in Section 7.05 hereof.

"Business Day" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of New York and any other day on which banks are closed for business in New York City shall not be regarded as a Business Day.

"Capital Account" means the capital account maintained for a Class A Member or a Class B Member Manager pursuant to Section 4.05 hereof.

"Certificate of Formation" means the Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware pursuant to the Act, as such Certificate of Formation may be amended or restated from time to time.

"Class A Member" means each Person admitted to the Company as an Initial Class A Member, as named on Schedule I hereto as a Class A Member, and any other Person admitted as an additional or substitute Class A Member, so long as such person remains a Class A Member.

"Class A Membership Interest" means a Class A Member's entire interest in the Company, including, without limitation, such Class A Member's share of the profits and losses of the Company, the right to receive distributions from the Company and the right to vote on any matter brought before a meeting of the Class A Members.

"Class B Member Manager" means each Person admitted to the Company as an Initial Class B Member, as named on Schedule I hereto as a Class B Member Manager, and any other Person admitted as an additional or substitute Class B Member Manager, so long as such person remains a Class B Member Manager.

"Class B Member Manager's Allocation" means for each Company Year an amount equal to the product of (i) the Class B Member Manager's Capital Contribution and (ii) the U.S. federal short-term rate under Section 1274(d)(i)(A) of the Code for the month of December in such Company Year.

"Class B Member Manager's Capital Contribution" means the one-thousand dollars ($1,000) in cash contributed to the Company by the Initial Class B Member Manager or by any substitute Class B Member Manager.

"Class B Member Manager's Profit Allocations" means the total amount of income or gain allocated to the Class B Member Manager under Section 5.01(d)(i).

"CMSA" means the Construction Management Services Agreement dated as of May 18, 2001, as amended, and the Second Construction Management Services Agreement dated as of October 25, 2001 (the "Second CMSA"), between El Paso Corporation, El Paso Chaparral Management, L.P., Milford and the Agents, the Consent and Reaffirmation made by El Paso dated October 25, 2001, and the Consent and Reaffirmation made by El Paso Chaparral dated October 25, 2001.

"CMSA Rights" means the reimbursement rights of El Paso and El Paso Chaparral under Section 4.1 of the Second CMSA with respect to funds advanced by them to or on behalf of Milford pursuant to the CMSA.

"CMSA Rights Assignment" means the assignment dated _____, 2003, pursuant to which El Paso Corporation and El Paso Chaparral Management, L.P. assigned the CMSA Rights to the Agent on behalf of the Lenders.

"Code" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"Company Minimum Gain" has the same meaning as the term "partnership minimum gain" set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

"Company Year" has the meaning specified in Section 2.05 hereof.

"Conflicting Business" means any arrangement whereby the Class B Member Manager or any of its Affiliates is either (i) performing services or otherwise engaged by any Person other than Milford, the Asset Manager or the Company, in connection with the Project, (ii) entitled to any share of profits, including as a result of such Person's ownership interests, of any power generating facility located in the New England Power Pool market, or (iii) as may otherwise be agreed by the Members.

"Construction Loans" has the meaning ascribed to such term in the Credit Agreement.

"Control", "Controls" or "Controlled" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, through contract, or otherwise.

"Credit Agreement" means the Milford Power Company, LLC Credit Agreement, dated as of March 25, 1999, by and among Milford Power Company, LLC, the Lenders named therein, Trust Company of the West, as Tranche C Institutional Agent, Teachers Insurance and Annuity Association of America, as Tranche D Institutional Agent, BNP PARIBAS, as Arranger and as Documentation Agent, WestLB, as Arranger and as Syndication Agent, Australia and New Zealand Banking Group Limited, as Arranger and as Technical Agent, and KBC Bank N.V., New York Branch, as

Lead Arranger, as Agent, as Collateral Agent, as Issuing Bank and as Depository Bank, as amended and as may be further amended, restated or supplemented from time to time.

"Designating Lender" means the Lender that controls an Initial Class A Member or has otherwise designated a Class A Member for purposes of this Agreement, as indicated on Schedule I hereto.

"Desired Action" has the meaning set forth in Section 2.11(b) hereof.

"El Paso Assignment" means the Assignment and Assumption Agreement in the form provided by the Restructuring Agreement pursuant to which the Company will acquire the El Paso Milford Interests.

"El Paso Milford Interests" means the Milford Interests pledged by El Paso Milford Power I Company and EPMENA to the benefit of the Lenders pursuant to the Pledge Agreement.

"EPMENA" means El Paso Merchant Energy North America Company, a successor in interest of El Paso Milford Power II Company.

"EWG" means an exempt wholesale generator under Section 32 of the Public Utility Holding Company Act of 1935, as amended.

"Governmental Authority" means any federal, state or local governmental entity, authority or agency, court, tribunal, department, regulatory commission or other body whether legislative, judicial or executive (or a combination or permutation thereof) having jurisdiction as to the matter in question.

"Indemnified Parties" has the meaning set forth in Section 6.07(a) hereof.

"Initial Capital" means (i) for any Initial Class A Member, the CMSA Rights and the El Paso Milford Interests contributed to the Company on behalf of such Initial Class A Member on account of its respective Designating Lender, and (ii) for the Initial Class B Member Manager, one thousand dollars ($1,000.00).

"Initial Class A Member" means any of the Persons, as designated by a Designating Lender, who have entered into this Agreement as of the date hereof and are identified as such on the signature page hereof.

"Initial Class B Member Manager" means the Initial Class B Member Manager designated as such on the signature page hereof.

"Initial Member" has the meaning specified in the introductory paragraph of this Agreement.

"Lender" has the meaning ascribed to such term in the Credit Agreement.

"Liquidator" has the meaning set forth in Section 10.03(b) hereof.

"Member" means a Class A Member or Class B Member Manager.

"Membership Interest" means a Member's entire interest in the Company, including, without limitation, such Member's share of the profits and losses of the Company, the right to receive distributions from the Company and the right to vote and participate in the management of the Company, provided that the Class B Member Manager shall not be entitled to share in the profits and losses of the Company (except pursuant to Section 5.01(d)(i)) or receive any distributions from the Company (except to the extent of the undistributed Class B Member Manager's Profit Allocations).

"Member Nonrecourse Debt" has the same meaning as the term "partner nonrecourse debt" set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"Member Nonrecourse Deductions" has the same meaning as the term "partner nonrecourse deductions" set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"Milford" has the meaning specified in the recitals.

"Milford Interests" has the meaning specified in the recitals.

"Milford Management Services Agreement" means that certain Management Services Agreement by and between CPV Milford, LLC and Milford Power Company, LLC dated _____, 2003, as may be amended from time to time, and any subsequent agreement of similar effect relating to the management of Milford.

"Nonrecourse Liability" has the meaning set forth in Section 1.752-1(a)(2) of the Treasury Regulations.

"Obligations" has the meaning ascribed to such term in the Credit Agreement.

"Participating Member" has the meaning set forth in Section 8.04(b) hereof.

"Percentage Interest" has the meaning set forth in Section 4.02 hereof.

"Permitted Transferee" means an Affiliate of a Designating Lender at the time of the Transfer, which is permitted by applicable law to hold such portion of

Membership Interests as are proposed to be Transferred by a Class A Member in accordance with the terms and provisions hereof.

"Person" means an individual or a corporation, partnership, trust, unincorporated organization, association, limited liability company or other entity.

"Pledge Agreement" means the Pledge Agreement, dated as of March 25, 1999 between El Paso Milford Power I Company, EPMENA and PDC Milford Power LLC (as Pledgors) and KBC Bank N.V. (as Collateral Agent), pursuant to which the Pledgors pledged their Milford Interests to the Collateral Agent as security under the Credit Agreement.

"Prime Rate" means the highest rate of interest published from time to time by The Wall Street Journal as the "base rate" on corporate loans at large money center commercial banks.

"Proceeding" has the meaning set forth in Section 4.09(c)(i) hereof.

"Project" means the design, development, procurement, construction, ownership, start-up, operation, management and maintenance of the approximately 544 megawatt power generation facility and associated equipment located in Milford, Connecticut to be operated by Milford.

"PUHCA" means the Public Utility Holding Company Act of 1935, as amended.

"Restructuring Agreement" means the Restructuring Agreement, dated as of September 10, 2003, among El Paso Corporation, El Paso Milford Power I Company, LLC, EPMENA, El Paso Merchant Energy, L.P., El Paso Chaparral Management, L.P., KBC Bank N.V. and each of the Lenders.

"Sale Notice" has the meaning set forth in Section 8.04(a) hereof.

"Sale Transaction" shall mean a transaction or a series of related transactions involving (i) the sale of any of the Milford Interests owned by the Company; (ii) any consolidation, merger or recapitalization of the Company in which the Company is not the continuing or surviving corporation or pursuant to which the Class A Membership Interests would be converted into cash, securities and/or other property, or any other transaction in which holders of the Class A Membership Interests immediately before the transaction, in the aggregate, do not own all of the voting power of all outstanding securities of the surviving corporation after the transaction, each in the same ratio to the other as such Class A Members holds in the Company at such time; or (iii) the liquidation or dissolution of the Company.

"Selling Class A Member" has the meaning set forth in Section 8.04(a) hereof.

"Security Interests" means the security interests of the Lenders in the collateral of Milford (including under the Pledge Agreement) pursuant to the Credit Agreement.

"Tax Distribution" means, for or in respect of any fiscal year or other tax period of the Company (each, for the purpose of this definition, a "Tax Period"), a distribution by the Company to each Class A Member in an amount equal to the product of (x) the amount included in the Company's US federal, state and local taxable income for such Tax Period allocable to each such Class A Member multiplied by (y) the Assumed Tax Rate with respect to each such amount. Tax Distributions shall be calculated and made in advance of the dates on which estimated tax payments relating to the pertinent Tax Period are due. Notwithstanding the foregoing, Tax Distributions shall also include any amounts determined pursuant to the foregoing formula with respect to adjustments to the taxable income of the Company imposed by any governmental authority (or otherwise).

"Tax Matters Member" has the meaning set forth in Section 7.03 hereof.

"TCW" means Trust Company of the West, not in its individual capacity but solely as trustee of the trust formed pursuant to an Individual Trust Agreement dated as of January 31, 1987, as amended, between itself and the Boilermaker-Blacksmith National Pension Trust.

"TCW Side Letter" means the side letter pursuant to Section 4.03 dated the date hereof, entitling TCW, within 45 days of the date hereof, to designate a nominee to become a Class A Member hereunder and providing for TCW to become a Designating Lender.

"Transfer" means, as a noun, any voluntary or involuntary transfer, sale, pledge, assignment, hypothecation or other disposition (by operation of law or otherwise) and, as a verb, to voluntarily or involuntarily transfer, sell, pledge, assign, hypothecate or otherwise dispose of; "Transferor" means a Person that Transfers; and "Transferee" means a Person to whom a Transfer is made. A Transfer of a Class A Member's entire Class A Membership Interest made pursuant to (i) a Transfer of all or substantially all the assets of a Class A Member to such Class A Member's Designating Lender or an Affiliate thereof or (ii) a change in ownership or a change as a result of which such Class A Member's Designating Lender shall remain in control of such Class A Member or (iii) a change of control of the Designating Lender of a Class A Member, shall, however, not be considered a Transfer of a Membership Interest or any part thereof for purposes of this Agreement, provided, that any transfer pursuant to this sentence shall be void unless the transfer, transferor and transferee, as applicable, comply with clauses (u), (v), (x), (y) and (z) of Section 8.01(a) and, in the case of clauses (i) and (ii) of this sentence, such transfer is approved, if prior to the end of 2004, by the unanimous approval of the Class A Members.

"Treasury Regulations" means the income tax regulations promulgated under the Code.

"Utility Status" has the meaning set forth in Section 12.11(a) hereof.

## ARTICLE II
## ORGANIZATIONAL AND OTHER MATTERS

SECTION 2.01.    Formation; Admission.  The Company was formed on October 8, 2003 as a limited liability company by the filing of its Certificate of Formation with the office of the Secretary of State of the State of Delaware under and pursuant to the Act. Upon the execution hereof, each of the individuals named on the signature pages hereto shall be considered admitted to the Company as a Member. The rights and liabilities of the Members shall be as provided in the Act, except as is otherwise expressly provided herein.

SECTION 2.02.    Name.  The name of the Company is, and the business of the Company shall be conducted under the name of, Milford Holdings LLC.

SECTION 2.03.    Office.  The Company shall maintain an office at 8403 Colesville Road, Suite 915, Silver Spring, Maryland 20910 and/or at such other locations as determined by the Class B Member Manager in its sole and absolute discretion, provided that a written notice of any change in the location of the Company's offices shall be provided to each Class A Member prior to such change.

SECTION 2.04.    Term.  The Company commenced existence on October 8, 2003, and the term of the Company shall continue until the filing of a Certificate of Cancellation with the Secretary of State of Delaware as provided in Section 10.04 hereof and in accordance with the provisions of ARTICLE X hereof or as otherwise provided by law.

SECTION 2.05.    Fiscal Year.  The fiscal year of the Company shall be the calendar year (the "Company Year").

## ARTICLE III
## PURPOSE AND POWERS

SECTION 3.01.    Purpose of the Company.

(a)    The purpose and business of the Company shall be, to hold and deal with the El Paso Milford Interests in order to promote the sale of all of the Milford Interests held by the Company or substantially all of the assets of Milford for the full satisfaction of Milford's Obligations and, as a holder of El Paso Milford Interests, to exercise all rights and powers appurtenant thereto, including acting as a Member of Milford in the conduct of the business and affairs

of Milford, and also to engage in any and all activities that are incidental or ancillary thereto.

(b)    The Company shall have the power to do any and all acts reasonably necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purposes and business described herein and for the protection and benefit of the Company, and shall have, without limitation, any and all of the powers that may be exercised on behalf of the Company by the Class B Member Manager pursuant to this Agreement, including ARTICLE VI hereof.

(c)    Notwithstanding anything to the contrary contained herein, the Company shall not participate in any manner in the establishment of, or the inclusion of any Membership Interest in the Company on, an established securities market or a secondary market or the substantial equivalent thereof (within the meaning of the Treasury Regulations promulgated under Section 7704 of the Code).

## ARTICLE IV
## CAPITAL CONTRIBUTIONS

SECTION 4.01.    Initial Capital Contributions.  The Designating Lenders collectively, each on behalf of its respective Initial Class A Member as listed on Schedule I, have caused to be contributed, or will cause to be contributed as soon as practicable, to the capital of the Company all of the CMSA Rights and El Paso Milford Interests.  The Initial Class B Member Manager has contributed the Class B Member Manager's Capital Contribution.

SECTION 4.02.    Percentage Interests.  On the date hereof, each Initial Class A Member holds a percentage interest ("Percentage Interest") in the Company as appears next to its name on Schedule II hereto as in effect on the date hereof.  The Initial Class B Member shall not have a Percentage Interest.  Schedule II shall be amended by the Class B Member Manager to reflect any adjustment in the Percentage Interests from time to time, including pursuant to Section 4.03, to reflect transfers or assignments of Membership Interests in the Company permitted by this Agreement and admissions, resignations or withdrawals of Members pursuant to the terms of this Agreement.

SECTION 4.03.    Admission of TCW  The Members agree that, without any vote of the Members, by election of TCW under the TCW Side Letter within 45 days after the date hereof, TCW shall become a Designating Lender and its nominee shall be admitted as a Class A Member hereunder in accordance with the terms of the TCW Side Letter.

SECTION 4.04.    Additional Capital Contributions.  No Member shall be required to make Additional Capital Contributions to the Company.

SECTION 4.05.    Capital Accounts. The Company shall maintain for each Member a separate Capital Account in accordance with the rules prescribed pursuant to Sections 704(b) and (c) of the Code and the Treasury Regulations promulgated thereunder. The opening Capital Account of the Initial Class A Members as of the date hereof shall be in proportion to their Percentage Interests as of the date hereof and shall be their Initial Capital as specified in Schedule II hereto. The Initial Class B Member Manager shall have an opening Capital Account equal to the Class B Member Manager's Capital Contribution.

SECTION 4.06.    No Interest. No interest shall be paid by the Company on capital contributions, balances in any Member's Capital Accounts or any other funds contributed to the Company or distributed or distributable by the Company under this Agreement.

SECTION 4.07.    Withdrawals. Except as explicitly provided elsewhere herein, no Member shall have any right to withdraw as a Member from the Company. Except as explicitly provided elsewhere herein, no Member shall have the right to (a) withdraw from the Company all or any part of such Member's capital contributions, (b) receive property other than cash in return for such Member's capital contributions or (c) receive any distribution from the Company.

SECTION 4.08.    Negative Capital Accounts. Except as provided in ARTICLE V, at no time during the term of the Company or upon dissolution and liquidation thereof shall a Member with a negative balance in its Capital Account have any obligation to the Company or the other Members to restore such negative balance, except as may be required by law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

SECTION 4.09.    Liability of Members.

(a)    Except as explicitly provided herein or in the Act or any other applicable law, no Member shall be liable for any debts, liabilities, contracts or obligations of the Company whatsoever. Each of the Class A Members acknowledges that its capital contributions are subject to the claims of any and all creditors of the Company to the extent provided by the Act and other applicable law.

(b)    (i) Except as required by the Act, other applicable law or as otherwise expressly set forth herein, no Member shall be required to repay to the Company, any other Member or any creditor of the Company all or any part of the distributions made to such Member pursuant hereto; provided, that, subject to the limitations set forth in Section 4.09(c) hereof, a Member may be required to return distributions made to such Member for the purpose of permitting the Company to fund such Member's *pro rata* share of the Company's indemnity obligations under Section 6.07(b) hereof.

(ii)     If, notwithstanding anything to the contrary contained herein, it is determined under applicable law that any Member has received a distribution which is required to be returned to or for the account of the Company or Company creditors, then the obligation under applicable law of any Member to return all or any part of a distribution made to such Member shall be the obligation of such Member and not of any other Member.

(iii)     Any amount returned by a Member pursuant to this Section 4.09(b) shall be treated as a contribution of capital to the Company.

(c)     The obligation of a Member to return distributions made to such Member for the purpose of permitting the Company to fund such Member's *pro rata* share of indemnity obligations under Section 6.07(b) hereof shall be subject to the following limitation:  no Member shall be required to return a distribution after the third anniversary of the date of liquidation of the Company; provided, that, if on such third anniversary, there are any legal actions, suits or proceedings by or before any court, arbitrator, governmental body or other agency (a "Proceeding") then pending or any other liability (whether contingent or otherwise) or claim then outstanding, then the Class B Member Manager shall so notify each Member at such time (which notice shall include a brief description of each such Proceeding (and of the liabilities asserted in such Proceeding) or of such liabilities and claims) and the obligation of each Member to return any distribution for the purpose of meeting the Company's indemnity obligations under Section 6.07 hereof shall survive with respect to each such Proceeding, liability and claim set forth in such notice (or any related Proceeding, liability or claim based upon the same or a similar claim) until the date that such Proceeding, liability or claim is ultimately resolved and satisfied.  The provisions of this paragraph (c) shall not affect the obligations of any Member under Section 18-607 of the Act or other applicable law.

ARTICLE V
ALLOCATIONS AND DISTRIBUTIONS

SECTION 5.01.     Allocations and Distributions.

(a)     Subject to any required vote of the Class A Members, each decision as to the timing, form and amount of distributions shall be made by the Class B Member Manager.

(b)     Distributions (including liquidating distributions) to Class A Members shall be made to the Class A Members, *pro rata*, in accordance with their respective Percentage Interests.  Prior to any distributions to the Class A Members under this Section 5.01(b), the Class B Member Manager shall receive a distribution of its undistributed Class B Member Manager's Profit Allocations.

(c) Notwithstanding any other provisions of this Agreement, to the extent the Company has cash available to it, and after setting aside appropriate reserves, the Company shall distribute to each Class A Member, not later than the due date for estimated taxes (for each period other than the final quarter of the fiscal year) and ninety (90) days after the end of each fiscal year of the Company, cash in an amount equal to such Class A Member's Tax Distribution. A Tax Distribution shall be deemed to have been made on the last day of the pertinent fiscal year, and taken into account in determining allocations with respect to such fiscal year, notwithstanding that such Tax Distribution is made in the following fiscal year. If the Company does not have sufficient cash available to it to make the full Tax Distribution owing to each Class A Member for a fiscal year, the Tax Distributions for such fiscal year shall be made pro rata to the Class A Members in proportion to the Tax Distributions owing to each Class A Member for such fiscal year. Tax Distributions shall be considered advance distributions to Class A Members in respect to all distributions otherwise payable hereunder.

(d) Except as explicitly provided elsewhere herein, (i) items of income and/or gain of the Company for each Company Year shall be allocated to the Class B Member Manager to the extent of the Class B Member Manager's Allocations as at the end of the Company Year, less any amounts allocated under this Section 5.01(d) in prior Company Years, and then (ii) items of income, gain, loss or deduction shall be allocated among the Class A Members in a manner such that the Capital Account of each Class A Member, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to (1) the distributions that would be made to such Class A Member pursuant to Section 5.01(b) if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their book value, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the book value of the assets securing such liability), and the net assets of the Company were distributed in accordance with the first sentence of Section 5.01(b) to the Class A Members immediately after making such allocation, minus (2) such Class A Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of the assets.

(e) Notwithstanding anything to the contrary contained in this Section 5.01, special allocations shall be made among the Class A Members in respect of any minimum gain chargeback as required by Section 1.704-2 of the Treasury Regulations, and any qualified income offset as required by Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Treasury Regulations. In addition, in the event any Class A Member has a deficit Capital Account at the end of any Company Year which is in excess of the sum of (i) the amount such Class A Member is obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations, each such Class A Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible; provided, that an allocation

pursuant to this Section 5.01(e) shall be made only if and to the extent that a Class A Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 5.01 have been tentatively made as if this Section 5.01(e) were not in this Agreement. Nonrecourse deductions shall be allocated to the Class A Members in accordance with their percentage interests. Member Nonrecourse Deductions shall be allocated to the Class A Member who bears the economic risk of loss with respect to the liability to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(j) of the Treasury Regulations.

(f)     Each item of income, gain, loss and deduction of the Company shall be allocated among the Members for tax purposes in the same manner as the corresponding items and specifically allocated items are allocated for Capital Account purposes; provided, that in the case of any Company asset the book value of which differs from its adjusted tax basis for U.S. federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be allocated solely for income tax purposes among the Members in accordance with the principles of Sections 704(b) and (c) of the Code (in any manner determined by the Tax Matters Member) so as to take account of the difference between the book value and adjusted basis of such asset.

(g)     The foregoing provisions of this Section 5.01 and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

(h)     If the fair market value of any Company asset is to be determined for the purpose of making distributions or allocations pursuant to this Agreement or for any other purpose, such determination shall be made by the Class B Member Manager.

SECTION 5.02.    Withholding of Certain Amounts.

(a)     Notwithstanding anything to the contrary contained herein, the Class B Member Manager, in its sole and absolute discretion, may withhold from any distribution to any Class A Member contemplated by this Agreement any taxes required to be withheld and amounts due from such Class A Member to the Company to the extent not otherwise paid. Any amount withheld pursuant to this Section 5.02 shall be applied to discharge the obligation in respect of which such amount was withheld.

(b)     Notwithstanding anything to the contrary contained herein, all amounts withheld by the Class B Member Manager pursuant to Section 5.02(a) hereof with respect to a Member shall be treated as if such amounts were distributed to such Member under this Agreement.

SECTION 5.03.   Tax Indemnification.  If the Company or any Affiliate is required by law to make any payment on behalf of a Member (including, without limitation, withholding taxes), then such Member shall indemnify and hold harmless the Company, each such Affiliate, and each of their respective officers, directors, employees, shareholders, partners, managers, members and agents (each of which shall be a third party beneficiary of this Agreement solely for purposes of this Section 5.03) for the entire amount of such payment (including interest and penalties thereon and expenses related thereto).  Distributions to which a Member is otherwise entitled pursuant to this ARTICLE V may be offset against such Member's obligation to indemnify the Company pursuant to this Section 5.03.  If a Member is not entitled to a distribution hereunder, the Member shall be deemed to have received a demand loan from the Company in the amount such Member is obligated to indemnify the Company or any Affiliate under this Section 5.03 which shall bear interest, commencing with the date such obligation arises, at the rate of the lesser of (i) the Prime Rate plus two percent (2%) per annum and (ii) the maximum amount permitted by law.

SECTION 5.04.   Restricted Distributions.  Notwithstanding anything to the contrary contained herein, the Company shall not make a distribution to any Member on account of its Membership Interest in the Company to the extent such distribution would violate applicable law.

## ARTICLE VI
## MANAGEMENT AND OPERATION OF BUSINESS

SECTION 6.01.   Management.

(a) The Class B Member Manager shall have full and complete charge of the business and affairs of the Company, except as otherwise explicitly provided by this Agreement or the Act.  The Class B Member Manager shall receive compensation for its services hereunder pursuant to the Milford Management Services Agreement (and not otherwise), and shall have an equity interest in the Company equivalent to the Class B Member Manager's Capital Contribution, provided, that it shall not have any right to receive any allocation of profits, losses or other financial or tax attributes of the Company (except pursuant to Section 5.01(d)(i)), any distributions from the Company (except to the extent of the undistributed Class B Member Manager's Profit Allocations), or any fee or other remuneration hereunder or on account of its services hereunder.  The Class A Members, except for the exercise of their approval and other rights pursuant to this Section 6.01 and Section 6.03, shall not participate in the control, management, direction or operation of the activities or affairs of the Company and shall have no power, in their capacity as Members of the Company, to act for or bind the Company.

(b) The Class A Members (acting as provided by Section 6.03) may remove from the Company's membership the Class B Member Manager by notice thereto given in accordance with this Agreement and such Class B Member

Manager shall thereupon have no further authority with respect to the management of the business and affairs of the Company. Upon removal of the Class B Member Manager, such Class B Member Manager's Membership Interest shall be cancelled and the removed Class B Member Manager shall not be entitled to receive any distribution or other payment from the Company (or any Member) in respect of its Membership Interest except for such Class B Member Manager's Capital Contribution and undistributed Class B Member Manager's Profit Allocations, and shall be entitled to such payment, if any, as is provided by the Milford Management Services Agreement. The Class A Members (acting as provided by Section 6.03) may not remove the Class B Member Manager unless such substitution shall not cause any Class A Member to become subject to regulation by the Federal Energy Regulatory Commission as a "public utility" under Section 201(e) of the Federal Power Act, 16 U.S.C. § 824, or any successor statutory provision. Upon appointment by the Class A Members as hereinafter provided of a substitute Class B Member Manager, such substitute Class B Member Manager shall receive a new equity, but non-voting, Membership Interest equivalent to the Class B Member Manager's Capital Contribution made by such substitute Class B Member Manager, and shall be admitted to the Company as the Class B Member Manager upon executing and delivering to the Company and the Class A Members an instrument, in form and substance reasonably satisfactory to each of the Class A Members, whereby it agrees to adhere to and be bound by this Agreement as the Class B Member Manager. In connection with such admission, such Person may be required to enter into an agreement with Milford of similar effect as the Milford Management Services Agreement.

(c) Subject to Section 12.11, the Class B Member Manager may resign only if the Asset Manager or any successor manager of Milford pursuant to an agreement of similar effect as the Milford Management Services Agreement is no longer obligated to perform its services or its other obligations thereunder, provided, that the Class B Member Manager shall maintain its position and perform its duties hereunder for a period of up to 90 days after resignation until a successor Class B Member Manager, approved as provided by Section 6.03(b) is appointed, qualified and substituted by the Class A Members; provided, further, that, if at the end of such 90 day period a successor Class B Member Manager has not been substituted because it has not yet received all approvals, including any approval of the Federal Energy Regulatory Commission, the Class B Member Manager shall continue to maintain its position and perform its duties hereunder for an additional period of up to the shorter of (i) 60 days or (ii) a date on which a successor Class B Member Manager is appointed, qualified and substituted, and provided, further, that upon request of any of the Class A Members, if circumstances warrant, the Class B Member Manager shall reasonably consider, but shall not be obligated to further extend such period. Notwithstanding the foregoing, the Class B Member Manager shall be entitled to immediately resign and shall not be subject to any of the provisos contained in this Section 6.01(c) if

the Milford Management Services Agreement has been terminated in accordance with Section 8.3 thereof.

SECTION 6.02.    Powers of the Class B Member Manager.  Subject to Section 6.03, the Class B Member Manager shall have the power, on behalf and in the name of the Company, to carry out any and all of the purposes of the Company set forth in Section 3.01 hereof and to perform all acts with respect to the Company and enter into and perform, in the name and on the behalf of the Company, all contracts and other undertakings which the Class B Member Manager may deem necessary or advisable or incidental for the conduct of the business and affairs of the Company, but only to the extent consistent with the terms and conditions of this Agreement.  The Class B Member Manager shall perform its duties hereunder in a prudent and efficient manner, in accordance with all Applicable Law.

SECTION 6.03.    Class A Members, Actions Related to the Company.

(a)    Unanimous Approval of Class A Members.  The unanimous approval of the Class A Members shall be required for the following decisions by or actions of the Company related to the Company:

(i)    amending the Certificate of Formation or this Agreement;

(ii)    (a) approval of any Transfer of any Class A Membership Interest to an Affiliate of a Designated Lender or Class A Member prior to the end of 2004 (such approval not to be unreasonably withheld, but if approved, then such Transfer to be subject to the applicable provisions of Article VIII as if unanimous approval had not been obtained), and (b) other than for Transfers subject to clause (a) of this sentence, approval of any Transfer of any Class A Membership Interest unless such approval is not required pursuant to Section 8.01;

(iii)    issuance of additional Membership Interests other than to the nominee of TCW pursuant to Section 4.03 and the TCW Side Letter (which shall not require any approval of the Class A Members);

(iv)    making any change in the character of the business or purpose of the Company;

(v)    making changes to any Class A Member's rights to distributions or allocation of profits or losses;

(vi)    instituting any proceedings for the Company's insolvency, bankruptcy, liquidation, dissolution or winding-up;

(vii)    incurring or becoming liable for indebtedness;

(viii)   the formation or operation by the Company of any subsidiary or new business;

(ix)   except for the acquisition of Milford Interests and the CMSA Rights, purchasing or acquiring any stock or securities of, or any interest in, or make any contribution to, any other entity, or purchase or acquire any assets;

(x)   implementing or adopting any change in the Company's accounting principles or material accounting practices, other than as may be required by GAAP or by law;

(xi)   permitting Additional Capital Contributions;

(xii)   obligating or otherwise committing the Company to do any of the foregoing; and

(xiii)   making any amendment to the provisions of Section 6.03.

(b)   <u>Approval of Three-Quarters of Percentage Interests</u>.  The approval of the Class A Members holding in the aggregate at least three-quarters of the Percentage Interests in the Company shall be required for the following actions of the Company related to the Company:

(i)   selling, assigning, pledging, hypothecating or otherwise Transferring any Milford Interest or any other substantial asset of the Company;

(ii)   prior to the full satisfaction of Milford's Obligations, declaring or paying any dividends or making distributions (other than Tax Distributions pursuant to Section 5.01(c)) upon any of the Membership Interests, or purchasing, redeeming or otherwise acquiring any of the Membership Interests or any securities convertible into any such interests;

(iii)   any Sale Transaction;

(iv)   subject to Section 6.01(b), the appointment, removal or firing of the Class B Member Manager and the admission of any Person as the Class B Member Manager in replacement for the previous Class B Member Manager;

(v)   making any loan or granting any lien (other than pledging the Company's interest in Milford as security for the Obligations);

(vi)   incurring or paying any capital expenditure;

(vii)    entering into any agreement relating to non-competition or confidential or proprietary information;

(viii)    approving any transaction related to the Company, Milford or the business thereof to be entered into after the date hereof between the Class B Member Manager and any of its Affiliates (other than with CPV Milford, LLC and its Affiliates as contemplated by the Milford Management Services Agreement); and

(ix)    obligating or otherwise committing the Company to do any of the foregoing.

(c)    <u>Class A Members' Actions Related to Milford</u>.  The approval of Class A Members holding at least three-quarters of the Percentage Interests shall be required for the following decisions by or actions of the Company related to or acting on behalf of Milford:

(i)    any sale, assignment, pledge, hypothecation or other Transfer of all or substantially all the assets of Milford;

(ii)    any merger, consolidation or similar transaction on the part of Milford;

(iii)    the dissolution of Milford;

(iv)    any material amendment or modification of the limited liability company agreement of Milford or any admission of any new member to Milford (other than the admission as a member of a transferee of a Milford Interest pursuant to a transfer permitted under Milford's limited liability company agreement);

(v)    approving any transaction related to the Company, Milford or the business thereof to be entered into after the date hereof between CPV Milford, LLC and any of its Affiliates (other than with the Class B Member Manager and its Affiliates as contemplated by the Milford Management Services Agreement); and

(vi)    the commencement of any case under Title 11 of the U.S. Code or any other action under federal or state law to reorganize the finances or affairs of Milford or to compromise or settle its obligations.

SECTION 6.04.    <u>Other Activities of the Members</u>.  Nothing in this Agreement shall be construed to limit any Member or its Affiliates from engaging in any business (whether or not in competition with the business of the Company) or making investments of any kind, directly or indirectly through one or more other entities, <u>provided</u>, that neither the Class B Member Manager nor its Affiliates shall engage in a

Conflicting Business. Other than as contemplated by the immediately preceding sentence, each Member or any Affiliate thereof may engage in or possess an interest in other business ventures of any nature or description, independently or with others, whether presently existing or hereafter created, and none of the Company or any other Member shall have any rights pursuant to this Agreement in or to such independent ventures or the income or profits derived therefrom.

SECTION 6.05.    Company Funds and Company Assets. The funds of the Company shall be deposited in such account or accounts in the name of the Company as are designated by the Class B Member Manager. All withdrawals from or charges against such accounts shall be made by the Class B Member Manager. Funds of the Company may be invested as determined by the Class B Member Manager consistent with the purpose of the Company.

SECTION 6.06.    Exculpation. Subject to Applicable Law, no Member shall be liable, in damages or otherwise, to the Company, the Members or any of their Affiliates for any act or omission performed or omitted by it in connection with the business or affairs of the Company, except for any act or omission with respect to which a court of competent jurisdiction has issued a final, nonappealable judgment that such Member was grossly negligent or engaged in willful misconduct.

SECTION 6.07.    Indemnification.

(a)    To the fullest extent permitted by applicable law, the Company shall and does hereby agree to indemnify and hold harmless and pay all judgments and claims against the Members, any Affiliate thereof (other than the Company or any subsidiary thereof), and their respective officers, directors, employees, shareholders, partners, managers, members, consultants or agents (the "Indemnified Parties", each of which shall be a third party beneficiary of this Agreement solely for purposes of this Section 6.07), from and against any loss or damage incurred by them or by the Company for any act or omission taken or suffered by the Indemnified Parties in connection with the business of the Company, including costs and reasonable attorneys' fees and any amount expended in the settlement of any claims or loss or damage, except with respect to any act or omission with respect to which a court of competent jurisdiction has issued a final, nonappealable judgment that such Indemnified Party was grossly negligent or engaged in willful misconduct.

(b)    Except as otherwise provided in this Section 6.07(b), the satisfaction of any indemnification obligation pursuant to Section 6.07(a) hereof shall be from and limited to Company assets. No Member shall have any obligation to make capital contributions to fund any indemnification obligations hereunder and no Member shall have any personal liability on account thereof; provided, that each Member shall be obligated, to the extent provided in Section 4.09 hereof, to return any or all amounts distributed to it as may be necessary in order to fund any deficiency in the Company's indemnity obligations hereunder.

SECTION 6.08.   Duties of the Members.   To the extent that, at law or in equity, any Member has duties (including fiduciary duties) and liabilities relating thereto to the Company or to the Members, any Member acting in connection with the Company's business or affairs shall not be liable to the Company or to any other Member for its good faith reliance on the provisions of this Agreement, and the Class A Members hereby expressly disclaim any fiduciary obligations towards each other or the Class B Member Manager. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Member otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Member.

## ARTICLE VII
## BOOKS, RECORDS, ACCOUNTING AND OTHER INFORMATION

SECTION 7.01.   Books of Account; Access.   The Class B Member Manager shall maintain complete and accurate books of account of the Company's affairs at the Company's principal office, including a list of the names and addresses of all Members, the aggregate amount of capital contributions made by each Member and the amount of distributions received by each Member from the Company. Each Member shall have the right to inspect the Company's books and records at any reasonable time upon advance request to the Class B Member Manager.

SECTION 7.02.   Reports to Members.   Within 120 days (or as soon as practicable thereafter) following the end of each Company Year, the Company shall furnish or cause to be furnished to each Member a Form 1065 and for each Class A Member a related Schedule K-1 and such other information, if any, with respect to the Company as may be necessary for the preparation of such Class A Member's U.S. Federal income tax return, including a statement showing each Class A Member's share of the Company's income, gain or loss, expense and credits for such Company Year for U.S. Federal income tax purposes.

SECTION 7.03.   Tax Controversies.   The Class B Member Manager is hereby designated the "Tax Matters Member" and shall serve as the tax matters partner (as defined in Section 6231 of the Code) and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, provided, that the Class B Member Manager will not take any action with respect to any such examination or audit without the approval of an aggregate of at least three-quarters of the Percentage Interests of the Company. Each Member agrees that such Member will not treat any Company item inconsistently on such Member's income tax return with the treatment of the item on the Company's return and that such Member will not independently act with respect to tax audits or tax litigation affecting the Company, unless previously authorized to do so in writing by the Tax Matters Member, which authorization may be withheld in the discretion of the Tax Matters Member.

SECTION 7.04.   Accounting Methods; Elections.   The Class B Member Manager shall determine, subject to the approval of an aggregate of at least three-quarters

of the Percentage Interests in the Company, the accounting methods and conventions to be used in the preparation of the Company's tax returns and, absent such approval, such accounting methods and conventions shall be determined by the Company's independent accountant. The Class B Member Manager shall make any and all elections under the tax laws of the United States and any other relevant jurisdictions as to the treatment of items of income, gain, loss, deduction and credit of the Company, or any other method or procedure related to the preparation of the Company's tax returns.

SECTION 7.05.    Confidentiality.

(a)    Each Member agrees to keep confidential, and not to disclose to any Person without the consent of the Class A Members holding in the aggregate at least three-quarters of the Percentage Interests of the Company, any matter relating to the Company (other than disclosure to such Member's and its Affiliate's officers, directors, employees, shareholders, partners, beneficiaries, managers, members, agents, accountants, legal counsel, advisors or representatives responsible for matters relating to the Company and who need to know such information in order to perform such responsibilities (each such Person being hereinafter referred to as an "Authorized Representative")); provided, that such Member or any of its Authorized Representatives may make such disclosure to the extent that (i) the information being disclosed is otherwise generally available to the public, (ii) the information is being disclosed to a bona fide potential Transferee of Class A Membership Interests, which potential Transferee executes an agreement to be bound by the obligations of confidentiality contained in this Section 7.05(a) and Section 11.14 of the Credit Agreement; (iii) such disclosure is required by any order of any Governmental Authority, or (iv) such disclosure is otherwise required by law. Each Member will use its best efforts to cause each of its Authorized Representatives to comply with the obligations of such Member under this Section 7.05.

(b) Notwithstanding anything to the contrary set forth herein or in any other agreement to which the parties hereto are parties or by which they are bound, the obligations of confidentiality contained herein and therein, as they relate to the transactions contemplated by this Agreement, shall not apply to the U.S. federal tax structure or federal tax treatment of the transactions contemplated by this Agreement, and each party hereto (and any employee, representative, or agent of any party hereto) may disclose to any and all Persons, without limitation of any kind, the U.S. federal tax structure and federal tax treatment of the transactions contemplated by this Agreement and all materials of any kind (including opinions and other tax analysis) that are provided to such party relating to such U.S. federal tax treatment and tax structure; provided, that such disclosure shall not include the name (or other identifying information not relevant to the U.S. federal tax structure or treatment) of any Person and shall not include information for which nondisclosure is reasonably necessary in order to comply with applicable securities laws.

ARTICLE VIII
TRANSFERS OF MEMBERSHIP INTERESTS

SECTION 8.01.    Transfer of a Member's Interest.

(a)    Other than as provided in Section 6.03(a)(ii), each Class A Member may Transfer any portion of its Class A Membership Interest in the Company at any time to (i) Permitted Transferees or (ii) any other person, provided, that such Transfer shall be conducted in compliance with the provisions of either Section 8.04 or Section 8.05, or (iii) if applicable, the provisions of Section 8.08, provided, that, notwithstanding anything to the contrary contained herein, a Transfer of any Class A Member's Class A Membership Interest shall be null and void unless (u) the Transfer or the Transferee shall not cause any Class A Member or Designating Lender to become subject to regulation by the Federal Energy Regulatory Commission as a "public utility" under Section 2.01(e) of the Federal Power Act, 16 U.S.C. § 824, or any successor statutory provision, (v) such Transferee shall not cause the Company to be treated as a corporation for U.S. federal income tax purposes; (w) contemporaneously with the Transfer of a Class A Membership Interest, the Designating Lender of the Class A Member transferring such Class A Membership Interest shall also assign or otherwise Transfer, or cause the assignment or Transfer of, and the Transferee shall accept, an equivalent proportion of such Designating Lender's and any of its Affiliate's rights and obligations under the Credit Agreement (if any are owned by such Designating Lender or any of its Affiliates at such time), (x) the assignee delivers to the Company the representations set forth in Exhibit A hereto, (y) such Person agrees to be bound by the terms of this Agreement and (z) the Transfer shall be made in accordance with Applicable Law.

(b)    Each Class A Member agrees, upon request of the Class B Member Manager to execute such certificates or other documents and perform such acts as the Class B Member Manager deems appropriate to preserve the status of the Company as a limited liability company after the completion of any Transfer of a Membership Interest of such Class A Member in the Company under the laws of the jurisdiction in which the Company is conducting its operations. For purposes of this Section 8.01, any assignment of a Class A Membership Interest in the Company, whether voluntary or by operation of law, shall be considered a Transfer.

(c)    No Class B Member shall Transfer any of its Membership Interest in the Company and any attempted Transfer shall be null and void and of no force and effect whatsoever.

SECTION 8.02.    Additional or Substitute Member.  A Transferee of any portion of a Class A Member's Membership Interest in the Company pursuant to Section 8.01 hereof shall become a substitute or additional Class A Member, entitled to all of the rights and subject to all of the obligations and liabilities of a Class A Member hereunder.

SECTION 8.03.   Transferee's Rights.  Any purported Transfer of a Class A Membership Interest or rights attributable to the Class A Membership Interest of any Class A Member in the Company which is not in compliance with this Agreement shall be null and void and of no force and effect whatsoever.  A permitted Transferee of any Class A Membership Interest or rights attributable to the Class A Membership Interest of any Class A Member in the Company shall be entitled to receive distributions of cash or other property from the Company.

SECTION 8.04.   Tag-Along Rights.

(a)  In the event that a Class A Member elects to sell any of its Class A Membership Interests (a "Selling Class A Member") in one transaction or a series of related transactions (other than to a Permitted Transferee), it shall provide a written notice (a "Sale Notice") to the other Class A Members, the Company and the Class B Member Manager stating that the other Class A Members have the right to participate in such contemplated sale by delivering a written notice to the Selling Class A Member and the Company within thirty (30) days after the date of delivery of the Sale Notice.

(b)  If any other Class A Member has elected to participate in the sale pursuant to the Sale Notice (each a "Participating Member"), each such Class A Member will be entitled to sell in the contemplated sale, at the same price and on the same terms as the Selling Class A Member is selling its Class A Membership Interests, a dollar value of its Class A Membership Interests equal to (i) the Percentage Interest held by such Class A Member, multiplied by (ii) the dollar value of Class A Membership Interests of the Selling Class A Member contemplated to be sold pursuant to the Sale Notice.

(c)  The Selling Class A Member and any Participating Members shall be entitled to consummate the sale of their Class A Membership Interests at the same price and on the same terms contained in the Sale Notice within sixty (60) days after the date of delivery of the Sale Notice.  If such sale is not consummated within such sixty (60) day period, then the Selling Class A Member and any Participating Members shall not be entitled to sell the subject Class A Membership Interests, unless the Selling Class A Member delivers another Sale Notice and follows the procedures set forth in this Section 8.04.

SECTION 8.05.   Drag-Along Rights.  Any Class A Member shall have the right to require the other Class A Members (i) to vote for a Sale Transaction approved by an affirmative vote of at least three-quarters of the Percentage Interests (including the vote of the Selling Class A Member) and (ii) to agree to and to sell all of their Class A Membership Interests on the same terms and conditions as the Selling Class A Member proposes to sell all (but not less than all) of its Class A Membership Interests approved as provided in (i) above, as reflected in a written notice provided to such other Class A Members by the Selling Class A Member.  The obligations of the other Class A Members with respect to such sale of Class A Membership Interests or Sale Transaction are subject

to the conditions that (i) upon the consummation of such Sale Transaction, Class A Members will receive, pro rata, the same form and amount of consideration in respect of their Class A Membership Interests and (ii) no Class A Member shall be required to incur indemnification obligations in connection with such Sale Transaction other than (x) pro rata obligations with respect to representations, warranties and agreements of or regarding the Company (which in no event shall exceed the sales proceeds received by such Class A Member) or (y) obligations in respect of the title of such Class A Member to its Membership Interests and other matters related to the legality of such Transfer by such Class A Member.

SECTION 8.06.    Distributions Subsequent to Transfer.  A Transfer of a Class A Member's Membership Interest in the Company as permitted pursuant to Section 8.01 hereof shall be effective on the first day of the month following the day on which the requirements of Section 8.01 hereof are satisfied, or at such earlier time as the Class A Members holding in the aggregate at least three-quarters of the Percentage Interests in the Company shall determine. Distributions made after the effective date of the assignment shall be made to the Transferee.

SECTION 8.07.    Satisfactory Written Assignment Required. Notwithstanding anything to the contrary contained herein, the Company, the Class A Members and the Class B Member Manager shall be entitled to treat the Transferor of a Class A Membership Interest or rights attributable to the Class A Membership Interest of any Class A Member in the Company as the absolute owner thereof in all respects, and shall incur no liability for distributions made in good faith to it, until such time as a written Transfer that conforms to the requirements of this ARTICLE VIII has been received by and recorded on the books of the Company.

SECTION 8.08.    Bankruptcy of a Member.  The Bankruptcy of a Member shall not cause a dissolution of the Company, but the rights, if a Class A Member, of such Class A Member to receive distributions and to Transfer its Class A Membership Interest in the Company pursuant to Section 8.01 hereof shall, on the happening of such an event, devolve on its successor, administrator or other legal representative for the purpose of settling its estate or administering its property, subject to the terms and conditions of this Agreement, and the Company shall continue as a limited liability company.  Such successor or representative shall become a substitute Class A Member as provided in Section 8.02 hereof with respect to a Transferee of such Class A Member's Membership Interest in the Company.  The successor or estate of such Class A Member shall be liable for all the obligations of such bankrupt or Class A Member.

## ARTICLE IX
## ADDITIONAL MEMBERS

SECTION 9.01.    Additional Members.  In addition to the admission of new Class A Members or as a result of a Transfer pursuant to ARTICLE VIII, one or more additional Class A Members may be admitted into the Company at any time with the unanimous written approval of the Class A Members, except for the addition of an additional Class A Member pursuant to Section 4.03 and the TCW Side Letter, which shall not require any approval of the Members hereunder; provided, that the admission of such additional Member shall not alter the rights, duties and Membership Interests of the Class B Member Manager except as also agreed in writing by the Class B Member Manager in its sole discretion.

## ARTICLE X
## DISSOLUTION AND LIQUIDATION

SECTION 10.01.  Dissolution.  The Company shall be dissolved and its affairs shall be wound up on the first to occur of any of the following events:

(a)    the unanimous decision of the Class A Members holding to dissolve the Company; or

(b)    any other event sufficient under the Act to cause the dissolution of the Company.

SECTION 10.02.  Final Accounting.  Upon the dissolution of the Company, a proper accounting shall be made from the date of the last previous accounting to the date of dissolution.

SECTION 10.03.  Liquidation.

(a)    Dissolution of the Company shall be effective as of the date on which the event occurs giving rise to the dissolution and all Members shall be given prompt notice thereof in accordance with Section 12.01 hereof, but the Company shall not terminate until the assets of the Company have been distributed as provided for in Section 10.03(c) hereof.  Notwithstanding the dissolution of the Company, prior to the termination of the Company, the business, assets and affairs of the Company shall continue to be governed by this Agreement.

(b)    Upon the dissolution of the Company, the Class B Member Manager, or a person selected by the Class A Members holding in the aggregate at least three-quarters of the Percentage Interests in the Company if such Class B Member Manager has not so acted, shall act as the liquidator (the "Liquidator") of the Company to wind up the Company.  The Liquidator shall have full power and authority to sell, assign and encumber any or all of the Company's assets and to

wind up and liquidate the affairs of the Company in an orderly and commercial manner.

(c)    The Liquidator shall distribute all proceeds from liquidation in the following order of priority:

(i)    first, to creditors of the Company (including creditors who are Members) in satisfaction of the liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof);

(ii)    second, to the Class B Member Manager in an amount equal to the Class B Member Manager's Capital Contribution; and

(iii)    thereafter, to the Members in the same manner in which non-liquidating distributions are made pursuant to ARTICLE V hereof.

(d)    The Liquidator shall determine whether any assets of the Company shall be liquidated through sale or shall be distributed in kind.  Any such distribution in kind shall either be *pro rata* in accordance with the Class A Members' Percentage Interests, following sixty (60) days notice thereof, or with the consent of the Class A Member receiving the distribution.  A distribution in kind of an asset to a Class A Member shall be considered, for the purposes of this ARTICLE X, a sale of the assets so distributed at their fair market value as reasonably determined by the Liquidator, with the deemed gain or loss thereon allocated to the Class A Members in accordance with the provisions of ARTICLE V hereof, followed by a distribution to such Class A Member at such fair market value.

SECTION 10.04.  Cancellation of Certificate.  Upon the completion of the distribution of Company assets as provided in Section 10.03 hereof, the Company shall be terminated and the person acting as Liquidator shall cause the cancellation of the Certificate of Formation and shall take such other actions as may be necessary or appropriate to terminate the Company.

SECTION 10.05.  Waiver of Action for Partition.  Each of the Members irrevocably waives during the term of the Company any right that such Member may have to maintain an action for partition with respect to the property of the Company.

ARTICLE XI
AMENDMENT OF LIMITED LIABILITY COMPANY AGREEMENT

SECTION 11.01.  Amendments.  Except for any provisions which, by their terms, require for amendment the approval of a greater Percentage Interest of Class A Membership Interests (in which case the approval of such greater Percentage Interests shall be required), this Agreement may be amended in the sole and absolute discretion of the Class A Members holding in the aggregate at least three-quarters of the Percentage

Interests in the Company; provided, that (i) no amendment which adversely affects one Class A Member disproportionately to other Class A Members shall be permitted without the consent of such Class A Member so disproportionately affected and (ii) no amendment shall alter the rights, duties, liabilities or Membership Interests of the Class B Member Manager without the prior written consent of the Class B Member Manager (which consent may be withheld in its sole discretion), provided that this clause (ii) shall not apply in connection with the removal of the Class B Member Manager by the Class A Members as provided in Sections 6.01 and 6.03.

ARTICLE XII

GENERAL PROVISIONS

SECTION 12.01. <u>Notices</u>. All notices, demands or other communications to be given to, or served upon, any of the parties to this Agreement by reason of this Agreement, shall be in writing and either shall be delivered in person with receipt acknowledged or by first-class mail, return receipt requested, postage prepaid, or telecopied, and, in each case, addressed at the address and/or telecopy number set forth below such Member's name on such Member's signature page hereto. The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice. Every notice, demand or other communication hereunder shall be deemed to have been duly given or served on the date on which delivered (with receipt acknowledged) or telecopied.

SECTION 12.02. <u>Specific Performance</u>. The parties hereto agree that irreparable damage would occur if any of the provisions of this Agreement were not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of the United States or any state having jurisdiction, in addition to any other remedy to which they are entitled at law or in equity.

SECTION 12.03. <u>No Third Party Beneficiaries</u>. It is understood and agreed among the parties that this Agreement and the covenants made herein are made expressly and solely for the benefit of the parties hereto (including any Person who agrees in writing to become a party hereto as provided in ARTICLE VIII hereof), and that no other Person, other than an Indemnified Party under Section 6.07 hereof, shall be entitled or be deemed to be entitled to any benefits or rights hereunder, nor be authorized or entitled to enforce any rights, claims or remedies hereunder or by reason hereof.

SECTION 12.04. <u>Successors and Assigns</u>. All of the terms and provisions of this Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective permitted Transferees, if any.

SECTION 12.05. <u>Entire Agreement</u>. This Agreement (including the schedules and exhibits hereto) contains the entire agreement among the parties with

respect to the subject matter hereof and supersedes all prior agreements, proposals, representations, arrangements or understandings, written or oral, with respect thereto.

SECTION 12.06. Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, in such jurisdiction, be ineffective to the extent of such prohibition or unenforceability, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. If any provision of this Agreement shall be held or deemed to be or shall, in fact, be inoperative or unenforceable as applied in any particular case because it conflicts with any other provision or provisions hereof or any law, statute, ordinance, rule, regulation, order, writ, decree or injunction, or for any other reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provisions herein contained invalid, inoperative or unenforceable to any extent whatsoever. The invalidity of any one or more phrases, sentences, clauses, Sections or subsection of this Agreement shall not affect the remaining portions thereof.

SECTION 12.07. Headings. All section headings herein are for convenience of reference only and are not part of this Agreement, and no construction or inference shall be derived therefrom.

SECTION 12.08. Gender and Number. Whenever required by the context hereof, the singular shall include the plural, and the plural shall include the singular. The masculine gender shall include the feminine and neuter genders and the neuter gender shall include the masculine and feminine genders.

SECTION 12.09. Applicable Law. This Agreement and the rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the State of Delaware, but not including the choice of law rules thereof.

SECTION 12.10. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

SECTION 12.11. PUHCA Status. (a) Notwithstanding anything herein to the contrary, the Class A Members, individually or in the aggregate, shall not knowingly amend this Agreement or the Certificate of Formation in a manner that would reasonably be expected to cause the Class B Member Manager to be considered a "public utility company" or "holding company" under PUHCA ("Utility Status").

(b) Additionally, prior to any agreement by a Class A Member, individually or together with any other Class A Member or Class A Members, to take or cause to be taken any action pursuant to subclauses (i), (iv), (viii) or (ix) of Section 6.03(a) of this Agreement or to amend any of such subclauses (each a "Desired Action"), such Class A Member or Members, as the case may be, shall provide a written notice to the Class B Member Manager describing in reasonable detail such action or actions

(each, a "Desired Action Notice"). Within five (5) business days after the delivery to the Class B Member Manager of a Desired Action Notice, the Class B Member Manager may deliver a written notice (each, a "Response Notice") to the Class A Members indicating in reasonable detail the reasons supporting its good faith belief that any Desired Action described in the Desired Action Notice is reasonably likely to result in Utility Status of the Class B Member Manager (each such Desired Action, an "Adverse Action").

(c) If the Class B Member Manager delivers to the Class A Members a Response Notice as required by clause (b) above, the Members shall cooperate with each other and use commercially reasonable efforts to reach an agreement with respect to taking the Adverse Actions in a manner that would not result in Utility Status of the Class B Member Manager as expeditiously as possible.

(d) Notwithstanding anything in this Agreement or the Milford Management Services Agreement to the contrary, if any Class A Member or Class A Members takes or causes to be taken any Desired Action or Adverse Action, as the case may be, which results in Utility Status of the Class B Member Manager, the Class B Member Manager shall be entitled to immediately resign from the Company as a Member and the Class B Member Manager. If the Class B Member Manager resigns pursuant to this Section 12.11, the Company and the Class B Member Manager agree to take such actions or cause such actions to be taken as the Class B Member Manager may reasonably request to effectuate such resignation.

[The remainder of this page is left blank intentionally.]

IN  WITNESS  WHEREOF,  the  parties  hereto  have  entered  into  this Limited Liability Company Agreement as of the date first above written.

### CLASS A MEMBERS:

IPF FUNDING LLC

By: _____

Name: WIM VERBRAEKEN          SUSAN M. SILVER

Title: PRESIDENT               TREASURER

ANZ MPH, LLC

By:_____

Name:

Title:

VREDEZICHT 'S-GRAVENHAGE 109 B.V.

By:_____

Name:

Title:

CTG&P, LLC

By:_____

Name:

Title:

SMBC CAPITAL PARTNERS LLC

By:_____

Name:

Title:

[Signature Page to Limited Liability Company Agreement of Milford Holdings LLC]

IN WITNESS WHEREOF, the parties hereto have entered into this Limited Liability Company Agreement as of the date first above written.

**CLASS A MEMBERS:**

IPF FUNDING LLC

By:_____
Name:
Title:

ANZ MPH, LLC

By:_____
Name: Gary Stuber
Title:   President

VREDEZICHT 'S-GRAVENHAGE 109 B.V.

By:_____
Name:
Title:

CTG&P, LLC

By:_____
Name:
Title:

SMBC CAPITAL PARTNERS LLC

By:_____
Name:
Title:

[Signature Page to Limited Liability Company Agreement of Milford Holdings LLC]

IN WITNESS WHEREOF, the parties hereto have entered into this Limited Liability Company Agreement as of the date first above written.

**CLASS A MEMBERS:**

IPF FUNDING LLC

By:_____
Name:
Title:

ANZ MPH, LLC

By:_____
Name:
Title:

VREDEZICHT 'S-GRAVENHAGE 109 B.V.

By:_____
Name:    J. A Mogkgal    Henny J.Th. Spanjaard
Title:    VP    Head Special Credits

CTG&P, LLC

By:_____
Name:
Title:

SMBC CAPITAL PARTNERS LLC

By:_____
Name:
Title:

[Signature Page to Limited Liability Company Agreement of Milford Holdings LLC]

IN WITNESS WHEREOF, the parties hereto have entered into this Limited Liability Company Agreement as of the date first above written.

**CLASS A MEMBERS:**

IPF FUNDING LLC

By:_____
Name:
Title:

ANZ MPH, LLC

By:_____
Name:
Title:

VREDEZICHT 'S-GRAVENHAGE 109 B.V.

By:_____
Name:
Title:

CTG & P, LLC

By:_____
Name: Elizabeth Schulz
Title:    Vice President

SMBC CAPITAL PARTNERS LLC

By:_____
Name:
Title:

[Signature Page to Limited Liability Company Agreement of Milford Holdings LLC]

IN WITNESS WHEREOF, the parties hereto have entered into this Limited Liability Company Agreement as of the date first above written.

**CLASS A MEMBERS:**

IPF FUNDING LLC


By:_____
Name:
Title:

ANZ MPH, LLC


By:_____
Name:
Title:

VREDEZICHT 'S-GRAVENHAGE 109 B.V.


By:_____
Name:
Title:

CTG&P, LLC


By:_____
Name:
Title:

SMBC CAPITAL PARTNERS LLC


By:_____
Name: Hideaki Horiuchi
Title: Treasurer


[Signature Page to Limited Liability Company Agreement of Milford Holdings LLC]

MILFORD W HOLDINGS, LLC

By: _____
Name: Jared Bvhmni
Title: Manager

By: _____
Name: Ben Wagner
Title: Manager
Global Specialized Finance

[Signature Page to Limited Liability Company Agreement of Milford Holdings LLC]

PARIBAS MILFORD HOLDINGS, LLC

BY:  PARIBAS POWER HOLDINGS, LLC

BY: PARIBAS NORTH AMERICA, INC.

By: _____

Name:  John Powers
Title:  Vice President, Secretary
and General Counsel

By: _____

Name:  Larry Sobin
Title:  Chief Administrative
Officer

[Signature Page to Limited Liability Company Agreement of Milford Holdings LLC]

**CLASS B MEMBER MANAGER:**

CPV Milford Management, LLC

By: _____
Name: GARY A LAMACIT JR.
Title: VICE PRESIDENT

[Signature Page to Limited Liability Company Agreement of Milford Holdings LLC]

## EXHIBIT A

### ASSIGNEE TAX REPRESENTATIONS

1. The assignee is, and will at all times continue to be, the sole beneficial owner of the interest in the Company to be registered in its name (the "Interest");

2. such assignee either (i) is not a grantor trust, partnership or S corporation for U.S. federal income tax purposes, or (ii) was not formed with, and will not be used for, a principal purpose of permitting the Company to satisfy the 100 partner limitation contained in Section 1.7704-1(h)(1)(ii) of the Treasury Regulations;

3. such assignee did not purchase, and will not sell, its Interest through (a) a national, non-U.S., regional, local or other securities exchange, (b) PORTAL or (c) over-the-counter market (including an interdealer quotation system that regularly disseminates firm buy or sell quotations by identified brokers or dealers by electronic means or otherwise);

4. such assignee did not purchase, and will not sell, its Interest from, to or through (i) a person, such as a broker or dealer, that makes a market in, or regularly quotes prices for, the, or (ii) a person that regularly makes available to the public (including customers or subscribers) bid or offer quotes with respect to the Interest and stands ready to effect, buy or sell transactions at the quoted prices for itself or on behalf of others; and

5. such assignee will only sell its Interest to a buyer who provides representations similar to these.

The Class A Members may waive representation 2. above on the advice of counsel that the transfer of an interest in the Company to such purchaser will not cause the Company to be treated as a corporation for U.S. federal income tax purposes. These representations may from time to time be revised by the Class A Members on the advice of counsel.

SCHEDULE I

NAMES, ADDRESSES AND TELECOPY NUMBERS OF
DESIGNATING LENDERS AND MEMBERS

| Designating Lender and Address | Initial Class A Member and Address |
|---|---|
| 1.  KBC Bank N.V., New York Branch<br>125 West 55th Street<br>New York, NY 10019<br>Tel: (212) 541-0670<br>Fax: (212) 541-0666<br>Attention: Susan M. Silver, Vice<br>President and Team Leader | IPF Funding LLC, a Delaware Limited<br>Liability Company<br>c/o KBC Bank N.V., New York Branch<br>125 West 55th Street<br>New York, NY 10019<br>Tel: (212) 541-0670<br>Fax: (212) 541-0666<br>Attention: Susan M. Silver, Treasurer<br>Tax ID: 75-313-0666 |
| 2.  Australia and New Zealand Banking<br>Group Limited<br>1177 Avenue of the Americas, 6th<br>Floor<br>New York, NY 10036-2798<br>Tel: (212) 801-9788<br>Fax: (212) 556-4889<br>Attention: Director, Corporate<br>Portfolio Management | ANZ MPH, LLC<br>1177 Avenue of the Americas, 6th Floor<br>Tel: (212) 801-9788<br>Fax: (212) 556-4889<br>Attention: Gary Stuber, President; Martin<br>Cleaver, Vice President, Gloria Lastra,<br>Vice President<br>Tax ID: |
| 3.  BNP Paribas<br>787 Seventh Avenue<br>New York, NY 10022-1278<br>Tel:<br>Fax:<br>Attention: | Paribas Milford Holdings, LLC<br>787 Seventh Avenue<br>New York, NY 10019<br>Tel: 212-841-3392<br>Fax: 212-841-2555<br>Attention: Kathryn B. Quinn<br>Tax ID: |
| 4.  NIB Capital Bank N.V.<br>Carnegieplein 4<br>PO Box 380, 2501 BH<br>The Hague<br>Tel: (011) 31-70-3425657<br>Fax: (011) 31-70-3425926<br>Attention: Special Credit, Head of<br>Department | Vredezicht 's-Gravenhage 109 B.V.<br>c/o NIB Capital Bank N.V.<br>Carnegieplein 4<br>PO Box 380, 2501 BH<br>The Hague<br>Tel: (011) 31-70-3425657<br>Fax: (011) 31-70-3425926<br>Attention: Special Credit, Head of<br>Department<br>Tax ID (Non-U.S.) 8099.36.859 |

| | | |
|---|---|---|
| 5. | Teachers Insurance and Annuity Association of America<br>730 Third Avenue<br>New York, NY 10017-3206<br>Tel: (212) 916-4256<br>Fax: (212) 916-6329<br>Attention: Elizabeth Shulz, Vice President; Roi Chandy, Vice President; Livia Maghiar, Vice President | CTG&P, LLC<br>730 Third Avenue<br>New York, NY 10017<br>c/o The Corporation Trust Company<br>1209 Orange Street<br>Wilmington, DE 19801<br>Tel: (212) 916-4256<br>Fax: (212) 916-6329<br>Attention: Elizabeth Shulz, Vice President; Roi Chandy, Vice President; Livia Maghiar, Vice President<br>Tax ID: 26-0074723 |
| 6. | West LB AG<br>1211 Avenue of the Americas<br>New York, NY 10036<br>Tel: (212) 853-6116<br>Fax: (212) 852-6273<br>Attention: Jared Brenner, Director | Milford W Holdings, LLC<br>1211 Avenue of the Americas, 25th floor<br>New York, NY 10036<br>Tel: (212) 852-6116<br>Fax: (212) 852-6386<br>Attention: Jared Brenner, Manager<br>FEIN: 20-0489941 |
| 7. | Sumitomo Mitsui Banking Corporation<br>277 Park Avenue<br>New York, NY 10172<br>Tel: (212) 224-4000<br>Fax: (212) 593-9522<br>Attention: Atsushi Horiike, Assistant Treasurer, Loan Restructuring | SMBC Capital Partners LLC<br>c/o Corporation Service Company<br>2711 Centerville Road, Suite 400<br>Wilmington, DE 19808<br>Notices to: Atsushi Horriike<br>Assistant Treasurer, Loan Restructuring Department<br>Sumitomo Mitsui Banking Corporation<br>277 Park Avenue, New York NY 10172<br>Tel: (212) 224-4192<br>Fax: (212) 224-5198<br>Tax ID: 13-561-1820 |
| **Class B Member Manager:** | | |
| 1. | CPV Milford Management, LLC<br>8403 Colesville Rd., Suite 915<br>Silver Spring, Maryland 20910<br>Tel:<br>Fax:<br>Attention: Douglas F. Egan<br>Tax ID: 51-0402836 | |

SCHEDULE II

PERCENTAGE INTEREST AND CAPITAL ACCOUNT OF EACH
CLASS A MEMBER IN MILFORD HOLDINGS LLC

| CLASS A MEMBER | PERCENTAGE INTEREST | CAPITAL |
|---|---|---|
| 1. IPF Funding LLC | 15.95% | $7,975 |
| 2. ANZ MPH, LLC | 15.95% | $7,975 |
| 3. PARIBAS MILFORD HOLDINGS, LLC | 15.95% | $7,975 |
| 4. Vredezicht 's-Gravenhage 109 B.V. | 6.78% | $3,390 |
| 5. CTG&P, LLC | 22.65% | $11,325 |
| 6. Milford W Holdings, LLC | 15.95% | $7,975 |
| 7. SMBC Capital Partners LLC | 6.78% | $3,390 |