# EXHIBIT B

THE OWNERSHIP INTERESTS EVIDENCED HEREBY (OR BY CERTIFICATES, IF ANY ARE ISSUED) HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES EXCHANGE ACT OF 1933 (15 U.S.C. ∍77a *et seq.*), AS AMENDED (THE "1933 ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE. SAID INTERESTS MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED AT ANY TIME EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS CONTAINED IN THIS AGREEMENT AND PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT AND ANY APPLICABLE STATE SECURITIES LAW OR AN EXEMPTION THEREFROM.  FURTHER, THE SALE OR OTHER DISPOSITION OF THE OWNERSHIP INTERESTS EVIDENCED HEREBY ARE RESTRICTED, AS SET FORTH IN THIS AGREEMENT AND THE COMPANY HAS THE RIGHT TO REQUIRE AN OPINION OF COUNSEL, IN FORM AND SUBSTANCE SATISFACTORY TO IT, THAT SUCH TRANSFER CAN BE LAWFULLY MADE WITHOUT REGISTRATION OR OTHER COMPLIANCE WITH SUCH STATUTES AND OTHER RULES AND REGULATIONS THEREUNDER.

AMENDED AND RESTATED

LIMITED LIABILITY COMPANY AGREEMENT

OF MILFORD POWER COMPANY, LLC

Dated as of March 25, 1999

By and Among

EL PASO MILFORD POWER I COMPANY

EL PASO MILFORD POWER II COMPANY

AND

PDC MILFORD POWER LLC

Milfordllc1.dot
BUSDOCS:728102.1

# TABLE OF CONTENTS

ARTICLE I  DEFINITIONS AND INTERPRETATIONS ...................................-1-
  1.1    Definitions ...............................................................-1-
  1.2    Interpretations .........................................................-1-

ARTICLE II  FORMATION.........................................................-1-
  2.1    Formation ................................................................-1-
        (a)    Organization ...........................................-1-
        (b)    Member's Rights and Liabilities.....................-2-
        (c)    Qualification in Other Jurisdictions .................-2-
  2.2    Name .....................................................................-2-
  2.3    Offices..................................................................-2-
  2.4    Term....................................................................-2-
  2.5    Authorized Number of Units of Membership Interest .................-2-

ARTICLE III  PURPOSES AND POWERS OF THE COMPANY ..................-3-
  3.1    Purposes of the Company .............................................-3-
  3.2    Powers of the Company ...............................................-3-
  3.3    Other Business Opportunities ........................................-4-
  3.4    Affiliate Transactions.................................................-4-

ARTICLE IV  MEMBERSHIP......................................................-4-
  4.1    Initial Members .......................................................-4-
  4.2    Additional Members ..................................................-4-
  4.3    Withdrawal ............................................................-4-
  4.4    No State-Law Partnership............................................-4-
  4.5    Meetings of Members..................................................-4-
        (a)    Quorum Requirements.................................-4-
        (b)    Location of Meetings of Members ...................-5-
        (c)    Adjournment of Meetings.............................-5-
        (d)    Meeting of Members ..................................-5-
        (e)    Notice of Meetings of Members .....................-5-
        (f)    Record Date ..........................................-5-
  4.6    Voting List............................................................-5-
  4.7    Proxies ................................................................-6-
  4.8    Conduct of Meetings..................................................-6-
  4.9    Action by Written Consent or Telephone Conference ................-6-
        (a)    Written Consent......................................-6-
        (b)    Record Date ..........................................-7-
        (c)    Documents ...........................................-7-
        (d)    Meetings of Members by Telephone.................-7-
  4.10   Preemptive Rights ....................................................-7-

**ARTICLE V  MANAGEMENT OF COMPANY** ..................................................................-7-
    5.1    Management by Members ...............................................................-7-
    5.2    Member Decisions ...........................................................................-7-
            (a)        Actions Requiring Unanimous Consent .........................-7-
            (b)        Actions Requiring Super-Majority in Interest Consent ............................-8-
            (c)        Actions Requiring Majority in Interest Consent ................... -10-
    5.3    Committees .................................................................................. -10-
            (a)        Construction Committee................................................. -11-
            (b)        Operations Committee .................................................. -11-
            (c)        Commercial Committee ................................................. -11-
    5.4    Member Management Agreements ................................................. -11-
    5.5    Management by Officers ............................................................... -11-
    5.6    Fuel Manager ............................................................................... -12-
    5.7    Power Marketer ............................................................................ -12-

**ARTICLE VI  CAPITAL CONTRIBUTIONS** ................................................................. -12-
    6.1    Capital Account ............................................................................ -13-
    6.2    Capital Contributions ................................................................... -13-
            (a)        Capital Contributions for the Construction of the Plant ......................... -13-
            (b)        Additional Capital Contributions ................................... -13-
    6.3    Ownership Interest ....................................................................... -14-
            (a)        Initial Ownership Interest ............................................. -14-
            (b)        Revision of Ownership Interests Following the Flip Point ..................... -14-
            (c)        Flip Point ....................................................................... -14-
    6.4    Consequences of Default in the Payment of Capital Contributions ....................... -15-
            (a)        Mandatory Capital Contributions ................................... -15-
            (b)        Additional Capital Contributions ................................... -15-
    6.5    Return of Capital ......................................................................... -16-

**ARTICLE VII  ALLOCATIONS AND DISTRIBUTIONS**................................................ -16-
    7.1    Cash Distribution ......................................................................... -16-
    7.2    Allocations of Profits and Losses................................................. -16-
    7.3    Curative Amendment .................................................................... -18-
    7.4    Section 704(c) .............................................................................. -18-
    7.5    Transfers ...................................................................................... -18-
    7.6    Withholdings ................................................................................ -18-

**ARTICLE VIII  ACCOUNTING AND TAXATION** ......................................................... -19-
    8.1    Fiscal Year.................................................................................... -19-
    8.2    Location of Records; Inspection ................................................... -19-
    8.3    Books of Account.......................................................................... -19-
    8.4    Financial Statements and Reports ................................................ -20-
    8.5    Taxation ....................................................................................... -20-
    8.6    Tax Returns and Audits ................................................................ -21-
    8.7    Other Reports ............................................................................... -21-
    8.8    Inspection of Records................................................................... -22-
    8.9    Deposit and Withdrawal of Funds................................................ -22-

Berkshire.doc
BUSDOCS:728102.1

8.10    Record Retention ....................................................................... -22-
8.11    Company Level Tax Audits .......................................................... -22-

ARTICLE IX   TRANSFER OR PLEDGE OF OWNERSHIP INTERESTS ........................ -24-
9.1     Transfers or Pledges Generally .................................................... -24-
9.2     Right of First Offer ..................................................................... -24-
9.3     Permitted Transfers ..................................................................... -26-
9.4     Requirements Applicable to All Dispositions and Admissions ............. -26-
        (a)     Ratification of this Agreement ........................................... -26-
        (b)     Securities Law Opinion ..................................................... -26-
        (c)     Restrictions on Sale of Interests in a Member ...................... -26-
9.5     Prohibited Transfers Null and Void ............................................... -26-
9.6     PUHCA Regulation ..................................................................... -27-

ARTICLE X   OWNERSHIP INTERESTS ............................................................ -27-
10.1    Certificates Representing Ownership Interests ................................. -27-
10.2    Certificate Transfer Book and Members of Record ........................... -27-
10.3    Member's Change of Name or Address .......................................... -28-
10.4    Transfer of Ownership Interests ................................................... -28-
10.5    Lost, Stolen or Destroyed Certificates ........................................... -28-

ARTICLE XI   DISSOLUTION AND TERMINATION ............................................. -28-
11.1    Automatic Dissolution ................................................................. -28-
11.2    Automatic Withdrawal of Member ................................................ -29-
11.3    Damages .................................................................................... -29-
11.4    Date of Dissolution ..................................................................... -29-
11.5    Control After Dissolution ............................................................ -30-
11.6    Dissolution and Winding Up ........................................................ -30-
11.7    Liquidation ................................................................................ -30-
11.8    Purchase Right Upon Dissolution ................................................. -31-
11.9    Voluntary Withdrawal Rights ...................................................... -31-
        (a)     Right to Withdraw ........................................................... -31-
        (b)     Reimbursement Rights ...................................................... -31-
        (c)     Indemnification of Withdrawing Member ............................. -32-

ARTICLE XII  LIMITATION OF LIABILITY AND INDEMNIFICATION ..................... -32-
12.1    Limitation of Liability ................................................................. -32-
12.2    Right to Indemnification .............................................................. -32-
12.3    Cross-Indemnification ................................................................. -32-
12.4    Consequential Damages ............................................................... -32-
12.5    Non-Recourse to Members ........................................................... -33-

ARTICLE XIII REPRESENTATIONS ................................................................. -33-
13.1    Representations of the Members .................................................... -33-
        (a)     Due Organization ............................................................ -33-
        (b)     Authorization .................................................................. -33-
        (c)     Effect of this Agreement ................................................... -33-

Berkshire.doc
BUSDOCS:728102.1

| | | |
|---|---|---|
| (d) | Litigation | -34- |
| (e) | Regulation | -34- |

**ARTICLE XIV  CONFIDENTIALITY OF COMPANY AFFAIRS** ................................. **-34-**
| | | |
|---|---|---|
| 14.1 | Disclosure of Confidential Information | -34- |
| 14.2 | Use | -34- |
| 14.3 | Procedures | -34- |
| 14.4 | Survival | -35- |
| 14.5 | Remedies | -35- |

**ARTICLE XV  MISCELLANEOUS** ............................................................. **-35-**
| | | |
|---|---|---|
| 15.1 | Entirety of Agreement | -35- |
| 15.2 | Notices | -35- |
| 15.3 | Further Assurances | -36- |
| 15.4 | APPLICABLE LAW AND CHOICE OF FORUM | -37- |
| 15.5 | Counterparts | -37- |
| 15.6 | Laws and Regulatory Bodies | -37- |
| 15.7 | Force Majeure | -37- |
| 15.8 | Notice of Litigation | -37- |
| 15.9 | Severability | -37- |
| 15.10 | Third-Party Beneficiaries | -37- |
| 15.11 | Remedies | -37- |
| 15.12 | Non-Waiver of Rights | -37- |

**EXHIBIT A** ............................................................................................. **-1-**

**ARTICLE 1  DEFINITIONS AND INTERPRETATIONS** ................................. **-1-**
| | | |
|---|---|---|
| 1.1 | Definitions | -1- |
| 1.2 | Interpretations | -4- |

**EXHIBIT B - Member Management Agreements** ............................................. **-1-**

**EXHIBIT C – Form of Certificate** ................................................................ **-1-**

Berkshire.doc
BUSDOCS:728102.1

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**MILFORD POWER COMPANY, LLC**

This Amended and Restated Limited Liability Company Agreement of **MILFORD POWER COMPANY, LLC** ("Agreement") is effective this   day of March, 1999 by and among the Members (as defined below).

**WHEREAS**, the Members filed the Certificate of Formation and formed Milford Power Company, LLC as a Delaware limited liability company on December 11, 1998, pursuant to the terms of a Limited Liability Agreement dated on the same date (the "Original LLC Agreement");

**WHEREAS**, PDC – El Paso Milford LLC filed its Articles of Organization with the Secretary of State of Connecticut on January 26, 1998, pursuant to which PDC – El Paso Milford LLC was formed, as a Connecticut limited liability company;

**WHEREAS**, Milford Power Company LLC filed a Certificate of Merger on December 11, 1998, whereby PDC – El Paso Milford LLC merged with and into Milford Power Company, LLC and the initial members of PDC – El Paso Milford LLC withdrew; and

**WHEREAS**, the Members desire to amend and restate the Original LLC Agreement and to set forth in this Agreement all of the terms and conditions applicable to the Company and the rights and obligations of the Members.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises, and in consideration of the representations, warranties, and covenants contained in this Agreement, the Members agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATIONS

1.1    Definitions - Unless otherwise provided to the contrary in this Agreement, capitalized terms in this Agreement shall have the meanings set forth in Section 1.1 of Exhibit A.

1.2    Interpretations - Unless expressly provided to the contrary in this Agreement, this Agreement shall be interpreted in accordance with the provisions set forth in Section 1.2 of Exhibit A.

## ARTICLE II
## FORMATION

2.1    Formation

(a)    Organization - The Company was originally formed and organized as a Delaware limited liability company on December 11, 1998 by the  filing by an authorized representative of the Company of a Certificate of Formation with the Secretary of the State of Delaware

BUSDOCS:728102.1

1

under the name "Milford Power Company, LLC."

(b)  <u>Member's Rights and Liabilities</u> - The rights, privileges, liabilities and obligations of the Members shall be as provided in this Agreement to the extent permitted under the Act, it being understood that the Members intend to govern all of their rights and obligations in accordance with the terms set forth in this Agreement.

(c)  <u>Qualification in Other Jurisdictions</u> - Prior to transacting business in Connecticut or any jurisdiction other than the State of Delaware, the Company shall qualify to do business in Connecticut and any such other jurisdiction if such a procedure is required and provided by statute or regulation in such other jurisdiction. The Members (or where appropriate, an officer of the Company) shall execute and deliver such certificates and documents and perform such acts consistent with the terms of this Agreement as may be necessary to comply with the requirements of the assumed or fictitious name statutes and any other applicable law for the qualification and operation of a limited liability company in each jurisdiction in which the Company will conduct business.

2.2  <u>Name</u> - The name of the Company shall be MILFORD POWER COMPANY, LLC and all Company business shall be conducted in that name or such other names that comply with applicable law as the Members may select from time to time.

2.3  <u>Offices</u> - The office of the Company required by the Act to be in the State of Delaware shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Members may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other Person(s) as the Members may designate from time to time in the manner provided by law. The principal place of business of the Company shall be at 300 Bic Drive, Milford, Connecticut or such other location as the Members shall designate from time to time. The Company shall maintain its books and records at the principal place of business of the Member Manager assigned responsibility for maintaining such books and records in accordance with the Member Management Agreements in accordance with Section 5.4. The Company may have such other offices as the Members may designate from time to time. Written notice of any change in the Company's principal place of business and the designation of any other offices of the Company shall be given to each Member.

2.4  <u>Term</u> - The Company commenced on December 11, 1998 and shall continue in existence until December 31, 2048, unless the Company is dissolved earlier in accordance with this Agreement or the Act.

2.5  <u>Authorized Number of Units of Membership Interest</u> - Subject to Section 6.4(b)(iii), the aggregate number of Units of Membership Interest that the Company is authorized to issue is 100. The following Units of Membership Interest that the Company issued at the time of the original formation of the Company and on the date of this Agreement are as follows:

| <u>Member</u> | <u>Units of Membership Interest</u> |
|---|---|
| El Paso I | 5 |
| El Paso II | 90 |
| PDC | 5 |

2

Each holder of a Unit of Membership Interest shall have the right to cast one vote for each percentage of Ownership Interest held by such holder on all matters upon which Members of the Company are entitled to vote.

## ARTICLE III
## PURPOSES AND POWERS OF THE COMPANY

3.1    <u>Purposes of the Company</u> - The purposes for which the Company is organized are:

    (a)    to develop, design, construct, own, operate, maintain and manage a natural gas-fired combined cycle electric generation facility having a nominal capacity of approximately five hundred forty (540) megawatts to be located in Milford, Connecticut; and

    (b)    to engage in such other lawful activities as may be related, incident or ancillary thereto for which limited liability companies may be organized under the Act, including, without limitation:

        (i)    any actions or transactions relating to the generation and sale of electric power from the Plant;

        (ii)    any actions or transactions relating to the purchase or other acquisition, sale or other disposition, of natural gas and other fuels as fuel supplies for the Plant;

        (iii)    any actions or transactions relating to the design, engineering, procurement and construction of the Plant;

        (iv)    any actions or transactions relating to the operation and maintenance of the Plant;

        (v)    any actions or transactions relating to the financing of the costs of developing, constructing, owning and operating the Plant;

        (vi)    any actions or transactions relating to the purchase, sale, development, maintenance, pledge or other disposition of any real, personal, moveable, immovable, or mixed properties or interests incidental to the Company's businesses;

        (vii)    any transactions involving forward contracts, energy commodity futures and price swaps, collars or other derivative instruments incident to the foregoing businesses, and

        (viii)    any other business or activity that now or hereafter may be necessary, incidental, proper, advisable, or convenient as determined by the Super-Majority in Interest of the Members to accomplish the purposes set forth above that is not prohibited by the law of the jurisdiction in which the Company engages in that business or activity; provided that the Company shall not engage in any business or activity that would cause the Company to be a "public utility company" or a "holding company" as such terms are used in the PUHCA.

BUSDOCS:728102.1

3.2  Powers of the Company - The purposes of the Company set forth in Section 3.1 may be accomplished by taking any action permitted under the Act that is customary or directly related to the business of the Company. The Company shall possess and may exercise all powers and privileges necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the Company.

3.3  Other Business Opportunities - The Members may engage, directly or indirectly, without the consent of any other Member or the Company, in other business ventures of any nature or description, independently or with others, including without limitation, businesses that may be competitive with or the same as or similar to the business of the Company. Each of the Members waives any rights it might otherwise have to share or participate in such other interests, businesses, opportunities, or ventures and in all income or profits that may be derived therefrom.

3.4  Affiliate Transactions - The Company will not enter into any agreement or arrangement with any Member or Affiliate, unless (a) there has been a full disclosure of the terms of such agreement or arrangement and the affiliation of the Members and (b) the terms of such agreement or arrangement are substantially equivalent to the terms that are available on an arms-length basis. The Members and the Company expressly agree that, with respect to the Member Management Agreements, the Fuel Purchase Agreement, the Power Marketing Agreement, the Fuel Subordination Agreement and any other agreements or documents contemplated by the Financing Agreements (i) the Members have complied with the disclosure requirements set forth in (a) above and (ii) the terms of such agreements comply with the standard set forth in (b) above.

## ARTICLE IV
## MEMBERSHIP

4.1  Initial Members  - The Members of the Company are El Paso I, El Paso II and PDC, each of which was admitted to the Company as a Member effective on the date of the filing of the Certificate of Formation. The name and principal office address of each initial Member is set forth in Section 15.2.

4.2  Additional Members - Additional parties may be admitted to the Company as Members and Units of Membership Interest may be issued to those parties and to existing Members on such terms and conditions as may be determined upon approval by all of the Members. In the case of an assignee of a Membership Interest, such assignee shall be admitted as a Member only upon the consent of all the Members in accordance with the provisions of Article IX; provided, however, that any assignment of a Membership Interest (including any associated Ownership Interest) shall be subject to the restrictions set forth in Article IX.

4.3  Withdrawal - Except as provided in Section 11.9, no Member has the right or power to resign or withdraw from the Company as a Member.

4.4  No State-Law Partnership - Except for federal and state tax purposes, the Members do not intend the Company to be a partnership, limited partnership or joint venture. No Member shall be a partner or joint venturer of any other Member solely on account of this Agreement and the transactions contemplated hereby, for any purpose other than federal and state tax purposes.

4.5  Meetings of Members - The following procedures and rules will apply with regard to the

4

meetings of the Members:

(a)   <u>Quorum Requirements</u> - A quorum shall be present at a meeting of Members if the holders of a Majority in Interest are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified percentage of Members entitled to vote is required by this Agreement, the affirmative vote of a Majority in Interest at a meeting of Members at which a quorum is present shall be the act of the Members. With respect to any matter for which the affirmative vote of the holders of a specified percentage of Members is required by this Agreement, if the holders of at least such required specified percentage of Members is not present, then another meeting can be resumed on such matters no sooner than three (3) days from the date of the adjournment of the initial meeting. Upon resumption of the meeting on such matters, such matters may be transacted by the required percentage of Ownership Interests of those Members present or represented at the resumed meeting.

(b)   <u>Location of Meetings of Members</u> - All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of Connecticut as shall be specified or fixed in the notices or waivers of notice thereof.

(c)   <u>Adjournment of Meetings</u> - Notwithstanding the other provisions of this Agreement, the Chairman of the Company or the holders of a Majority in Interest of the Members shall have the power to adjourn such meeting from time to time. If any meeting that is adjourned is resumed within a three (3) day period, then all of the Members shall be given notice of the time and place of the resumption of such meeting. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d)   <u>Meetings of Members</u> - The Members shall hold a Members meeting at least once each calendar Year. In addition, special meetings of the Members for any proper purpose or purposes may be called at any time by the holders of at least five percent (5%) of the Ownership Interests prior to the Flip Point and at least ten percent (10%) of the Ownership Interests on and after the Flip Point. If not otherwise stated in or fixed in accordance with the remaining provisions of this Agreement, the record date for determining Members entitled to call a special meeting is the date of the notice of that meeting.

(e)   <u>Notice of Meetings of Members</u> - Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) nor more than sixty (60) days before the date of the meeting, either personally or by mail by a nationally recognized overnight delivery service, by or at the direction of the Members or Person calling the meeting, to each Member entitled to vote at such meeting. Attendance by a Member at any meeting of the Company shall be deemed to constitute a waiver of notice unless such attendance is specifically for the purpose of objecting to the lack of notice and such objection is clearly stated by such Member or its representative.

(f)   <u>Record Date</u> - The date of the notice of a meeting of Members shall be the record date for

5

the determination of the Members entitled to notice of or to vote at such meeting, including any adjournment thereof.

4.6     Voting List - At least ten (10) days before each meeting of the Members, the Chairman shall make a complete list of the Members entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Units of Membership Interests (and associated Ownership Interests) held by each. For ten (10) days prior to such meeting, the list shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during normal business hours and shall be produced in writing upon the request of any Member. The list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima-facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this Section shall not affect the validity of any action taken at the meeting.

4.7     Proxies - A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section 4.7. Proxies for use at any meeting of Members shall be filed with the Members, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Members, who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more Persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Ownership Interests that are the subject of such proxy are to be voted with respect to such issue.

4.8     Conduct of Meetings - All meetings of the Members shall be presided over by the Chairman of the Company. The nominee of the Member with the largest Ownership Interest shall be designated as the Chairman for so long as it owns the largest Ownership Interest in the Company. The Chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him in order; provided that the Chairman shall conduct meetings of the Members in accordance with such rules of procedure as shall be agreed upon by the Members attending such meetings. The Chairman shall not have any additional vote by virtue of his capacity as Chairman.

4.9     Action by Written Consent or Telephone Conference

(a)     Written Consent - Any action required by or permitted to be taken at any annual or

6

special meeting of Members or otherwise in accordance with the provisions of this Agreement may be taken without a meeting, without prior notice, and without a vote if the holders of not less than the minimum Ownership Interests that would be necessary to take the action consent in writing; provided, however, that all actions contemplated by Sections 5.2(a) and (b) must be presented to all of the Members with the same period of notice as is required pursuant to Section 4.5(e). A telegram, telex, cablegram or similar transmission by a Member, shall be regarded as a signed consent by the Member for purposes of this Section 4.9(a). Prompt notice of the taking of any action by Members without a meeting by less than unanimous written consent to the actions shall be given to the Members that did not provide their consent.

(b)  Record Date - The record date for determining Members entitled to consent to an action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Members.

(c)  Documents - If any action by Members is taken by written consent, then any documents filed with the Secretary of State of Delaware as a result of the taking of the action shall state, in lieu of any statement required by the Act concerning any vote of Members, that written notice required by the Act has been given.

(d)  Meetings of Members by Telephone - Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can simultaneously hear or otherwise communicate with each other. Participation in such a meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened and such objection is clearly stated.

4.10  Preemptive Rights - Except as set forth in Section 6.4(b)(iii) of this Agreement, the Members shall not have a preemptive right to acquire additional, unissued or treasury Units of Membership Interest of the Company or securities of the Company, convertible into or carrying a right to subscribe to acquire Units of Membership Interest.

## ARTICLE V
## MANAGEMENT OF COMPANY

5.1  Management by Members - The business and affairs of the Company shall be managed by the Members in accordance with the terms of this Agreement. Subject to the provisions of Section 5.2, the Members shall have authority to make all decisions with respect to the overall management, supervision and control of, and the determination of all matters relating to, the development, construction, ownership and operation of the Plant, except where such decision-making power may be delegated in a writing entered into in accordance with the terms of this Agreement to (a) committees in accordance with Section 5.3, (b) El Paso II and Power Development Company, LLC pursuant to a Member Management Agreement and a Service Agreement, respectively, in accordance with Section 5.4, (c) any officers that may be appointed in accordance with Section 5.5, (d) the Fuel Manager pursuant to the Fuel Purchase Agreement in accordance with Section 5.6, (e) the Power Marketer pursuant to the Power Marketing Agreement in accordance with Section 5.7, or (f) any other body or representative by the vote of the Members.

7

5.2    Member Decisions - All matters requiring the approval or consent of the Members shall require the level of votes by the Members as set forth below:

(a)    Actions Requiring Unanimous Consent - A Member, committee, management personnel or any other agent, representative or employee of the Company shall not have the power or authority, and may not cause the Company, to do any of the following without obtaining the unanimous approval of the Members:

(i)    sell, lease, exchange or otherwise dispose of all or substantially all of the Company's property and assets in a single transaction or series of related transactions;

(ii)    except as described in Section 2.1, cause the Company to be a party to (A) a merger or consolidation, or (B) an exchange or acquisition of the type described in Section 18-209 of the Act;

(iii)    except as expressly provided in this Agreement, amend or restate the Certificate of Formation or this Agreement;

(iv)    change, or authorize a transaction, agreement or action of the Company that is unrelated to, the scope or nature of the Company's business purpose as set forth in Section 3.1;

(v)    cause the Company to repurchase Units of Membership Interest or, except as set forth herein, issue additional Units of Membership Interest;

(vi)    cause the Company to accept the resignation of a Member;

(vii)    cause the Company to make an assignment for the benefit of creditors of the Company, file a voluntary petition in bankruptcy, appoint a receiver for the Company or agree to voluntarily dissolve the Company;

(viii)    cause the Company to enter into the Financing Agreements with the Lenders or any refinancing of such agreements that would have an adverse impact on the net present value of the future cash flows of the Company or any of its Members, discounted at 12% per annum or any other material adverse impact to the Company or any of its Members;

(ix)    cause the Company to provide a notice to proceed under the EPC Contract;

(x)    change the location of the principal place of business of the Company to a place outside of the United States; or

(xi)    any other action that requires the consent of all the Members by the express terms of this Agreement.

(b)    Actions Requiring Super-Majority in Interest Consent - The approval by a Super-Majority in Interest of the Members or the representatives of the committee to which such

8

matters may be delegated shall be required before any of the following acts involving the Company may be taken:

(i) entering into, or amending, modifying, or terminating, an agreement involving aggregate consideration (including assumed actual and contingent liabilities) or receipts, or delivery or receipt of goods or services having a value, in excess of $2,000,000 per year (other than the Member Management Agreements, Fuel Purchase Agreement or Power Marketing Agreement);

(ii) approving, adopting and amending written Company operating procedures (the "Operating Policy"), which Operating Policy shall be approved and adopted within forty-five (45) days of the execution of this Agreement, addressing, among other areas, procedures for the execution and approval of agreements binding the Company (including specific authority level of Members, officers, and Company employees), that may be used in connection with its businesses, procedures for the execution and approval of agreements between the Company and Members, Affiliates, officers, and/or Company employees, tax recording and accounting procedures, retention and audit policies;

(iii) approving a capital budget (the "Capital Budget") for each Fiscal Year, which shall not be exceeded without the express consent of a Super-Majority in Interest of the Construction Committee (except with respect to capital expenditures of less than the greater of $2,000,000 or 5% of an individual line item contained in the Capital Budget or as otherwise provided in the Financing Agreements);

(iv) making any capital expenditure in excess of $2,000,000, unless such expenditure is reflected in a capital budget for the current Fiscal Year that has been approved by the Members;

(v) approving and amending an annual business plan for the Company;

(vi) approving an operating budget for costs other than fuel costs (the "Operating Budget") for each Fiscal Year, which shall not be exceeded without the express consent of a Super-Majority in Interest of the Operations Committee (except with respect to operating expenditures of less than the greater of $1,000,000 or 5% of the an individual line item contained in the Operating Budget or as otherwise provided in the Financing Agreements);

(vii) providing for the indemnification of any Officer, employee, agent or any other Person except as specifically provided in this Agreement or in the Member Management Agreement with El Paso II or the Service Agreement with Power Development Company, LLC;

(viii) revaluing any property or asset, where such revaluation is for an amount in excess of $2,000,000;

(ix) taking action that will result in any Company property being burdened by a lien or other encumbrance in excess of $2,000,000, other than the lien under Fuel Subordination Agreement;

9

(x)     entering into, amending or terminating any contract or commitment to acquire or transfer any asset, the fair market value or aggregate consideration (including assumed actual and contingent liabilities) of which exceeds $2,000,000;

(xi)    approving the distribution of Company property to Members in accordance with Article VII;

(xii)   executing or otherwise entering into, or amending, modifying, or terminating, any agreement with a Member, officer or employee of the Company, an Affiliate of a Member, or a person related by blood or marriage to an Officer or employee of the Company, involving aggregate consideration (including assumed actual and contingent liabilities) or fair market value or actual or contingent liability in excess of $500,000, except that this Section 5.1(c)(xii) shall not apply to the Member Management Agreements, Fuel Purchase Agreement or the Power Marketing Agreement;

(xiii)  (A) filing any claim or lawsuit against any third party in an amount claimed in excess of $500,000, or (B) settling any claim or lawsuit where the fair market value of the settlement amount exceeds $500,000;

(xiv)   incurring any Company indebtedness for borrowed money in excess of $2,000,000;

(xv)    authorizing the acquisition by the Company of the assets of another entity as a going concern in an amount in excess of $2,000,000;

(xvi)   subject to any requirements of the Lenders under the Financing Agreements, establishing any reserves of the Company in excess of $4,000,000;

(xvii)  causing the Company to change its name; or

(xviii) establishing any committee pursuant to Section 5.2, subject to the limitations set forth herein, or delegating any authority to any such committee.

(c)     <u>Majority in Interest</u> - The approval by a Majority in Interest of the Members or the representatives of the committee to which such matters may be delegated shall be required for all other matters not set forth in Sections 5.2(a) and (b) above.

5.3   <u>Committees</u> - The Members hereby establish (a) a Construction Committee to provide oversight over the construction of the Plant, (b) an Operations Committee to provide oversight over the operations of the Plant, (c) a Commercial Committee to provide oversight over the key commercial issues and contracts affecting the Company. The Members may, by unanimous consent, establish other committees after the date of execution of this Agreement. Unless otherwise agreed to by the Members, each such committee shall be comprised of one representative of each Member ("Committee Representative"), designated by such Member by written notice to each other Member. Each Member shall have the right to designate one or more alternate Committee Representatives to act in the place of the designated Committee Representative, if such Member's designated Committee Representative is or becomes

10

unavailable to act on behalf of such Member. Any Member may at any time, by written notice to each other Member, remove its Committee Representative or alternate and designate a new Committee Representative or alternate. The term "Committee Representative," as used in this Agreement, includes an alternate Committee Representative if the designated Committee Representative is unavailable to act on behalf of a Member. Each Committee Representative may vote in person or by proxy. Each Committee Representative shall be fully empowered to act on behalf of the Member he, she or it represents with respect to all matters brought before the Committee affecting the Company, its business or affairs. Unless otherwise agreed to by all of the Members, a Committee Representative shall either be an officer, director, employee of a Member or its Affiliates. Each Committee shall meet upon the request of any representative serving on such Committee and upon the request of any Member. The provisions of Sections 4.5, 4.6, 4.7, 4.8 and 4.9 shall apply with regard to the meetings and votes of the Committee Representatives as if such Committee Representatives were Members and as if each duly convened meeting of a Committee at which a quorum is present were a meeting of the Members with respect to the subject matter delegated to such Committee.

(a)     Construction Committee - The Construction Committee shall provide oversight and direction to the Member designated responsibilities as owners' engineer under the Member Management Agreement pursuant to Section 5.4 and to the EPC Contractor associated with the construction activities of the Company. This shall include the review and approval of matters submitted by the relevant Member to the committee, including the review and approval of (i) construction budgets, (ii) final engineering design and specifications for said facilities, unless otherwise previously approved by the Members, (iii) the bids for and the contracts with third party suppliers, contractors and subcontractors, (iv) establishment of procedures for the testing, start up and commissioning of the Plant and (v) execution of an agreements associated with the acquisition of the necessary rights-of-way or land for the Plant.

(b)     Operations Committee - The Operations Committee shall provide oversight and direction to the O&M Operator associated with the operation, maintenance and repair of the Plant. This shall include the review and approval of matters submitted by the O&M Operator to the committee, including the review and approval of (i) operations budgets, and (ii) any repair of the Plant, unless otherwise previously approved by the Members; and

(c)     Commercial Committee - The Commercial Committee shall provide oversight and direction to the Fuel Manager and the Power Marketer associated with the key commercial issues and contracts affecting the Company. The Commercial Committee shall, from time to time, provide written guidance and authorization to the Fuel Supplier and the Power Marketer as to the general plan to sell and transport natural gas supplies to the Company and to purchase the electric output of the Plant from the Company. The Commercial Committee shall prescribe general contract guidelines and terms for routine contracts not involving long term commitments or serious financial exposure.

5.4     Member Management and Service Agreements - The Company has entered into a Member Management Agreement with El Paso II and a Service Agreement with Power Development Company, LLC that are attached as Exhibit B to this Agreement.

5.5     Management by Officers - The Members may establish such management positions of the Company as they shall deem appropriate from time to time. Any officers so designated shall

BUSDOCS:728102.1

have such authority and perform such duties as provided in this Agreement or as the Members may, from time to time, delegate to them. The initial officer of the Company shall consist of a general manager. Unless delegated otherwise by the Members and subject to the control of the Members and the Members in accordance with the Member Management Agreement and the contractor under the Service Agreement, the general manager shall have the responsibility for the general supervision of the employees of the Company, the general direction of the operational affairs of the Company (including without limitation the direction of the O&M Contractor) and the responsibility for the day-to-day affairs, business, administration and operations of the Company (including without limitation the discretionary authority to take any action or enter into any transaction, agreement or arrangement on behalf of the Company to be taken or entered into in the ordinary course of business of the Company, except to the extent that such action or transaction is of the type that would otherwise require the approval of the Members, the Committees, the Members pursuant to the Member Management Agreements, the Fuel Manager, the Power Marketer, or any other body or representative established by the Members in accordance with this Agreement. The general manager may sign and execute in the name of the Company (a) all contracts or other instruments authorized by the Members, the Members pursuant to the Member Management Agreements or delegated representatives in accordance with this Agreement or (b) all contracts or instruments in the usual and regular course of business, except in cases when the signing and execution thereof shall be expressly delegated or permitted by the Members or by this Agreement to some other representative. In addition, the general manager shall perform all duties incident to the office of the chief executive officer of a Company and such other duties as from time to time may be assigned to him by the Members. The Members may establish such other officer positions and when establishing such other positions, the Members will expressly state what authority is delegated to such officers. The salaries or other compensation of the officers shall be fixed from time to time by the Members.

5.6   Fuel Marketer - The Company and El Paso Gas Marketing Company ("EPGM") have entered into on the date of execution of this Agreement a Fuel Purchase Agreement, pursuant to which EPGM shall sell natural gas and fuel oil as a source of fuel for the Plant.

5.7   Power Marketer - The Company and El Paso Power Services Company ("EPPS") have entered into on the date of execution of this Agreement a Power Marketing Agreement, pursuant to which EPPS shall manage the purchase, sale and transmission of the electrical output of the Plant (or any futures contract or derivative contract relating to electricity).

## ARTICLE VI
## CAPITAL CONTRIBUTIONS

6.1   Capital Accounts - A "Capital Account" shall be established for each Member, which shall, for avoidance of doubt, be used to allocate distributions to the Members in accordance with Section 704(b) of the Code. In this regard, a Member's Capital Account shall be adjusted and maintained in the following manner:

(a)   To each Member's Capital Account there shall be credited the amount of cash and the value as determined by all of the Members of any asset contributed to the Company by such Member, such Member's distributive share of Profits, any items in the nature of income or gain which are specially allocated pursuant to Sections 7.2, 7.3 or 8.5(b) of this

12

Agreement, and the amount of any Company liabilities assumed by such Member or which are secured by any asset of the Company distributed to such Member.

(b)     To each Member's Capital Account there shall be debited the amount of cash and the value as determined by all of the Members of any Company asset distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses, any items in the nature of expenses or losses which are specially allocated pursuant to Sections 7.2, 7.3 or 8.5(b), and the amount of any liabilities of such Member assumed by the Company or which are secured by any asset contributed by such Member to the Company.

(c)     In the event that all or a portion of a Membership Interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that it relates to the transferred interest in the Company.

(d)     In determining the amount of any liability for purposes of this definition of Capital Accounts, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and regulations.

Solely for accounting and financial reporting purposes, the Capital Accounts shall be maintained in accordance with GAAP and in accordance with Section 704(b) of the Code.

6.2     <u>Capital Contributions</u> - The Members shall make or be deemed to have made the following Capital Contributions to the Company:

(a)     <u>Capital Contributions for the Construction of the Plant</u> - Pursuant to the Financing Agreements, the Lenders will provide the Company (a) an equity bridge loan of $78.75 million ("Equity Bridge Loan") and a non-recourse construction loan of $271.25 million. Such loans will convert into a $271.25 million term non-recourse loan at commencement of commercial operations of the Plant and El Paso II (and any successor to its interest in accordance with this Agreement) will make cash capital contributions to the Company as are required from time to time pursuant to the Financing Agreements to repay the Equity Bridge Loan; provided that El Paso II or its successors shall not be obligated to contribute in excess of $78.75 million or such higher amount as the Parties may mutually agree associated with its equity contribution required by the Financing Agreements ("Equity Contribution") and neither PDC nor El Paso I shall be obligated to contribute any capital to the Company pursuant to this subsection (a). The Capital Accounts of El Paso II or its successors shall be credited with the full amount of any cash contributions made in accordance with this Section 6.2(a).

(b)     <u>Additional Capital Contributions</u> - If the Members, pursuant to Section 5.2, determine that additional capital is required following the contribution of the Equity Contribution and the available funds are drawn under the Financing Agreements which are necessary to either (i) complete the construction of the Plant and to place it into commercial operation in excess of the amounts provided in Section 6.2(a), or (ii) repair, perform a major overhaul, replace facilities of the Plant or other capital costs following the placement of the Plant into commercial operation, then the Members shall use commercially reasonable efforts to finance such additional capital requirements from

13

third party sources. To the extent that there is a shortfall in the funds available from such third party sources (with such shortfall referred to as the "Additional Capital Contributions"), then the Chairman in accordance with the determination of the Members pursuant to Section 5.2 shall give written notice to the Members stating: (i) the aggregate amount of the Additional Capital Contributions that are required, (ii) the purpose or purposes for which such Additional Capital Contributions are proposed to be used, (iii) the portion of such Additional Capital Contribution that are required to be contributed by each Member based upon each Member's Ownership Interest, and (iv) the date on which the Additional Capital Contribution must be made, which shall be not less than the earlier of (A) ninety (90) days from the giving of such notice or (B) the date the expenditure associated with the Additional Capital Contribution must be incurred to avoid an adverse impact on the Project.

6.3    Ownership Interests - Subject to the provisions of this Agreement, the interests of the Members in the profits, gains and losses of the Company ("Ownership Interests") shall be as follows:

(a)    Initial Ownership Interests - The initial Ownership Interests of the Members in the Company shall be as follows:

| El Paso I | 5% |
| El Paso II | 90% |
| PDC | 5% |

(b)    Revision of Ownership Interests Following the Flip Point - From and after the occurrence of the Flip Point, the Ownership Interests of the Members shall be as follows:

| El Paso I | 60% |
| El Paso II | 10% |
| PDC | 30% |

(c)    Flip Point - The Flip Point shall occur at the point which the Discounted Distributions and Allocations equals the Discounted Contributions. For purposes of this section, "Discounted Distributions and Allocations" shall mean the discounted sum of (i) distributions made to El Paso II and its successors pursuant to Section 7.1 or Section 11.7, less (ii) allocations of Profit made to El Paso II and its successors pursuant to Section 7.2(a) (including any amounts that are specially allocated pursuant to Sections 7.2, 7.3 or 8.5(b) and specifically excluding any Profit exempt from taxes) multiplied by the Corporate Tax Rate, plus (iii) allocations of Losses made to El Paso II and its successors pursuant to Section 7.2(b) (including any amounts that are specially allocated pursuant to Sections 7.2, 7.3 or 8.5(b)) multiplied by the Corporate Tax Rate, with such amounts discounted at a rate of fifteen percent (15%) per annum from the date such amounts are distributed or allocated in accordance with this Agreement back to the date of the initial Capital Contribution by El Paso II or its successors. For avoidance of doubt, "Discounted Distributions and Allocations" shall include distributions and allocations associated with the sale or liquidation of the Company or sale of all or substantially all of the assets of the Company, including without limitation, liquidations pursuant to Section 11.7, up to that portion of such proceeds from such sale or liquidation of the Company or all or substantially all of the assets of the Company that cause the Flip Point to occur. In addition, for purposes of this section, "Discounted Distributions and Allocations" shall

14

also mean distributions and allocations associated with the simultaneous sale of all of the Membership Interests or Ownership Interests in the Company, where the sale of all of such Membership Interests or Ownership Interests are sold at the same per unit price and the sale of such Membership Interests or Ownership Interests is the substantial equivalent of the sale of the Company or all or substantially all of the assets of the Company. For purposes of this section, "Discounted Contributions" shall mean the discounted sum of all of the Capital Contributions made by El Paso II and its successors to the Company, with such contributions being discounted at a rate of fifteen percent (15%) per annum from the date such amounts are contributed back to the date of the initial Capital Contribution. The occurrence of the Flip Point shall not result in any adjustment to the Member's Capital Accounts or entitle any Member to the then existing Capital Account balance of any other Member. For avoidance of doubt, if at the Conversion Date there remains any Project Savings (as those terms are defined in the Financing Agreements), then the Capital Contributions required to be made by El Paso II to the Company shall be reduced in an amount equal to the Project Savings, which are available to be distributed to the Company pursuant to the Financing Agreements. The sum of (a) the Capital Contributions actually made by El Paso II (after taking into consideration the reduction in its capital contributions pursuant to the preceding sentence) and (b) any contingent equity contribution obligations of El Paso II or its Affiliates under the Financing Agreements that have been paid on or before the Flip Date shall be used in the calculation of the Flip Date pursuant to this Section 6.3(c).

6.4    <u>Consequences of Default in the Payment of Capital Contributions</u>

(a)    <u>Mandatory Capital Contribution</u> - If El Paso II or its successors shall default in the performance of its obligations to make Capital Contributions to the Company, including all or any portion of the Equity Contribution, as and when required by Section 6.2(b) (a "Defaulting Member"), then at the expiration of ten (10) days after written notice of such default is sent by the Company or any Nondefaulting Member and such notice is received by the Defaulting Member (with copies of such notice to all other Members), if the default is not cured, then the Nondefaulting Members shall have the right, but not the obligation to exercise their rights pursuant to Article XI of this Agreement. From and after such termination, the Defaulting Members shall have no further rights under this Agreement, except that the Non-defaulting Member shall pay the Defaulting Member any unreimbursed development costs incurred by such Defaulting Member that may be recovered from Lenders under the Financing Agreements, any subsequent financial arrangements or from available cash flows received from the Company or any of the Nondefaulting Members from the operation of the Plant in accordance with the terms of the Joint Development Agreement. The right of the Nondefaulting Members to exercise their rights pursuant to Article XI of this Agreement in accordance with this section shall be the sole and exclusive remedy for the failure of the Defaulting Member to make the Capital Contributions to the Company as and when required by Section 6.2(a).

(b)    <u>Additional Capital Contributions</u> - If a Member fails to provide when due the whole or any part of its share of the Additional Capital Contributions ("Unpaid Contribution") in accordance with Section 6.2(b) (a "Non-Contributing Member"), then the sole remedy of the Company and each other Member (a "Contributing Member") shall be as follows:

(i)    the Company shall immediately give notice (a "Contribution Notice") to each

15

Non-Contributing Member of the failure to pay its Unpaid Contribution in accordance with Section 6.2(b);

(ii)    within five (5) days of receipt of a Contribution Notice each Non-Contributing Member shall provide written notice to the Company and each Contributing Member stating whether it intends to pay the Unpaid Contribution. If there is more than one Non-Contributing Member, each Non-Contributing Member shall provide written notice of whether it intends to pay the portion of the Unpaid Contribution equal to the amount of the Unpaid Contribution times a fraction, the numerator of which is the Ownership Interest of the Non-Contributing Member and the denominator of which is the Ownership Interest of all of the Non-Contributing Members in the same manner and form as was required with respect to the relevant Unpaid Amount.

(iii)    if the Non-Contributing Member (A) does not provide written notice that it intends to pay the Unpaid Contribution, (B) provides written notice that it does not intend to pay the Unpaid Contribution or (C) fails to contribute the Unpaid Amount when due, then each Contributing Member shall have the right, but not the obligation, to pay (on a pro rata basis based upon their relative Ownership Interests) all or part of the Unpaid Contribution of the Non-Contributing Member. The Company shall issue additional Units of Membership Interest to the Contributing Members making such additional capital contributions such that the Ownership Interests of each of the Members shall be adjusted in proportion to the aggregate Capital Accounts of all Members after such additional Capital Contributions have been made. In the event that compliance with this Section 6.4(b)(iii) requires the Company to issue Units of Membership Interest in excess of that which the Company is expressly authorized to issue under the terms of this Agreement, the number of Units of Membership Interest shall automatically be amended and increased, without further action by or notice to any party, to the number necessary to allow the Units of Membership Interest of the Contributing Members making such additional Capital Contributions to be increased in accordance with this Section 6.4(b)(iii).

6.5    <u>Return of Capital</u> - No Member shall have any personal liability for the repayment of the Capital Contributions of any other Member. No Member shall be entitled to the withdrawal or return of its Capital Contributions except to the extent, if any, that distributions made pursuant to this Agreement or upon the dissolution of the Company may be considered as such by operation of law, and then only to the extent provided for in this Agreement. Except as otherwise expressly set forth in this Agreement, no Member shall have priority over any other Member either as to the return of capital or as to profits, losses or distributions or be entitled to receive any interest on its Capital Contributions or to receive or demand any property from the Company other than cash.

**ARTICLE VII**
**ALLOCATIONS AND DISTRIBUTIONS**

7.1    <u>Cash Distribution</u> - Subject to Sections 18-607 and 18-804 of the Act, the Company shall distribute to the Members its available cash on hand (including without limitation available cash from a sale of property of the Company, proceeds available from refinancings and proceeds from

the issuance of additional Membership Interests) after payment of all expenses and liabilities of the Company then due and payable to third parties and after establishment of such reserves as provided for under the Financing Agreements or as the Members shall otherwise determine (the "Available Cash") within forty-five (45) days of the end of each calendar quarter. Subject to the review and approval of the Members, the Tax Matters Member (defined in Section 8.11) shall determine whether such distributions represent profits, or return of Capital Contributions and shall advise in writing each Member of such determination. The Available Cash shall be distributed to the Members in proportion to their respective Ownership Interests.

7.2    <u>Allocations of Profits and Losses</u> - Subject to any special allocations required by IRS Regulations Sections 1.704-2(b), 1.704-2(i), and 1.704-2(j)(2)(ii), relating to deductions and gains attributable to Nonrecourse Deductions and Partner Nonrecourse Deductions (as those terms are defined in such Regulations), the Company's items of income, gain, loss, deduction and credit shall be allocated among the Members in each taxable year (or portion thereof) in the same ratio in which Profits and Losses are allocated as provided below:

(a)    Profits for any taxable year (or portion thereof) shall be allocated in the same ratio as the Members are entitled to distributions from the Company under Section 7.1 of this Agreement.

(b)    Losses for any taxable year (or portion thereof) shall be allocated among the Members in proportion to their respective Ownership Interests for such taxable year (or portion thereof).

(c)    As used in this Agreement, "Profits" and "Losses" mean, for each taxable year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss and deduction required to be stated separately pursuant to Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses shall be added to such income or loss for the purpose of determining the Members' Capital Accounts;

(ii)    Any expenditures of the Company described in Section 705(a)(2)(B) of the Code (or treated as such expenditures pursuant to IRS Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits and Losses shall be subtracted from such income or loss for the purpose of determining the Members' Capital Accounts;

(iii)    In the event that the Gross Asset Value of any Company asset is adjusted as required by the terms of the definition of Gross Asset Value of this Agreement, the amount of such adjusted Gross Asset Value shall be taken into account in accordance with IRS Regulation Section 1.704-2(b) for the purpose of determining the Members' Capital Accounts;

(iv)    Gain or loss resulting from the disposition of Company assets with respect to which gain or loss is recognized for federal income tax purposes shall be

17

computed by reference to the Gross Asset Value of the property disposed of in accordance with IRS Regulation Section 1.704-1(b) for the purpose of determining the Members' Capital Accounts, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v)     In lieu of the depreciation, amortization or other cost recovery deductions taken into account in computing such taxable income or loss, for the purpose of determining the Members' Capital Accounts there shall be taken into account Depreciation for such taxable year or other period, computed in accordance with the definition of Depreciation in this Agreement; and

(vi)    Notwithstanding any other provision of this definition of Profits and Losses, any items which are specially allocated pursuant to Sections 7.4 or 8.5(b) shall not be taken into account in computing Profits and Losses but shall be taken into account in computing the Members' Capital Accounts.

(d)    As used in this Agreement, "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the other Members;

(ii)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by all of the Members, as of the following times: (a) the acquisition of any additional interest in the Company in exchange for more than a de minimis Capital Contribution, (b) the distribution by the Company to a Member of more than a de minimis amount of Company assets as consideration for an interest in the Company, and (c) the liquidation of the Company within the meaning of IRS Regulation Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to Clauses (a) and (b) of this Section shall be made only with the consent of all the Members;

(iii)   The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as determined by the Company; and

(iv)    The Gross Asset Value of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Sections 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to IRS Regulations Section 1.704-1(b)(2)(iv)(m) and Section 6.1.

As used in this Agreement, "Depreciation" means, for each taxable year, or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to any asset for such year or other period, except that if the Gross Asset Value of an asset differs form its adjusted basis for federal income tax purposes as the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax

18

depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Company.

7.3    <u>Curative Amendment</u> - Notwithstanding any other provision of this Agreement, the allocations in this Agreement shall effect an allocation for federal income tax purposes in a manner consistent with Section 704(b) of the Code and the regulations promulgated thereunder. If for any reason the allocations conflict with the regulations under Section 704(b) of the Code, the Tax Matters Member may amend these provisions to the extent necessary to reflect allocations consistent with the regulations as long as they do not alter any policies approved pursuant to Section 5.2(b)(ii), the Member's Ownership Interests or interests in cash distributions as established in this Agreement.

7.4    <u>Section 704(c)</u> - In accordance with Section 704(c) of the Code and the regulations promulgated thereunder and IRS Regulation Section 1.704-1(b)(i), income, gain, loss and deductions with respect to any property with a Gross Asset Value which differs from its adjusted basis, shall, solely for tax purposes (and not for purposes of determining Capital Accounts under Section 6.1), be allocated among the Members so as to take account of any variation between the adjusted basis to the Company and its Gross Asset Value. The Members agree to use the traditional method with curative allocations under IRS Regulation Section 1.704-3(c) for this purpose.

7.5    <u>Transfers</u> - The allocation of items of income, gain, loss, deduction and credit attributable to a Membership Interest that is assigned during the taxable year will be done in accordance with Section 706(d) of the Code. If more than one method is permitted, the Tax Matters Member shall choose the method of allocation, taking into account the desire to match income and deductions and ease of administration. For this purpose, the transferor of a Membership Interest shall be treated as owning the transferred Membership Interest through the effective date of the transfer and shall be allocated all items of Company income, gain, loss, deduction and credit arising through the effective date of the transfer that are attributable to the transferred Membership Interest. A transferee of a Membership Interest shall succeed to a pro rata portion of the Capital Account of the transferor relating to the Membership Interest so transferred and any special allocations pursuant to Section 8.5(b) attributable to the Membership Interest transferred.

7.6    <u>Withholdings</u> - All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as amounts paid or distributed, as the case may be, to the Members with respect to which such amounts were withheld pursuant to this Section 7.6 for all purposes of this Agreement. The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state and local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocated any such amounts to the Members with respect to which such amounts were withheld.

**ARTICLE VIII**
**ACCOUNTING AND TAXATION**

19

BUSDOCS:728102.1

8.1    Fiscal Year - The Fiscal Year of the Company shall be the calendar year. The first Fiscal Year of the Company commenced on December 11, 1998 and shall end on December 31, 1998.

8.2    Location of Records; Inspection - The books, records and accounts for the Company shall be kept and maintained at the principal office of the Member who is responsible for maintaining such books and records pursuant to the Member Management Agreement in accordance with Section 5.4 or at such other place as the Members may determine by a Super-Majority in Interest of the Members. Each Member, at its own expense, shall have the right and power to examine and inspect, or cause to be examined and inspected, at any and all reasonable times, the books, records and accounts of the Company and any tax returns prepared for the Company prior to the filing of such returns.

8.3    Books of Account - The books of account for the Company shall be (a) maintained by a Member pursuant to the Member Management Agreement entered into pursuant to Section 5.4 on an accrual basis in accordance with GAAP and (b) audited annually by a certified public accountant, which shall be PricewaterhouseCoopers or other public accounting firm acceptable to the Lenders for so long as the Company is indebted to Lenders pursuant to the Financing Agreements and, thereafter, such other public accounting firm agreed to by a vote of the Super-Majority in Interest of the Members. A copy of the annual audit shall be provided to all Members. An individual Member may request the auditor to provide it any additional reports that such Member may want generated for its own account and at its own cost.

8.4    Financial Statements and Reports - As soon as practicable following the end of each Fiscal Year and in any event within the time specified below or such other times as may be required by the Lenders, the Company shall cause the Member with responsibilities pursuant to the Member Management Agreements pursuant to Section 5.4, to prepare and deliver to each Member:

(a)    Within forty-five (45) days following the end of each calendar quarter in each Fiscal Year, a report containing information regarding changes to the Capital Accounts of each Member during such Fiscal Year, including (i) the amount of Capital Contributions credited to each Member's Capital Account during such quarter, (ii) any distributions received by a Member during such quarter, and (iii) any items, such as income or loss from the Company's activities, allocated to each Member's Capital Account during such quarter;

(b)    Within sixty (60) days following the end of such Fiscal Year (or such later time as the Members shall permit), a report containing information regarding changes to the Capital Account of each Member during such Fiscal Year, including (i) the amount of Capital Contributions credited to each Member's Capital Account during such Fiscal Year, (ii) any distributions received by a Member during such Fiscal Year under this Agreement, and (iii) any items, such as income or loss from the Company's activities, allocated to each Member's Capital Account during such Fiscal Year under this Agreement; and

(c)    Such other reports and information reasonably requested by any Member having a Ownership Interest of 5% or more for the period prior to the Flip Point or 10% or more for the period on and after the Flip Point.

8.5    Taxation

20

(a)    The Parties intend that the Company shall be treated as a partnership for federal, state and local income and other tax purposes. The Members agree to cooperate in the taking of all action, including the amendment of this Agreement and the execution of other documents, if required, to qualify for and receive such tax treatment. The Company shall make elections for income tax purposes and other taxes computed with respect to income which shall maximize and accelerate deductions, credits and losses and minimize and defer income and gains, unless otherwise determined by the Members, except those specifically reserved by the Code or applicable regulations to be made by the individual Members. The Company shall use discounted cash flow analysis, using the prime rate as published by The Chase Manhattan Bank N.A. as the discount rate in selecting the most appropriate tax election strategy or such other methodology as approved by a Super-Majority in Interest of the Members.

(b)    If for any Fiscal Year of the Company the allocation of any loss or deduction (net of any item of income or gain) to any Member would cause or increase a negative balance in such Member's Adjusted Capital Account as of the end of such Fiscal Year (a "Deficit Member") after taking into account the provisions of this Section 8.5(b), only the amount of such loss or deduction that reduces the balance to zero shall be allocated to such Deficit Member and the remaining loss or deduction shall be allocated to the other Members whose Adjusted Capital Accounts has a positive balance remaining at such time (the "Positive Member"). After any such allocation, any items of Company income or gain that would otherwise be allocated to the Deficit Member under this Agreement, other than pursuant to the succeeding sentence, shall be allocated instead to each Positive Member up to an amount equal to the Company loss or deduction allocated to each Positive Member (or which has been reflected in the Capital Account of a transferee Member) under the preceding sentence; provided, however, that no allocation of income or gain shall be made under this sentence if the effect of such allocation would be to cause the Adjusted Capital Account of a Deficit Member to be less than zero. If, after taking into account the allocation in the first sentence of this Section 8.5(b), the Adjusted Capital Account balance of a Deficit Member remains less than zero at the end of a Fiscal Year, a pro rata portion of each item of Company income or gain otherwise allocable to each Positive Member for such Fiscal Year (or if there is no such income or gain otherwise allocable to the Positive Member for such Fiscal Year, all such income or gain so allocable in the succeeding Fiscal Year or Years) under this Agreement shall be allocated to the Deficit Member in an amount necessary to cause its Adjusted Capital Account balance to equal zero; provided that no allocation under this sentence shall have the effect of causing any Positive Member's Adjusted Capital Account to be less than zero. After any such allocation, any items of Company income or gain that would otherwise be allocated to a Deficit Member for any Fiscal Year under this Agreement shall be allocated instead to each Positive Member until the amount of income or gain so allocated equals the amount of income or gain previously allocated to such Deficit Member under the preceding sentence of this Section 8.5(b); provided, however, that no allocation of gain shall be made under this sentence if the effect of such allocation would be to cause the Adjusted Capital Account of a Deficit Member to be less than zero. The provisions of this Section 8.5(b) are intended to constitute a "qualified income offset" within the meaning of IRS Regulation Sections 1.704-1(b)(2)(ii)(d).

(c)    Each Member shall be responsible for the discharge of its own income taxes and shall indemnify each other Member against and hold them harmless from any and all loss, cost

21

or liability arising therefrom.

8.6 <u>Tax Returns</u> - The Tax Matters Member shall prepare and file such federal and state partnership income tax returns and reports as may be required to report the operations of the Company. The Tax Matters Member shall use its best efforts in the preparation and filing of such returns; provided, however, that in so doing it shall incur no liability to any Member with regard to such returns in the absence of fraud, gross negligence or willful misconduct. The Tax Matters Member may, in addition to its own tax and accounting staffs and those of its affiliates, employ outside consultants to prepare such returns, the cost of which shall be borne by the Members in proportion to their Ownership Interests. The other Members shall cooperate with the Tax Matters Member in furnishing information necessary to prepare such returns and the Tax Matters Member shall provide the other Members with preliminary copies of such returns for review and approval in advance of their due date (as extended). A copy of all federal and state partnership income tax returns prepared and filed by the Tax Matters Member shall be provided to all Members.

8.7 <u>Other Reports</u> - The Member designated such responsibility pursuant to the Member Management Agreement entered into in accordance with Section 5.4 shall prepare and file all reports prescribed by any other commission or governmental agency having jurisdiction over the business or properties of the Company, the costs of which shall be paid by the Company.

8.8 <u>Inspection of Records</u> - Each Member shall have the right, individually at its own cost and expense, to audit the books and records of the Company; provided, however, the Members agree to coordinate any outside audits so that there will be no more than one such audit in any given Fiscal Year. Additionally, in the event that a governmental or regulatory authority having jurisdiction over a Member requires that such Member audit the Company's books, such Member shall be allowed to audit the Company's books to the extent required by such governmental or regulatory authority. In addition to the above, each Member shall have the right to inspect and copy at its own cost and expense, the books and records of the Company upon reasonable notice, during normal business hours.

8.9 <u>Deposit and Withdrawal of Funds</u> - Funds of the Company not needed, in the opinion of the Members, for the operation of the Company shall be deposited in a segregated account or accounts in the name of the Company that are maintained in one or more national or state banks or other depositories as shall be designated from time to time by the Company. Such funds may be withdrawn by properly authorized representatives as designated from time to time of the Members or pursuant to the Member Management Agreement entered into pursuant to Section 5.4. The Members shall not commingle funds of the Company with any other funds of the Members.

8.10 <u>Record Retention</u> - The Company shall cause all records that are required under this Agreement or under any other agreement entered into pursuant to this Agreement to be retained by the Company for such period of time as required by law, but in no event for less than seven (7) years.

8.11 <u>Company Level Tax Audits</u> - El Paso II is designated as the "Tax Matters Member" which shall have the same meaning as the "Tax Matters Partner" as defined in Section 6231(a)(7) of the Code. The general duties of the Tax Matters Member shall be to inform the other Members of all matters which shall come to its attention in its capacity as Tax Matters Member by giving the other Members notice thereof within 10 days after becoming so informed. In general, the Tax Matters Member shall not take any action contemplated by Sections 6221 through 6233 of the

22

Code unless it has first given the other Members notice of the contemplated action and received the unanimous consent of the Members to such contemplated action. This provision is not intended to authorize the Tax Matters Member to take any action which is left to the determination of an individual Member under Sections 6221 through 6223 of the Code. More specifically, the duties of the Tax Matters Member and all of the Members individually shall include, without limitation, the items enumerated in Sections 8.11(a) through 8.11(h) below:

(a)     The Members shall furnish the Tax Matters Member with such information including, without limitation, information specified in Section 6230(e) of the Code as it may reasonably request to permit it to provide the Internal Revenue Service with sufficient information to allow proper notice to the Members in accordance with Section 6223 of the Code. The Members shall also furnish to each other copies of all correspondence with the Internal Revenue Service or the Department of the Treasury regarding any aspect of "partnership items", as defined in Code Section 6221(a)(3), or the Company's tax return. The Tax Matters Member shall keep each Member informed of all administrative and judicial proceedings for the adjustment at the Company level of "partnership items" in accordance with Section 6223(g) of the Code.

(b)     The Members shall promptly notify the Tax Matters Member at least ten (10) days in advance of their treatment of any partnership item on their federal income tax return in a manner which is inconsistent with the treatment of that item on the Company's tax return.

(c)     The Tax Matters Member shall not enter into any extension of the period of limitations as provided under Section 6229 of the Code without first giving reasonable advance notice to all other Members of such intended action and obtaining their unanimous consent.

(d)     No Member shall file pursuant to Section 6227 of the Code, a request for an administrative adjustment of partnership items for any Company taxable year without first giving reasonable advance notice to all other Members. If all of the Members agree with the requested adjustment, the Tax Matters Member shall file the request for administrative adjustment on behalf of the Company. If unanimous consent is not obtained within thirty days, or within the period required to timely file the request for administrative adjustment, if shorter, any Member, including the Tax Matters Member, may file a request for administrative adjustment on its own behalf.

(e)     Any Member intending to file a petition under Code Sections 6226 and 6228, or other sections of the Code with respect to any partnership item, or other tax matters involving the Company, shall give reasonable advance notice to the other Members of such intention and the nature of the contemplated proceeding. In the case where the Tax Matters Member is the Member intending to file such petition, such notice shall be given within a reasonable time to allow the other Members to participate in the choosing of the forum in which such petition shall be filed. If the Members do not agree on the appropriate forum, then the appropriate forum shall be decided by a Majority in Interest of the Members. Each Member shall have a vote in accordance with its Ownership Interest. If a majority cannot agree, the Tax Matters Member shall choose the forum. If any Member intends to seek review of any court decision rendered as a result of a proceeding instituted under this Section 8.11(e), such Member shall notify all of the other Members of such intended action.

23

(f)     The Tax Matters Member shall not enter into settlement negotiations with respect to the tax treatment of partnership items without first giving reasonable advance notice of such intended action (including any proposal for settlement) to the other Members. The Tax Matters Member shall not bind any other Member to a settlement agreement without obtaining the written concurrence of any such Member who would be bound by such agreement. Unless prohibited, any other Member who enters into a settlement agreement with the Internal Revenue Service or the Secretary of the Treasury with respect to any partnership items shall notify the other Members of such settlement agreement within ninety days from the date of settlement.

(g)     The Tax Matters Member shall have the right to engage legal counsel, certified public accountants, or other assistance without the prior written consent of a majority of the Members with respect to Company level tax audits and contests. Any reasonable item of expense with respect to such matters, including but not limited to fees and expenses for legal counsel, certified public accountants, and other experts which the Tax Matters Member incurs in connection with any Company level tax audit, assessment, litigation, or other proceedings regarding any "partnership item," shall be borne by the Company.

(h)     The provisions of this Section 8.11, including but not limited to the obligation to pay fees and expenses contained in Section 8.11(g), shall survive the termination of the Company and the termination of any Membership Interest and shall remain binding for a period of time necessary to resolve with the Internal Revenue Service or the Department of Treasury any and all matters regarding the federal income taxation of the Company for the applicable tax year.

(i)     The provisions of this Section 8.11 shall extend to other taxes measured by or computed with respect to income to the extent rules similar to Code Sections 6221 through 6223 are applicable to such taxes (including state and local taxes).

## ARTICLE IX
## TRANSFER OR PLEDGE OF OWNERSHIP INTERESTS

9.1     <u>Transfers or Pledges Generally</u> - Subject to Sections 9.2, 9.3 and 9.4 and any applicable provisions in the Financing Agreements, a Member may not sell, assign, pledge, hypothecate or otherwise transfer all or any part of its Units of Membership Interest or its interest this Agreement to any third party (including, without limitation, an assignment by operation of law), without the prior written consent of the other Members, which shall not be unreasonably withheld, conditioned or delayed. Notwithstanding anything to the contrary in this Agreement, it is expressly agreed that any Member may withhold its consent in its sole discretion with regard to any proposed sale, assignment or transfer of another Member's Unit of Membership Interest where the transferring Member proposes to sell, assign or transfer less than a ten percent (10%) Ownership Interest, except in the case of PDC prior to the Flip Point, less than all of its Units of Membership Interest.

9.2     <u>Right of First Offer</u>

(a)     Any Member (the "Transferring Member") that proposes to sell, transfer or assign all or part of its Membership Interest (the portion to be sold or otherwise disposed of referred to

24

as the "Transferred Interest") shall provide written notice of such proposal to the other Member(s) (a "Notice of Proposed Transfer") specifying the Transferred Interest sought to be sold or otherwise transferred. Subject to Section 9.4, the Member(s), other than the Transferring Member, shall have a right, exercisable within 30 days of receipt of such written notice, to offer to purchase the Transferred Interest at a price specified in a written offer or its cash equivalent if the price offered is other than cash or a promissory note from such Member to the Transferring Member. Upon the earlier to occur of the expiration of such 30-day period or receipt of offers (or written notices electing not to make an offer) from all other Member(s), the Transferring Member shall notify each other Member whether any offers have been received, and if such offers have been received, the highest price offered by any Member that is acceptable to the Transferring Member. Each Member shall then have the right, exercisable within ten days of receipt of such notice by giving written notice to the Transferring Member and other Members, to participate in the highest offer on a pro rata basis (determined by dividing each such Member's Ownership Interest by the sum of the Ownership Interests of all of the Members desiring to participate in the highest offer).

(b)     In the event that one or more Members offers to purchase the entire Transferred Interest in accordance with the provisions of this Section 9.2, the Transferring Member shall be entitled, at its discretion, within the sixty (60) day period following the date of such last offer(s), to either (i) accept such offer(s) in accordance with the terms thereof, (ii) sell or convey the Transferred Interest to one or more third parties (subject to the other provisions of this Article IX) at a price in cash or its cash equivalent if the price offered is other than cash or a promissory note that is greater than the allocable price offered by the Members or (iii) subject to its right to reinstitute the procedures of this Section 9.2 at a later time, withdraw the Notice of Proposed Transfer and continue to hold the Transferred Interest. Any sale to a Member shall be promptly effectuated in accordance with the provisions of this Section 9.2(b). The closing of such purchase of the Transferred Interest shall occur at the principal place of business of the Company, or such other location mutually agreed by the Transferring Member and the transferee(s), on or before the sixtieth (60th) day after the acceptance of such offer (or if later, the fifth (5th) business day following the receipt of any applicable governmental authorizations). At the closing, (i) the Transferring Member shall execute and deliver to the transferee(s) (A) an assignment of the Transferred Interest, in form and substance reasonably acceptable to the transferee(s), containing a general warranty of title as to such Transferred Interest (including that such Transferred Interest is free and clear of all encumbrances, other than any lien in favor of the Lender under the Financing Agreements) and (B) and other instruments reasonably requested by the transferee(s) to give effect to the purchase and (ii) the transferee(s) shall deliver to the Transferring Member in immediately available funds the purchase price provided for in Section 9.2(a).

(c)     If the other Members do not offer to purchase the entire Transferred Interest after compliance with the procedures specified in Section 9.2(a) and Section 9.4, the Transferring Member, after obtaining the written consent of the other Member(s) in accordance with Section 9.4, shall thereafter be free to sell all (but not less than all) of the Transferred Interest to a third party for a purchase price in cash equal to or greater than the allocable price offered by the other Members in accordance with Section 9.2. If the Transferring Member does not consummate the sale of the Transferred Interest to the third party within sixty (60) days of the date on which the Transferring Member became

BUSDOCS:728102.1

entitled to do so (whether upon the other Members' failure to offer to purchase the entire Transferred Interest within 30 days of receipt of a Notice of Proposed Transfer or upon receipt of the last offer by the other Members), such sale shall once again be subject to the procedures set forth in this Section 9.2.

(d)     It is the intent of the Members that the procedures set forth in this Section 9.2 shall also apply to the issuance, sale or other transfer of the stock or other interest in any entity that, directly or indirectly, owns any Units of Membership Interest if such Units of Membership Interest comprise all or substantially all of the assets of such entity. In furtherance of such intent, the Members covenant to take whatever action may be necessary to cause this restriction to be incorporated into their respective constituent documents so as to be enforceable under applicable law and the Members agree that the transfer of shares in such an entity will constitute a transfer of the Units of Membership Interest for which the provisions of this Section shall apply. Notwithstanding any of the provisions of Sections 9.1 and 9.2 above, with regard to (i) transfers of stock or interests in PDC between existing members of PDC or their Affiliates as of the date of this Agreement or (ii) transfers of stock or interests in PDC to third parties that are not competitors of the Company or any of the other Members, PDC shall not be required to obtain the consent of the Members; provided that with regard to (ii) above, PDC shall be required to comply with the duty of first offer set forth in this Section 9.2

9.3     Permitted Transfers - Nothing in Sections 9.1 and 9.2 shall prevent, no consents or approvals of the other Members are required and no rights of first offers apply with regard to the following assignments or transfers:

(a)     an assignment by a Member of its Membership Interest in the Company to an Affiliate of such Member without the other Member's consent, provided that (i) the ultimate parent company of the assigning Member shall continue to own and control 50% or more of the outstanding securities of such Affiliate and (ii) the assigning Member remains personally obligated for its duties and obligations hereunder;

(b)     an assignment, pledge or other transfer creating a security interest to Lenders under the Financing Agreements or, to the extent not in conflict with the Financing Agreements, to any other financial institution or bona fide lender (and any transfer made in foreclosure or other enforcement of such security interest and admission in this Agreement) in all or any portion of a Member's right, title or interest in the Company for the purpose of securing indebtedness for borrowed money by the Company (and not to such Member); and

(c)     an assignment, sale or other transfer of up to 70% of the Membership Interest in the Company owned by El Paso I and/or El Paso II to a third party, subject to any required approvals of the Lenders pursuant to the Financing Agreements.

9.4     Requirements Applicable to All Dispositions and Admissions - In addition to the requirements set forth in Sections 9.1 and 9.2, the following documents must be delivered to the Members and must be satisfactory, in form and substance, to a Majority in Interest of the Members:

(a)     Ratification of this Agreement - An instrument, executed by the Transferring Member and its assignee, containing the assignee's ratification of this Agreement and its confirmation that the representations and warranties contained in this Agreement with

26

respect to the Transferring Member are also true and correct with respect to it;

(b)     <u>Securities Law Opinion</u> - Unless the Units of Membership Interest (or portion thereof) subject to the sale or transfer are registered under the Securities Act and any applicable state securities law, a favorable opinion of the Company's legal counsel, or of other legal counsel acceptable to a Majority in Interest of the Members, to the effect that the sale or transfer (and admission, if applicable) is being made pursuant to a valid exemption from registration under those laws and in accordance with those laws;

(c)     <u>Restrictions on Sale of Interests in a Member</u> - The Company must receive a favorable opinion of the Company's legal counsel or legal counsel acceptable to a Majority in Interest of the Members, to the effect that the sale or transfer would not result in the Company's being considered to have been terminated within the meaning of Code Section 708.

Such transfer, disposition or admission of the new Member, if applicable, shall not be effective unless such requirements are complied with; provided, however, that the Members, acting unanimously and in their sole discretion, may waive any of such requirements.

9.5     <u>Prohibited Transfers Null and Void</u> - Any transfer by a Member of its Membership Interest in the Company in violation of the terms of this Agreement shall not be recognized and shall be deemed null and void. Any purported sale or transfer of a Membership Interest that is not permitted pursuant to the provisions of this Agreement shall be null and void and of no force or effect whatever; provided that, if the Company is required to recognize such disposition or transfer, the Units so transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Units, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee may have to the Company. Nothing in this Agreement shall limit any right or remedy that the other Member may have against such Member for an unauthorized transfer.

9.6     PUHCA REGULATION - IF THE COMPANY IS OR BECOMES SUBJECT TO ADDITIONAL, MORE ONEROUS REGULATORY REQUIREMENTS UNDER PUHCA AS A RESULT OF ANY MEMBER'S INTEREST IN THE COMPANY THAT HAS A MATERIAL ADVERSE EFFECT ON THE COMPANY, THEN (A) SUCH MEMBER SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS THE COMPANY AND EACH OTHER MEMBER FROM AND AGAINST ANY AND ALL COSTS, LOSSES, DAMAGES OR LIABILITIES INCURRED BY THE COMPANY OR THE OTHER MEMBERS RESULTING FROM SUCH REGULATION (EXCLUDING ANY CONSEQUENTIAL OR OTHER DAMAGES SPECIFIED IN SECTION 12.4), and (b) the Company may, by a majority vote of the Members (excluding the vote of the Person who caused or whose Affiliate caused the imposition of such regulation) require such Member to divest its Units of Membership Interest if such divestiture is deemed necessary to avoid such regulatory requirements. Such divestiture shall be subject to the remaining provisions of this Article.

**ARTICLE X**
**MEMBERSHIP INTERESTS**

10.1     <u>Issuance of LLC Interest Certificates</u> - The Company shall issue one (1) certificate (each, an

27

"LLC Interest Certificate") substantially in the form attached as Exhibit C, in the name of each Member certifying that the Member named therein is a Member of the Company pursuant to this Agreement. The LLC Interest Certificate shall also include as a part thereof, a form of assignment sufficient, subject to the terms of this Agreement, to effectuate a disposition of such Member's LLC Interest to an assignee. Each LLC Interest Certificate shall bear a legend in substantially the following form: "This certifies that, subject to adjustments as set forth in the Amended and Restated Limited Liability Company Agreement of Milford Power Company, LLC, dated as of _____ __, 1999, as amended, modified and supplemented from time to time (the "LLC Agreement"), _____ is the owner of a fully paid and non-assessable LLC Interest in the Company consisting of a ____% Membership Interest in connection therewith and certain other rights in the Company, all as set forth in the LLC Agreement. This LLC Interest Certificate, including the rights attendant thereto, shall be a security governed by Article 8 of the Uniform Commercial Code in any jurisdiction (a) that has adopted revisions to Article 8 of the Uniform Commercial Code substantially consistent with the 1994 revisions to Article 8 adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and (b) the laws of which may be applicable, from time to time, to the issues of perfection, the effect of perfection or non-perfection and the priority of a security interest in membership interests of the Company."

10.2    Certificate Transfer Book and Members of Record - The clerk of the Company (or, if none, the Chairman) shall maintain or cause to be maintained, among other records, a Unit transfer book containing certificates evidencing the Units of Membership Interest, the stubs in which shall set forth the names and addresses of the holders of all issued Units of Membership Interest of the Company, the number of Units of Membership Interest held by each such holder, the number of certificates representing such Membership Interest, the Ownership Interest held pursuant to each Member's Units of Membership Interest, the date of issue of such certificates, and whether or not such Membership Interest derives from original issue or transfer. The names and addresses of Members as they appear on the Unit transfer book shall be the official list of Members of record of the Company for all purposes except as otherwise provided in this Agreement. The Company shall keep record of Members at its registered office or principal place of business, or at the office of its transfer agent or registrar. The Company shall be entitled to treat the holder of record of any Units of Membership Interest as the owner thereof for all purposes, and shall not be bound to recognize any equitable or other claim to, or interest in, such Units of Membership Interest or any rights deriving from such Units of Membership Interest on the part of any other Person, including, but without limitation, a purchaser, assignee, or transferee, unless and until such other Person becomes the holder of record of such Units of Membership Interest, whether or not the Company shall have either actual or constructive notice of the interest of such other Person.

10.3    Member's Change of Name or Address - Each Member shall promptly notify the Members of the Company, at its principal business office, by written notice sent by certified mail, return receipt requested, of any change in name or address of the Member from that as it appears upon the official list of Members of record of the Company. The secretary of the Company (or, if none, the Chairman) shall enter such changes into all affected Company records, including, but not limited to, the official list of Members of record.

10.4    Transfer of Membership Interests - Units of Membership Interests represented by any certificate of the Company are transferable only on the books of the Company by the holder of record thereof or by his duly authorized attorney or legal representative upon surrender of the certificate for such Units of Membership Interest, properly endorsed or assigned. The Members may make

28

such rules and regulations concerning the issue, transfer, registration and replacement of certificates as they deem desirable or necessary. Subject to compliance with the other provisions of this Agreement, Members may transfer their respective Ownership Interest independent of their other rights and interests represented by their Units of Membership Interest.

10.5    Lost, Stolen or Destroyed Certificates - The Company may issue a new certificate for Units of Membership Interest in the place of any certificate previously issued and alleged to have been lost, stolen or destroyed, but the Members may require the owner of such lost, stolen or destroyed certificate, or his legal representative, to furnish an affidavit as to such loss, theft, or destruction and to give a bond in such form and substance, and with such surety or sureties, with fixed or open penalty, as the board may direct, in order to indemnify the Company and its transfer agents and registrars, if any, against any claim that may be made on account of the alleged loss, their or destruction of such certificate.

**ARTICLE XI**
**DISSOLUTION AND TERMINATION**

11.1    Automatic Dissolution - The Company shall be automatically dissolved upon the occurrence of any of the following:

(a)    Immediately at the termination date specified in Section 2.4 or as otherwise provided in this Agreement;

(b)    Immediately upon the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act;

(c)    The sale of all or substantially all of the Company's business and assets;

(d)    The unanimous approval of the Members; or

(e)    Any event which shall make it unlawful for the business of the Company to be carried on.

11.2    Automatic Withdrawal of Member - A Member shall be deemed to have withdrawn from the Company and shall be treated as a Withdrawn Member under this Agreement automatically upon the occurrence of any of the following events:

(a)    Immediately if any Member shall (i) voluntarily file with a Bankruptcy Court a petition seeking an order for relief under the Federal bankruptcy laws, (ii) seek, consent to or fail to contest the appointment of a receiver, custodian or trustee for itself or for all or any significant part of its property, (iii) file a petition seeking relief under the bankruptcy, arrangement, reorganization or other debtor relief laws of the United States or any state or other competent jurisdiction, (iv) make a general assignment for the benefit of its creditors, or (v) admit in writing its inability to pay its debts as they mature;

(b)    If (i) a petition is filed against any Member seeking relief under the bankruptcy, arrangement, reorganization or other debtor relief laws of the United States or any state or other competent jurisdiction and such petition remains pending 60 days after it was filed, (ii) a period of 60 days shall have elapsed after a court of competent jurisdiction

29

enters an order, judgment or decree appointing, without the consent of said Member, a receiver, custodian or a trustee for such Member, or for all or any part of its property, and such order, judgment or decree shall not be discharged or stayed, or (iii) either Member is otherwise adjudicated a bankrupt;

(c)     Immediately if any Member is ordered by the Securities Exchange Commission under the PUHCA to divest such Member's Units of Membership Interest;

(d)     At the election of any Member (an "Electing Member"), by giving written notice thereof to the other Member (the "Nonelecting Member") if (i) the interest of the Nonelecting Member in the Company is seized, attached or otherwise encumbered by a creditor of the Nonelecting Member and the same is not released from seizure or bonded out within 30 days from the date of notice of such seizure or (ii) El Paso II or its successors shall default in the performance of their obligations to make the Equity Contribution to the Company in accordance with Section 6.2(a), in which case El Paso II or its successors shall be deemed to be a Nonelecting Member.

11.3    <u>Damages</u> - The Members each agree not to voluntarily withdraw from the Company, except as permitted by this Agreement, including Section 11.9. If the Company is dissolved as a consequence of any such withdrawal, the Defaulting Member shall be in breach of this Agreement and shall be liable to each other Member for all damages such other Member may incur as a result thereof.

11.4    <u>Date of Dissolution</u> - The dissolution shall be effective on the day specified in Section 11.1 or the day on which notice of dissolution is given, whichever occurs first, but the Company shall not terminate until its affairs have been wound up and its assets distributed as provided in Section 11.6 or the Electing Member acquires the other Units of Membership Interest in the Company as provided in Section 11.2(d).

11.5    <u>Control After Dissolution</u> - The Electing Member, if the Company is dissolved under Section 11.2(d), or the Member not causing the dissolution if the Company is dissolved under Sections 11.2(a), 11.2(b) or 11.2(c) may either:

(a)     proceed with winding up and liquidating as provided in Sections 11.6 and 11.7, or

(b)     acquire the Units of Membership Interest held by the other Member as provided in Section 11.8

In any event, from the date of dissolution to the date of termination, the Member entitled to make the election under this Section (the "Liquidation Member") shall have sole control of the operations and assets of the Company.

11.6    <u>Dissolution and Winding Up</u> - After the date of dissolution contemplated by Section 11.4, and, if applicable, in the event the Liquidation Member elects to proceed with the winding up and liquidation of the Company as provided in Section 11.7, the Company shall not enter into any contract or undertake any business not then subject to contract or which is not related to the winding up of the Company. Upon dissolution and subsequent winding up, a proper accounting shall be made of the Company's assets, liabilities and operations from the date of the last previous accounting to the date of dissolution. The profits and losses realized subsequent to the date of

30

dissolution shall be allocated in accordance with Article VII and proper adjustments made to the Capital Account of each Member. Profits and losses realized on the sale of any Company asset in the process of winding up shall be allocated as provided in Article VII. Unless otherwise agreed in writing by the Members, all of the assets of the Company shall be sold or otherwise converted into cash. Assets not sold will be valued at their fair market value and gain or loss allocated as provided in Article VII as if they had been sold at their fair market value. The Company will provide each Member a right of first offer to purchase any assets being sold in accordance with this section in amounts proportionate to each Member's Ownership Interest.

11.7    Liquidation - As soon as the actions contemplated by the preceding sections of this Article XI have been completed, the cash~~and~~ other assets of the Company shall be applied or distributed in the following order of priorities:

    (a)    In payment of all liabilities of the Company to creditors including any creditor who may be a Member to the extent otherwise permitted by law. If any liability is contingent, or uncertain in amount, a reserve equal to the maximum amount to which the Company could reasonably be held liable will be established. Upon the satisfaction or other discharge of such contingency, the amount of the reserve not needed, if any, will be distributed in accordance with the balance of this Section;

    (b)    In payment of the Capital Accounts of the Members pro rata based on the positive balance, if any, of the Capital Accounts of each Member.

    (c)    No Member with a negative balance in its Capital Account shall be liable to the Company or any other Member for the amount of such negative balance upon dissolution and liquidation.

11.8    Purchase Right Upon Dissolution - If an Electing Member elects to acquire the other Member's interest in the Company pursuant to Section 11.5(b), the Electing Member shall give written notice of such election to the other Member within 60 days after the date of dissolution. The purchase price shall be the agreed upon fair market value (as of the date of such notice) of the Company assets less the Company's liabilities multiplied by a fraction, the numerator of which is the Capital Account of the other Member and the denominator of which is the sum of the Capital Accounts of both Members. The Electing Member shall continue the business of the Company until the purchase price has been determined. In the event there is no agreement on such fair market value within 30 days from the date of notice given pursuant to this Section 11.8 (the "Exercise Notice") after good faith negotiations, then each Member shall, within 35 days after delivery of the Exercise Notice, appoint an appraiser of recognized standing and the appraisers so appointed by the Members shall, within 45 days after delivery of the Exercise Notice, appoint a third appraiser of recognized standing and the fair market value of the assets of the Company shall be determined by majority vote of such three appraisers within 30 days after the date such third appraiser was appointed; if any Member shall fail to appoint an appraiser within 35 days after the delivery of the Exercise Notice, the valuation of the appraiser appointed by the other Member shall be deemed the fair market value of the assets of the Company. Upon such determination of the fair market value of the assets, the Electing Member shall purchase all of the interest in the Company owned by the other Member at the price determined in accordance with this Section. As of the date of agreement on such price and terms of payment, such other Member causing the dissolution shall immediately cease to be a Member in the Company and shall have no interest in the assets of the Company, either as a Member or otherwise, except to

31

receive payment of such price.

11.9    Voluntary Withdrawal Rights

      (a)    Right to Withdraw - Subject to the provisions of Article XI, a Member (in this Agreement called a "Withdrawing Member") shall have the right to withdraw from the Company at any time after the commencement of commercial operations of the Plant by ten days written notice to the other Members (in this Agreement called a "Withdrawal Notice"). The Withdrawing Member shall assign all its rights and interests in the Company to the remaining Members or their designees and the Withdrawing Member waives any and all rights that it might otherwise have had pursuant to the Act arising from its withdrawal from the Company. The Withdrawing Member hereby irrevocably appoints the Company its attorney-in-fact, with full authority in its place and stead and its name or otherwise, to take any action and to execute any instrument which the Company may deem necessary or advisable to accomplish such assignment of the Withdrawing Member's rights and interests in the Company to the remaining Members or their designees. Upon thirty days' prior written notice, the Company may terminate any contracts or agreements with the Withdrawing Member or any of its Affiliates, pursuant to which the Withdrawing Member or its Affiliates provide materials or services to the Company, and the Company shall have no further liability to the Withdrawing Member or its Affiliates under such contracts or agreements, other than the payment of any obligations incurred prior to the date of such termination.

      (b)    Reimbursement Rights - In the event of such withdrawal, the Company shall retain all contributions theretofore made by the Withdrawing Member, and such Withdrawing Member shall pay its share of such further obligations and commitments that are due and payable at the time of the giving of the Withdrawal Notice including any obligations attributable to the work performed or actions taken by the Members or any Committee of the Company prior to the date of withdrawal including termination costs.

      (c)    Indemnification of Withdrawing Member - The remaining Members shall indemnify and hold harmless the Withdrawing Member:

          (i)    For all amounts due and payable in connection with the Company and its business after the date of withdrawal that were not incurred prior to the date of withdrawal; and

          (ii)    For all amounts or damages arising out of activities of the non-withdrawing Members or the Company undertaken after the date of withdrawal.

## ARTICLE XII
## LIMITATION OF LIABILITY AND INDEMNIFICATION

12.1    Limitation of Liability - Neither the officers of the Company, the Members, nor their respective shareholders, officers, directors, agents, employees and representatives ("Member Representatives") shall be liable, responsible or accountable in damages or otherwise to the Company or to each other for any loss suffered by the other or by the Company arising out of any action or omission by such parties, so long as such action or omission (a) was in good faith, (b)

32

was consistent with the provisions of this Agreement, (c) was, in the reasonable judgment of the party involved, in the best interests of the Company and (d) did not constitute bad faith, gross negligence, fraud or willful misconduct of the party involved; provided that the terms and conditions regarding the liability of EPGM and EPPS and any limitations to such liability in its role as a fuel marketer and power marketer pursuant to Sections 5.6 and 5.7 shall be governed by the terms and conditions set forth in the Fuel Purchase Agreement and the Power Marketing Agreement.

12.2 <u>Right to Indemnification</u> - Subject to the limitations and conditions provided in this Article XII, the Company shall indemnify and hold the Members and the Member Representatives harmless from and against any losses, damages, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by any of them in connection with the activities of the Company, provided that the same did not result from the bad faith, gross negligence, fraud or willful misconduct of the party involved. The Company may purchase and maintain insurance, at its expense, to protect itself, the Members and any Member Representative of the type entitled to be indemnified under this Section 12.2, whether or not the Company would have the power to indemnify such Member Representative against such expense, liability or loss under Section 12.2.

12.3 <span style="font-variant:small-caps">CROSS-INDEMNIFICATION - EACH MEMBER (FOR PURPOSES OF THIS SECTION, THE "INDEMNITOR") SHALL INDEMNIFY AND HOLD HARMLESS EACH OF THE OTHER MEMBERS (FOR PURPOSES OF THIS SECTION THE "INDEMNITEE") AND THE AFFILIATES, DIRECTORS, OFFICERS, PARTNERS, EMPLOYEES, AGENTS AND REPRESENTATIVES OF THE INDEMNITEE FROM AND AGAINST ANY COSTS, LOSSES, CLAIMS, DAMAGES AND LIABILITIES ARISING OUT OF THE INDEMNITOR'S BREACH OF ANY PROVISIONS OF THIS AGREEMENT.</span>

12.4 <u>Consequential Damages</u> - Notwithstanding anything to the contrary in this Agreement, any damages resulting from a breach of this Agreement by a Member shall be limited to actual damages incurred by the Member claiming damages and that no Member shall be liable for claims or causes of action arising under this Agreement for consequential or incidental damages including but not limited to any claims for indirect losses, loss of business opportunity or of lost profits or for punitive or exemplary damages.

12.5 <u>Non-Recourse to Members</u> - Unless otherwise agreed to by the unanimous vote of all Members, no Member shall be liable to any Person (including any third party or to another Member) (a) as the result of any act or omission of another Member or (b) for losses, liabilities or obligations of the Company (except as otherwise expressly agreed to in writing by such Member). Unless otherwise agreed to by the unanimous vote of all Members, no contract, agreement or other instrument shall be executed and delivered by or on behalf of the Company that provides for or suggests that the claims of all parties thereto and other beneficiaries thereunder are not limited solely to the assets of the Company and any contract, agreement or other instrument containing such a provisions shall be null and void and shall not constitute a valid obligation of the Company.

## ARTICLE XIII
## REPRESENTATIONS

13.1 <u>Representations of the Members</u> - Each Member represents and warrants to the other:

(a)  <u>Due Organization</u> - Such Member is a corporation, partnership or limited liability

33

company duly organized, validly existing and in good standing under the laws of the state of its organization and has the requisite power and authority (i) to carry on its business as presently conducted and to own or hold under lease its properties, where the failure to have such power and authority would have a material adverse effect on its ability to perform its obligations under this Agreement, and (ii) to enter into and perform its obligations under this Agreement.

(b)    Authorization - The execution, delivery and performance by such Member of this Agreement have been duly authorized by all necessary action on the part of such Member. This Agreement has been duly authorized, executed and delivered by such Member and is a legal, valid and binding obligation of such Member, enforceable against such Member in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, liquidation, moratorium or similar laws affecting creditors' or lessors' rights generally and the application of general equitable principles may limit the availability of certain remedies.

(c)    Effect of this Agreement - Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby nor compliance by such Member with any of the provisions of this Agreement, will: (i) conflict with or result in a breach of any provision of the constituent documents of such Member; (ii) require the approval or consent of, or filing of registration with, any foreign, federal, state, local or other governmental or regulatory body or the approval or consent of any other Person the failure of which to make or obtain would have a material adverse effect on the ability of such Member to perform its obligations under this Agreement; (iii) violate any provision of any law or regulation or violate, breach or, with the giving of notice or passage of time, constitute an event of default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, agreement or other instrument or obligation to which such Member is a party, or by which it may be bound, which violation, breach or default (or right of termination, cancellation or acceleration) would have a material adverse effect on the ability of such Member to perform its obligations under this Agreement and the transactions contemplated hereby, except in the case of (ii) and (iii) as to which requisite waivers or consents have been obtained.

(d)    Litigation - There is no action, suit or proceeding pending or, to the knowledge of such Member, threatened against such Member which, if adversely determined could, individually or in the aggregate, materially and adversely affect the ability of such Member to perform its obligations under this Agreement.

(e)    Regulation - No Member nor any of its Affiliates is subject to regulation under (i) the ICA, as amended, or (ii) the PUHCA, as amended.

**ARTICLE XIV**
**CONFIDENTIALITY OF COMPANY AFFAIRS**

14.1    Disclosure of Confidential Information - Except as in this Agreement provided, each Member shall treat, and cause its Affiliates to treat, as confidential, and shall not disclose to any third party not authorized by the Members to receive confidential information, any confidential information

34

of the Company, including information (i) obtained either directly or indirectly from any Member pursuant to this Agreement and designated by such Member as confidential, or (ii) developed or acquired by the Company and designated confidential by the Members unless:

    (a)    such confidential information was already in the possession of the receiving Member or any of its Affiliates at the time it or they obtained such confidential information under this Agreement;

    (b)    such confidential information was or is published or otherwise becomes generally available to the public through no fault of the receiving Member or any of its Affiliates;

    (c)    such confidential information was or is made available to the receiving Member or any of its Affiliates without restriction by any entity which is not bound by, and does not impose, an obligation of confidentiality or use with respect thereto;

    (d)    such disclosure is required by operation of law or regulation; or

    (e)    the Members authorize a Member or any of its Affiliates in writing to disclose such confidential information.

14.2    <u>Use</u> - Neither the Company nor a Member shall use any such confidential information provided by another Member for any purpose other than in connection with its activities pursuant to this Agreement, except that confidential information developed or acquired by or on behalf of the Company may be used by any Member or its Affiliates for its own purposes, subject to confidentiality agreements consistent with this Article XIV.

14.3    <u>Procedures</u> - Each Member shall take, and cause its Affiliates to take, such reasonable and prudent steps and precautionary measures as are required to ensure compliance with this Article XIV by such of their employees, officers, agents, Affiliates and other Persons as shall be given access to such confidential information and shall be responsible for compliance by their employees, officers, agents and Affiliates.

14.4    <u>Survival</u> - The obligations of the Members pursuant to this Article XIV shall survive the term of this Agreement for a period of two years.

14.5    <u>Remedies</u> - The Company and each Member agree that no adequate remedy at law exists for a material breach or threatened material breach of any of the provisions of this Article, the continuation of which unremedied will cause the injured Party to suffer irreparable harm. Accordingly, the Company and the Members agree that the injured Party shall be entitled, in addition to other remedies which may be available to it, to immediate injunctive relief from any material breach of any of the provisions of this Article XV and to specific performance of its rights hereunder, as well as to any other remedies available at law or in equity.

**ARTICLE XV**
**<u>MISCELLANEOUS</u>**

15.1    <u>Entirety of Agreement</u> - Except as set forth in the Fuel Purchase Agreement, the Power Marketing Agreement, the Member Management Agreement, the Service Agreement and the Funding and

35

Settlement Agreement, this Agreement reflects the whole and entire agreement among the Members and their Affiliates with respect to the subject matter in this Agreement and supersedes all previous agreements and understandings among the Members and their Affiliates (including the Joint Development Agreement) and the Articles of Association of PDC – El Paso Milford LLC, and may be amended, restated or supplemented only by the written agreement of all Members.

15.2    <u>Notices</u> - Unless otherwise specifically provided in this Agreement, any written notice or other communication given pursuant to this Agreement shall be sufficiently delivered if delivered personally or mailed or if given by telegram, telex, telecopy or similar means of visual data transmission:

(a)    to each of the Members at the address set forth below or at such other address as may be designated from time to time by the Member by written notice to each other Member and to the Company:

if to El Paso I:

El Paso Milford Power I Company
1001 Louisiana Street
Houston, Texas  77002
Telephone: 713-420-6234
Facsimile:  713-420-5487
Attention: Director of Finance & Planning

if to El Paso II:

El Paso Milford Power II Company
1001 Louisiana Street
Houston, Texas  77002
Telephone: 713-420-6234
Facsimile:  713-420-5487
Attention: Director of Finance & Planning

if to PDC:

PDC Milford Power LLC
c/o Power Development Company, LLC
200 High Street, 5th Floor
Boston, Massachusetts 02110
Telephone: 617-747-9100
Facsimile: 617-747-9101
Attention: Michael J. Armitage
            Kevin P. Joyce

with a copy to:

Rubin and Rudman LLP
50 Rowes Wharf

36

BUSDOCS:728102.1

)

Boston, Massachusetts 02110
Telephone: 617-330-7000
Facsimile: 617-434-9556
Attention: John A. DeTore, Esq.

and

Eckert Seamans Cherin & Mellott, LLC
1 International Place, 18th Floor
Boston, MA 02110
Telephone: 617-342-6834
Facsimile: 617-342-6899
Attention: Ted Tedschi, Esq.

(b)    to the Company at the principal office of the Company or such other address as may be designated from time to time by written notice to each of the Members.

If mailed, such notice shall be deemed received five days following the date on which the same is mailed by registered or certified mail, postage prepaid, properly addressed to the addresses set forth above.  If delivered personally or by telegram, telex, telecopy or similar means of visual data transmission, then such notice shall be deemed delivered on the first business day of the recipient following the day on which such notice was transmitted and has been confirmed received.  Any Member may request that copies of notices be given to an Affiliate of such Member at such address as is designated by such Member by written notice to the other Member and to the Company; provided, however, that any failure to give such notice shall not affect the validity of any notice given to the Member or the Company in accordance with this Section 15.2. Each of the Members agrees to give such designated notice to any such designated Affiliate.

15.3    Further Assurances - Each Member agrees to execute and deliver all such other and additional instruments and documents and to do such other acts and things as may be reasonably necessary more fully to effectuate the intent of the Members set forth in this Agreement and carry on the Company business in accordance with this Agreement.

15.4    APPLICABLE LAW AND CHOICE OF FORUM - THIS AGREEMENT SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, EXCEPT THAT ANY CONFLICT OF LAWS RULE OF SUCH JURISDICTION WHICH WOULD REQUIRE REFERENCE TO THE LAWS OF SOME OTHER JURISDICTION SHALL BE DISREGARDED.  THE PARTIES SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE COURTS OF THAT STATE AND ANY COURTS HAVING JURISDICTION TO HEAR APPEALS FROM THOSE COURTS, AGREE TO ACCEPT SERVICE OF PROCESS BY MAIL IN ACCORDANCE WITH SECTION 15.2 AND ALL OBJECTIONS TO VENUE AND PERSONAL JURISDICTION IN SUCH FORUM ARE HEREBY EXPRESSLY WAIVED.

15.5    Counterparts - This Agreement is executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

15.6    Laws and Regulatory Bodies - This Agreement and the obligations of the Members under this Agreement are subject to all applicable laws, rules, orders and regulations of governmental

37

authorities and, in the event of conflict, such laws, rules, orders and regulations of governmental authorities shall control.

15.7    Force Majeure - If either Member is rendered unable, wholly or in part, by force majeure to carry out its obligations under this Agreement, other than the obligation to make money payments, the obligations of such Member, so far as they are affected by such force majeure, shall be suspended during the continuance of such force majeure. The term "force majeure," as used in this Agreement, shall mean an act of God (which does not include a Year 2000 compliance matter), strike, lockout, or other industrial disturbance, act of public enemy, war, blockade, public riot, lightning, fire, storm, flood, explosion, governmental restraint, unavailability of equipment or supplies and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of such Member. The requirement that any force majeure shall not be reasonably within the control of such Member shall not require settlement of strikes, lockouts, or other labor difficulty by such Member, contrary to its wishes; and all such difficulties shall be handled entirely at the discretion of such Member.

15.8    Notice of Litigation - Either Member that becomes aware of any litigation pending against the Company shall give timely notice of such to the Company and the other Member. Additionally, any Member against which any litigation is filed in its capacity as a Member shall give the other Member and the Company timely notice of such litigation.

15.9    Severability - Any provision of this Agreement prohibited by applicable law shall be invalid to the extent of such prohibition and severed from this Agreement unless it is determined by the Members by unanimous vote that such prohibition invalidates the purpose or intent of this Agreement, in which case the Company shall be dissolved and its business and affairs wound up, liquidated and terminated.

15.10    Third-Party Beneficiaries - The representations, warranties, covenants and obligations of the Members are made for the express benefit of the Members, and parties that are not express signatories to this Agreement are not intended to have, nor shall have, the benefit of, or any right to seek enforcement or recovery under, any of such covenants or obligations.

38

15.11  <u>Remedies</u> - All rights and remedies under this Agreement are cumulative and in addition to other rights or remedies under this Agreement or any applicable law.

15.12  <u>Nonwaiver of Rights</u> - The failure of either Member to enforce any provision of this Agreement or right granted hereby shall not in any way be construed to be a waiver of such provision or right, nor in any way affect the validity of this Agreement or any part thereof, or limit, prevent or impair the right of either Member subsequently to enforce such provisions or exercise such right in accordance with its terms.

**IN WITNESS WHEREOF,** the Members have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**EL PASO MILFORD POWER I COMPANY**

By: _____
Title: _Senior Vice President_
_Randolph L. Wu_

**EL PASO MILFORD POWER II COMPANY**

By: _____
Title: _Senior Vice President_
_Randolph L. Wu_

**PDC MILFORD POWER, LLC**

By: _____
Title: _Manager_
_Michael J. Armitage_

319

**EXHIBIT A**
**ARTICLE I**
**DEFINITIONS AND INTERPRETATIONS**

1.1    Definitions - The following capitalized terms shall have the following meanings when used in this Agreement, unless the context otherwise requires:

1933 Act shall have the meaning set forth on the cover page of this Agreement.

1934 Act shall mean the Securities Exchange Act of 1934, 15 U.S.C. Section 78a *et seq.*

Act means the Delaware Limited Liability Company Act, 6 Del. C. §§18-106 et seq., as amended (or the corresponding provisions of any successor statute).

Additional Capital Contributions shall have the meaning set forth in Section 6.2(c).

Adjusted Capital Account shall mean the Capital Account maintained for each Member as provided in Section 6.1, (a) increased by (i) the amount of any unpaid Capital Contributions agreed to be contributed by such Member under Article VI, if any, (ii) an amount equal to such Member's allocable share of minimum gain as computed on the last day of such Fiscal Year in accordance with the applicable IRS Regulations, and (iii) the amount of Company liabilities allocable to such Member under Section 752 of the Internal Revenue Code with respect to which such Member bears the economic risk of loss (other than liabilities which constitute nonrecourse debt as defined in IRS Regulation Section 1.704-2), and (b) reduced by (i) the amount of all depletion deductions reasonably expected to be allocated to such Member in subsequent years and charged to such Member's Capital Account as provided in Section 7.1, (ii) the amount of all losses and deductions reasonably expected to be allocated to such Member in subsequent years under Sections 704(e) (2) and 706(d) of the Internal Revenue Code and IRS Regulation Section 1.751-1(b)(2)(ii), and (iii) the amount of all distributions reasonably expected to be made to such Member to the extent they exceed offsetting increases to such Member's Capital Account that are reasonably expected to occur during (or prior to) the year in which such distributions are reasonably expected to be made.  The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of IRS Regulations Section 1.704-l(b)(2)(ii)(d) and shall be interpreted consistently therewith.

Affiliate means any Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with another Person.  The term "control," as used in the immediately preceding sentence, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the controlled Person, whether through the ownership of voting securities, by contract or otherwise.

Agreement shall have the meaning set forth in the first paragraph of page 1 of this Agreement.

Available Cash shall have the meaning set forth in Section 7.1.

Business Day  means a day other than a Saturday, Sunday or other day on which national banks are permitted or required to be closed in the United States.

Capital Account shall have the meaning set forth in Section 6.1.

40

BUSDOCS:728102.1

Capital Contribution means the capital contributed or deemed contributed by a Member to the Company pursuant to Article VI.

Certificate of Formation means the certificate of formation of the Company filed with the Secretary of State of Delaware in respect of the Company, as the same may be amended from time to time.

Certificate of Merger means the certificate of merger of the Company filed with the Secretary of State of Delaware in connection with the merger of PDC – El Paso Milford LLC with and into the Company.

Chairman means the chairman of the Company that shall preside over the meetings of the Members and shall be nominated in accordance with Section 4.8.

Code means the Internal Revenue Code of 1986, as amended (or any successor or replacement statute).

Committee means a committee established pursuant to Section 5.3 or as otherwise established by the Members.

Commercial Committee means the committee established by the Members to provide oversight and direction to the Members associated with key commercial issues and contracts affecting the Company.

Committee Representative means a representative of a Member appointed to one or more of the committees established by the Members pursuant to Section 5.3.

Company means Milford Power Company, LLC.

Construction Committee means the committee established by the Members to provide oversight and direction to the Members for the construction of the Plant.

Contributing Member shall have the meaning set forth in Section 6.4(b).

Corporate Tax Rate shall mean a composite federal, state and local income tax rate applicable to corporations, which for purposes of this Agreement is equal to 41.175% on the date of the formation of the Company (which under current laws and regulations will be adjusted to 40.525% in 1999) and as subsequently adjusted during the term of this Agreement to reflect any changes in federal, State of Connecticut and local corporate tax rates after the date of formation of the Company.

Defaulting Member shall have the meaning set forth in Section 6.4.

Deficit Member shall have the meaning set forth in Section 8.5(b).

Depreciation shall have the meaning set forth in Section 7.2(d).

Electing Member shall have the meaning set forth in Section 11.2(d).

El Paso I means El Paso Milford Power I Company.

41

BUSDOCS:728102.1

El Paso II means El Paso Milford Power II Company.

EPC Contractor shall mean the consortium of ABB Power Generation Inc. and Black & Veatch Construction Inc. or such other party that has entered into an EPC Contract with the Company or that has been assigned to the Company, pursuant to which EPC Contractor will construct and place into service the Plant.

Equity Contribution means the commitment of El Paso II and its successors in interest to contribute certain capital or subordinated loans to the Company pursuant to the Financing Agreements.

Exercise Notice shall have the meaning set forth in Section 11.8

Financial Closing means the date on which all conditions precedent under the Financing Agreements have been satisfied (or waived by the party for whose benefit such conditions were provided) and the first drawdown of funds under the Financing Agreements has occurred.

Financing Agreements means the credit agreement, security agreements, equity funding agreements, subordination agreement, interest rate protection agreements with any Lender associated with financing the costs of developing and constructing the Plant.

Fiscal Year shall have the meaning set forth in Section 8.1.

Flip Point shall have the meaning set forth in Section 6.3(c).

Fuel Marketer means El Paso Gas Marketing Company, which shall provide fuel to the Company pursuant to the Fuel Purchase Agreement.

Fuel Purchase Agreement means the contract to be entered into between the Company and the El Paso Gas Marketing Company, which shall provide for El Paso Gas Marketing Company to sell natural gas and fuel oil to the Company.

Fuel Subordination Agreement means the subordination agreement entered into between El Paso Gas Marketing Company, the Company and the Lenders, pursuant to which certain of the payments under the Fuel Purchase Agreement are subordinated to other operating expenses of the Company.

Funding and Settlement Agreement shall mean the agreement entered into by the affiliates of the Members dated the same date as this Agreement, pursuant to which such parties set forth their agreement, among other things, regarding development costs and fees and the fees or commissions under the Fuel Purchase Agreement and the Power Marketing Agreement based upon the level of the unspent contingency under the Financing Agreements.

GAAP means generally accepted accounting principles, applied on a consistent basis, as madated from time to time by the American Institute of Certified Public Accountants. Accounting principles are applied on a "consistent basis" when the accounting principles observed in a current period are comparable in all material respects to those accounting principles applied in a preceding period.

Gross Asset Value shall have the meaning set forth in Section 7.2(d).

42

)

ICA means the Investment Company Act of 1940, 15 U.S.C. "80a-1-54.

IRS Regulations means the Income Tax Regulations promulgated under the Code, as may be amended from time to time (including corresponding provisions of successor IRS Regulations).

Joint Development Agreement means the agreement between El Paso Energy Marketing Company and Power Development Company, Inc. dated October 7, 1997, which sets forth the terms and conditions upon which the parties to such agreement developed the Project.

Lender shall mean the senior lenders under the Financing Agreements.

Liquidation Member shall have the meaning set forth in Section 11.5(b).

Majority in Interest means those Members owning more than fifty percent (50%) of the Ownership Interest in the Company; provided that for any approval of the Company to enter into, amend, modify, terminate or exercise any of the rights or remedies of the Company under any agreement with a Member or an Affiliate of a Member ("Contracting Member"), including without limitation the Member Management Agreements, the Fuel Purchase Agreement and the Power Marketing Agreement, if the Contracting Member owns more than fifty (50%) of the Ownership Interest, then for purposes of calculating the Majority in Interest the Contracting Member shall be deemed to only own fifty (50%) of the Ownership Interest and the other Members shall be deemed to own the remaining fifty (50%) of the Ownership Interest on a proportionate basis, based upon their respective Ownership Interests.

Member Management Agreement means the agreement between the Company and El Paso II attached as Exhibit B pursuant to which El Paso II is delegated the management of certain affairs of the Company.

Member means any Person executing this Agreement as of the date of this Agreement as a member or hereafter admitted to the Company as a member as provided in this Agreement, but does not include any Person who has ceased to be a member in the Company.

Membership Interest means the entire ownership interests and rights of a Member in the Company represented by the total of all Units of Membership Interest held by such Member, including, without limitation, the Capital Accounts, Ownership Interest, rights to distributions (liquidating or otherwise), allocations, information, and to consent or approve.

Non-Contributing Member shall have the meaning set forth in Section 6.4(b).

Nondefaulting Member shall have the meaning set forth in Section 6.4(a).

Nonelecting Member shall have the meaning set forth in Section 11.2(d).

Notice of Proposed Transfer shall have the meaning set forth in Section 9.2(a).

Officer means an officer of the Company appointed by the Members pursuant to Section 5.5.

O&M Operator means ABB Power Generation Inc., an Affiliate of El Paso II or such other party which shall operate and maintain the Plant in accordance with an O&M Agreement that is executed by the

43

Company or has been assigned to Company.

Operating Budget shall have the meaning set forth in Section 5.2(b)(vi).

Operating Policy shall mean the written statement of operating procedures for the Company referred to in Section 5.1(b)(ii), as such procedures may be amended, supplemented or revised from time to time by a Majority in Interest or a Super-Majority in Interest of the Manages, as applicable, as set forth in Section 5.1(b)(ii) and in the currently effective Operating Policy.

Operations Committee shall mean the committee established by the Members to provide oversight and direction to the Members for the operation, maintenance and repair of the Plant.

Ownership Interest shall have the meaning set forth in Section 6.3.

PDC means PDC Milford Power LLC.

Person means an individual, corporation, voluntary association, joint stock company, business trust, partnership, proprietorship or other legal entity (excluding any governmental body), however constituted.

Plant means a natural gas-fired combined cycle electric generation facility having a nominal capacity of approximately five hundred forty (540) megawatts to be located in Milford, Connecticut.

Positive Member shall have the meaning set forth in Section 8.5(b).

Power Marketer means El Paso Power Services Company, which shall provide power marketing services to the Company pursuant to the Power Marketing Agreement.

Power Marketing Agreement means the contract to be entered into between the Company and the El Paso Power Services Company, which shall provide for El Paso Power Services Company to provide power marketing services to the Company.

President means the Person then serving as the president of the Company or, if none, the Person then serving as the vice president of the Company.

Proceeding shall have the meaning set forth in Section 12.1.

PUHCA means the Public Utility Holding Company Act of 1935, 15 U.S.C. Section 79-79z-6.

Securities Acts means the 1933 Act and the 1934 Act.

Service Agreement means the agreement between the Company and Power Development Company, LLC attached as Exhibit B pursuant to which Power Development Company, LLC is delegated the management of certain affairs of the Company.

Sponsors means El Paso Energy Marketing Company and Power Development Company, Inc., the parties to the Joint Development Agreement.

Super-Majority in Interest means Members or representatives to any Committee formed pursuant

44

to this Agreement, as the context may require, who own or who represent more than three-quarters (75%) of the Ownership Interest in the Company, or such greater percentage as may be required by the Act: provided that for so long as El Paso I and El Paso II own greater than 80% of the Ownership Interests. Super-Majority in Interest shall mean Members, or representatives to any Committee formed pursuant to this Agreement, as the context may require, who own or who represent on any such Committee a Member or Member who owns more than ninety-five percent (95%) of the Ownership Interest in the Company;.

Tax Matters Member shall have the meaning set forth in Section 8.11.

Transferred Interest shall have the meaning set forth in Section 9.2.

Transferring Member shall have the meaning set forth in Section 9.2.

Unit of Membership Interest means each share (or the aggregate thereof, as applicable) of Membership Interest in the Company issued to a Member pursuant to this Agreement, whether now or hereafter.

Withdrawn Member shall have the meaning set forth in Section 11.9.

1.2    Interpretations    Unless expressly provided for elsewhere in this Agreement, this Agreement shall be interpreted in accordance with the following provisions:

(a)    Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

(b)    If a word or phrase is defined, its other grammatical forms have a corresponding meaning.

(c)    A reference to a person, corporation, trust, partnership, or other entity includes any of them.

(d)    The headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

(e)    All references in this Agreement to articles, sections or subdivisions thereof shall refer to the corresponding article, section or subdivision thereof of this Agreement unless specific reference is made to such articles, sections, or subdivisions of another document or instrument. .

(f)    A reference to any agreement or document (including without limitation a reference to this Agreement) is to the agreement or document as amended, varied, supplemented, novated or replaced, except to the extent prohibited by this Agreement or that other agreement or document.

(g)    No waiver by either Member of any default by the other Member in the performance of any provision, condition or requirement in this Agreement shall be deemed to be a waiver of, or in any manner release the other Member from, performance of any other provision, condition or requirement in this Agreement, nor shall such waiver be deemed to be a waiver of, or in any manner a release of, the other Member from future performance of the same provision, condition or requirement. Any delay or omission of either Member to exercise any right hereunder shall not impair the exercise of any such right, or any like right, accruing to it thereafter. The failure of either Member to perform its obligations hereunder shall not release the other Member from the

45

performance of such obligations.

(h)  A reference to any party to this Agreement or another agreement or document includes the party's successors and assigns.

(i)  A reference to legislation or to a provision of legislation includes a modification or reenactment of it, a legislative provision substituted for it and a regulation or statutory instrument issued under it.

(j)  A reference to writing includes a facsimile transmission and any means of reproducing words in a tangible and permanently visible form.

(k)  The words "hereof," "in this Agreement" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified.

46

**EXHIBIT B**
**MEMBER MANAGEMENT AND SERVICE AGREEMENTS**

1

EXHIBIT B

## MEMBER MANAGEMENT AGREEMENT

THIS **MEMBER MANAGEMENT AGREEMENT** ("Agreement") is
made and entered into this ____ day of March, 1999 by and between **MILFORD
POWER COMPANY, LLC** ("Company") and **EL PASO MILFORD POWER II
COMPANY** ("Manager"). Company and Manager may be referred to in this Agreement
individually as a "Party" and collectively as the "Parties."

## W I T N E S S E T H :

WHEREAS, Company is developing and will construct a combined cycle
electric generation facility having a nominal capacity of approximately 540 MW to be
located near Milford, Connecticut (the "Plant");

WHEREAS, Manager is Member of the Company pursuant to a Limited
Liability Company Agreement executed on the same date as this Agreement; and

WHEREAS, the Company desires to have Manager perform certain
construction, operation and maintenance and administrative functions on behalf of the
Company and Manager desires to perform such functions on behalf of the Company.

NOW THEREFORE, for and in consideration of the premises and the
mutual covenants and agreements contained in this Agreement, the Parties agree to the
following:

### ARTICLE I

### GENERAL ROLE

1.1     Independent Contractor - Subject to the terms of this Agreement,
Manager is an independent contractor of the Company to provide administrative,
construction and operations and maintenance services to the Company as set forth in
Article II of this Agreement (the "Services"). Manager agrees to maintain its status and
relationship as an independent contractor. Any provisions of this Agreement that may
appear to give the Company a measure of control over the details of the Services shall be
deemed to mean that the Manager shall follow the general desires of the Company, but
that the Manager shall have the authoritative control as to the details of performing the
Services. Except as expressly set forth herein, Manager shall not be deemed to be the
agent, representative or employee of the Company. Nothing in this Agreement is
intended to (a) create a partnership, joint venture, agency or other relationship creating

fiduciary or quasi fiduciary duties or similar duties or (b) subject the Parties to joint and several or vicarious liability.

      1.2    <u>Policy Direction</u> - The Company shall provide Manager with general guidelines, instructions and budgets upon which it will provide the Services. Subject to compliance with all laws, regulations or orders of governmental bodies having jurisdiction, Manager will provide the Services under this Agreement.

      1.3    <u>Authority to Bind Company</u> - In connection with the performance of the Services in accordance with this Agreement, Manager shall be authorized to act in the name of and on behalf of the Company. Manager shall also be authorized to prepare and negotiate all contracts, assignments and other agreements, instruments and documents to be entered into and executed by the Company.

      1.4    <u>Standard of Performance</u> - Manager shall provide or cause to be provided to Company the Services under this Agreement in compliance with all applicable laws, regulations and government authorizations and with the same degree of care, skill and diligence with which Manager performs similar services for its own account or the account of its affiliates. EXCEPT AS MAY BE OTHERWISE SET FORTH ABOVE, MANAGER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICES TO BE PROVIDED UNDER THIS AGREEMENT.

      1.5    <u>Devotion of Time and Efforts</u> - Manager shall be obliged to devote only as much of its time to the Company's business as shall be required to meet its obligations under this Agreement and in light of the Company's business and objectives.

## ARTICLE II

## SERVICES

      2.1    <u>Administrative Services</u> - Subject to the terms of this Agreement, Manager shall perform for the Company the following administrative services (the "Administrative Services"): accounting, financial reporting, tax, cash management, review of significant operating and financial matters, invoicing, insurance services, legal and such other administrative services as directed by the Company. Without limiting the above, Manager shall provide the following services:

      (a)    to maintain the books and records of the Company in accordance with good business practice, Internal Revenue Service regulations, applicable law

and generally accepted accounting principles and the retention and oversight of independent auditors to review such books and records on an annual basis;

(b)     to provide  services regarding the cash of the Company, including (i) establishing bank accounts and lines of credit and (ii) investing funds in short-term government obligations, commercial paper and other investments having a prudently obtainable yield in accordance with the general policy guidelines of the Company;

(c)     to provide accounting services related to the administering of the financing proceeds and ensuring compliance with the loan and other ancillary agreements with the lenders which have advanced to the Company the costs of the Plant (the "Financing Agreements");

(d)     to provide accounting services related to development and implementation of financial controls and systems of the Company;

(e)     to invoice for all transactions of the Company and to collect all such amounts due the Company;

(f)     to the extent that amounts are available from the Company, to pay all fees, debts and obligations of the Company;

(g)     to provide tax related services; and

(h)     to do and perform such other acts as may be mutually agreed to by Manager and the Company from time to time.

2.2     <u>Financial and Operational Reports</u> - In addition to the administrative duties set forth above in Section 2.1, Manager will disseminate periodic financial reports to the Company.  Without limiting the above, unless otherwise required by the Financing Agreements or otherwise directed by the Company, Manager shall cause to be prepared and distributed to the Company the following reports:

(a)     within forty-five (45) days after the end of each calendar quarter, a quarterly report containing among other things, financial statements and reports of the Company's operations and equity accounts for the prior calendar quarter and year-to-date (including a variance analysis comparing actual versus projected results); and

NY3: 177344.01

(b)    within sixty (60) days after the end of each fiscal year, an annual audited report containing among other things, financial statements and reports of the Company's operations as of the end of such fiscal year (including a variance analysis comparing actual versus projected results).

(c)    tax returns, reports and advice memorandums; and

(d)    all other records, reports and information regarding the Company's business and financial condition including all Company agreements, correspondence, internal memos, evaluations and materials.

2.3    <u>Construction Management Services</u>  Manager shall provide construction management and engineering services associated with the construction of the Plant (the "Construction Management Services"), including without limitation, the following:

(a)    the administration of the Engineer, Procure and Construct Contract dated February 27, 1999 between the Company and the consortium of ABB Power Generation Inc. and Black & Veatch Construction Inc. (the "EPC Contract"), including the coordination and resolution of any contractual, technical (including design documentation), procurement, construction, testing or commissioning issues under the EPC Contract and representing the Company as the on-site point of contact with the contractor under the EPC Contract;

(b)    the review and recommendation to the Company of any change orders under the EPC Contract;

(c)    the review, monitoring and auditing of all construction activities under the EPC Contract, including work progress, obtaining permits and government authorizations that the contractor under the EPC Contract is required to obtain and maintain, compliance with the engineering and technical specifications under the EPC Contract, development of training programs for the contractor under the O&M Contract and monitoring compliance with the quality assurance, health, safety and security provisions of the EPC Contract and reporting areas of non-compliance, with recommendations for corrective actions;

(d)    the development and implementation of budgets and project controls for the construction of the Plant, including the implementation of cost and project reporting systems and procedures and the provision of variance analysis and revised cash flow projections;

NY3: 177344.01

(e)     the administration and resolution of issues with vendors related to the EPC Contract, including tracking and expediting reviews, performing quality audits (associated with technical qualifications, safety programs, environmental compliance and financial capabilities) and witnessing and inspecting the assembly of equipment and major materials;

(f)     the monitoring of compliance with insurance requirements under the EPC Contract;

(g)     the coordination of any activities with the lender's independent engineer;

(h)     the review and monitoring of all construction activities associated with the interconnection with Northeast Utilities; and

(i)     such other construction management services mutually agreed to between Manager and the Company.

2.5     <u>O&M Management Services</u> - Manager shall provide operations and maintenance management services associated with the oversight of the O&M operator with regard to the operation and maintenance of the Plant (the "O&M Management Services"), including without limitation, the following:

(a)     the administration of the Operations and Maintenance Agreement dated February 27, 1999 between the Company and ABB Power Generation Inc. (the "O&M Contract"), including the coordination and resolution of any contractual, technical, operation, or commissioning issues under the O&M Contract and representing the Company as the on-site point of contact with the contractor under the O&M Contract;

(b)     the review and recommendation to the Company of any change orders under the O&M Contract;

(c)     the review and monitoring of all construction activities under the O&M Contract, including work progress, compliance with the operational and technical specifications under the O&M Contract and compliance with the health, safety and security provisions of the O&M Contract;

(d)     the development and implementation of budgets and project controls for the operation of the Plant, including the implementation of cost and project reporting systems and procedures;

NY3: 177344.01

(e)     the administration and resolution of issues with vendors related to the O&M Contract, including the provision of services and materials to the contractor under the O&M Contract that the Company must provide to such contractor;

(f)     the monitoring of compliance with insurance requirements under the O&M Contract;

(g)     the coordination of any activities with the lender's independent engineer; and

(h)     such other operational management services mutually agreed to between Manager and the Company.

## ARTICLE III

## COMPENSATION AND EXPENSES

3.1     Compensation of Manager - For the period from the date of execution of this Agreement until the earlier of the commercial operations date of the Plant or January 1, 2001 (the "Initial Period"), the Company shall pay Manager a fee of $149,250 per month.  Commencing upon the expiration of the Initial Period, the Company shall pay Manager a fee of $94,167 per month for a period of two years and $104,167 per month thereafter.  Fees after the Initial Period shall be adjusted commencing on January 1, 2000 and each January 1st thereafter by the Implicit Price Deflator to the Gross Domestic Price (as published by the Department of Commerce's Bureau of Economic Analysis).  Such a monthly fee shall compensate for all costs and expenses, including travel expenses, that are incurred to perform the Services, unless the Company otherwise agrees in advance in writing. The Company and Manager shall not amend or modify such fees without the consent of the Lenders to the Company, if required under the Financing Agreements.

3.2     Statements and Billings - On or after the fifteenth day of each month, Manager shall submit to the Company an invoice (in reasonable detail and with adequate explanation and support) for all Services performed and materials delivered during the previous month.

3.3     Payments - Company shall pay to Manager the amounts invoiced within ten days of receipt of such invoice. If Company fails to make timely payments of any invoice, then Manager shall be entitled to collect the amount of such unpaid invoice together with interest at the prime or reference rate quoted or announced from time to

6

time by The Chase Manhattan Bank, N.A. plus two percent per annum for successive 30 day periods commencing on the date of default and, if not paid when due, shall bear interest in accordance with this section (not to exceed the maximum allowable usurious rate permitted by applicable law) on any unpaid disputed amount. If the Company's failure to pay is a result of a good faith dispute of any such charges, then interest will be payable only on the disputed portion that is found to be ultimately due. Interest shall accrue on unpaid amounts beginning on the payment due date of the Manager's invoice to the Company and shall terminate upon payment of the invoice. Payment and the failure to object to all or any portion of an invoice shall not be construed as an acceptance of defective work or improper materials or a waiver or any right under this Agreement by the Company.

## ARTICLE IV

## TERM OF AGREEMENT

4.1    Primary Term - This Agreement shall become effective on the date hereof and shall continue in effect for a period of 20 years, unless terminated pursuant to another provision of this Agreement.

4.2    Extension - Subject to termination in accordance with Section 4.3, this Agreement shall remain in full force and effect from year to year after the primary term, unless and until terminated by either the Company or Manager upon giving sixty days' prior written notice to the other Party.

4.3    Removal Rights - The Company may terminate this Agreement or any portion of the Services provided under this Agreement upon sixty days' prior written notice for the following reasons:

(a)    for breaching any of its material obligations in accordance with this Agreement to the material detriment of the Company and, after receiving written notice from the Company, failing to remedy such failure within fifteen days or such longer period as is reasonably required to remedy such default;

(b)    for performing or failing to perform its duties under this Agreement in a manner that is without authority to the material detriment of the Company and that is associated with the fraud, deceit, gross negligence, willful misconduct, or wrongful taking of Company property by Manager;

7

(c)    for failing to comply with all applicable laws, rules and regulations, where the failure to so comply has a material adverse effect on the Company;

(d)    an order is made by a court or an effective resolution is passed for the dissolution, liquidation, winding up or reorganization of Manager;

(e)    Manager dissolves, liquidates or terminates its corporate existence;

(f)    Manager becomes insolvent, bankrupt or makes an assignment for the benefit of creditors;

(g)    a receiver, guardian, trustee, conservator or other representative is appointed for a substantial part of Manager's assets;

(h)    Manager or its affiliates cease to own at least 25% of the Company; or

(i)    the Company and Manager mutually agree to terminate all or a portion of the Services under this Agreement.

Subject to Section 4.4, any removal of the Manager shall become effective as of the date specified by the Company and in a notice delivered to the Manager (except that it cannot be effective on a date earlier than the date such notice is delivered to the Manager).

4.4    <u>Manager's Rights to Terminate</u> – Manager shall have the right to terminate this Agreement at any time upon ninety days' prior written notice to the Company, subject either to (a) receipt of the Lender's consent, such consent not to be unreasonably withheld or delayed, to the extent that the Company and Manager can locate a replacement manager that is financially solvent and experienced in the provision of the Services being provided under this Agreement or (b) Manager's Affiliates are no longer the gas and/or power marketer under the Fuel Purchase Agreement or the Power Marketing Agreement (as such terms are defined in the Financing Agreements). If requested by the Company, Manager shall continue to perform the Services on the same terms provided in this Agreement or as otherwise directed by the Company for up to six months following the termination to provide for a transition of the Services to a replacement for Manager. Manager agrees to cooperate with the Company to locate and train such replacement for Manager. Manager shall receive compensation on the same terms provided in this Agreement during such transition period; pro rated to reflect any reduction in the level of services provided by Manager.

8

## ARTICLE V

### GENERAL OBLIGATIONS

5.1     Assignment of Duties - Manager may, from time to time, delegate all or part of its responsibilities to others as the Manager deems necessary, useful or appropriate; provided that any such arrangement shall be on an arm's length basis and shall not relieve the Manager of any responsibility for such duties or provide any right to increase in the amounts owed under this Agreement to the Manager and further provided that Company approval shall be required if more than an insignificant portion of such total management responsibilities are delegated by Manager to a non-affiliated company. Notwithstanding anything to the contrary, Manager may assign all or a part of its responsibilities to (a) another member of the Company that is financially and technically competent in the area of responsibilities that are assigned or (b) an affiliate without the consent of the Company.

5.2     Transactions With Affiliates - Subject to the approval of the Company, Manager may utilize, as it deems necessary or appropriate, the services of any of its affiliates, provided that such services are provided on terms no less favorable to the Company than those prevailing at the time for comparable services by unaffiliated independent parties in an arms-length transaction.

5.3     Non-Exclusive Arrangement - Subject to the below, Manager shall not incur any liability to the Company as a result of engaging in any other business or venture regardless of whether such other business or venture competes with the Company or whether Manager is active in the management or business of such other business venture. Neither the Company nor any other party shall have any rights by virtue of this Agreement or any applicable law in or to the other business ventures of Manager or to the income, gains, losses, deductions and credits derived therefrom by Manager.

5.4     Assistance of Company - Manager shall have the right, but not the obligation, to submit to the Company any matter within its authority under this Agreement for consideration, authorization or ratification by the Company. If the Manager does not submit the matter to the Company, such an election by Manager shall not be deemed to be negligence or a breach of the Manager's obligations hereunder to the Company.

5.5     Inspection of Books and Records - All of Manager's books and records associated with the Services under this Agreement shall be made available at Manager's offices upon reasonable notice during normal business hours for inspection, copying or audit by the Company, or an independent certified public accountant on behalf

9

of and at the sole expense of the Company; provided that the Company shall not have access to any daily nomination, measurement and delivery information. Manager will maintain all necessary records at its accounting office, including back-up data, all of which shall be complete to reflect all charges for reimbursable work. This inspection right may be exercised at any time within twelve (12) months following the end of the calendar year during which the applicable Services were performed.

    5.6    <u>Indemnification and Limitation of Liability</u>

    (a)    <u>Indemnification by Company</u> - Subject to (b) below, the Company shall indemnify, reimburse and hold harmless Manager when acting in accordance with this Agreement against expenses, reasonable attorneys' fees, losses, damages, claims, judgments and other liabilities ("Costs") arising from Manager's acts or omissions on behalf of the Company under this Agreement; and

    (b)    <u>Indemnification by Manager</u> - The Company shall not indemnify Manager when such Costs arise as a result of Manager's gross negligence, willful misconduct, fraud, or deceit. Subject to (c) below, Manager shall indemnify, reimburse and hold harmless the Company against any expenses, reasonable attorneys' fees, losses, damages, claims, judgments and other liabilities arising from acts or omissions of Manager set forth in this paragraph (b).

    (c)    <u>Limitation of Damages</u> - Neither the Company, its related companies, the representatives of the Company, nor the Manager shall be liable to the other for any exemplary or punitive damages or for loss of profits, consequential losses or business loss, injury or damage arising in connection with this Agreement.

### ARTICLE VI

### MISCELLANEOUS

    6.1    <u>Notices</u> - Any notice, payment, request, demand or other communications hereunder shall be in writing and shall be deemed to have been duly given when received by the party to be notified by appropriate means including person delivery, courier, mail (postage prepaid), facsimile and/or electronic mail. The Company and Manager may change their address, fax number and/or representative at any time by giving at least ten (10) days prior written notice to the other.

    6.2    <u>Governing Law</u> - This Agreement shall be deemed to be made under and shall be construed in accordance with the laws of the State of Delaware.

10

NY3: 177344.01

6.3    <u>No Third Party Beneficiaries</u> - Except as may be expressly provided for herein, no person or entity not a party to this Agreement shall have any rights or obligations hereunder.

6.4    <u>Entire Agreement</u> - This Agreement and any subsequent written amendments thereto contain the entire understanding between and among the Parties and supersede any prior understandings and agreements between and among them.

6.5    <u>Waiver</u> - No waiver by any Party of any default by any other Party in the performance of any provision, condition or requirement herein shall be deemed to be a waiver of, or in any manner release such other Party from, performance of any other provision, condition or requirement herein, nor deemed to be a waiver of, or in any manner release the defaulting Party from, future performance of the same provision, condition or requirement; nor shall any delay or omission of either Party to exercise any right hereunder in any manner impair the exercise of such right or of any other right to which it is entitled.

6.6    <u>Headings</u> - The titles to each of the various Articles or Sections in this Agreement are included for convenience or reference only and shall have no effect on, or be deemed as part of, the text of this Agreement.

6.7    <u>Assignment</u> - No Party shall assign its rights or interest under this Agreement to any other person without the express prior written consent of the other Party, which consent shall not be unreasonably withheld; provided that any Party shall have the right to (i) make an assignment to an affiliate, (ii) mortgage, pledge, encumber or otherwise impress a lien or security interest upon its rights and interest in and to this Agreement, or (iii) participate in a merger, consolidation, or other reorganization with another entity if the Party is the sole surviving entity.

11

6.8    <u>Reformation and Severability</u> - If any provision of this Agreement is declared null and void by a court of competent jurisdiction, then that provision shall be considered severable at the option of the Parties; and if the severability option is exercised, the remaining provisions of this Agreement shall remain in full force and effect.

This Agreement is executed as of the date first above mentioned.

**MILFORD POWER COMPANY, L.L.C.**

By:    _____
Title:    _____


**EL PASO MILFORD POWER II COMPANY**

By:    _____
Title:    _____

12

EXHIBIT B

## SERVICE AGREEMENT

THIS SERVICE AGREEMENT ("Agreement") is made and entered into this ___ day of March, 1999 by and between **MILFORD POWER COMPANY, LLC** ("Company") and **POWER DEVELOPMENT COMPANY, LLC** ("Contractor"). Company and Contractor may be referred to in this Agreement individually as a "Party" and collectively as the "Parties."

## W I T N E S S E T H :

WHEREAS, Company is developing and will construct a combined cycle electric generation facility having a nominal capacity of approximately 540 MW to be located near Milford, Connecticut (the "Plant"), and

NOW THEREFORE, for and in consideration of the premises and the mutual covenants and agreements contained in this Agreement, the Parties agree to the following:

## ARTICLE I

## GENERAL ROLE

1.1    Independent Contractor.  Subject to the terms of this Agreement, Contractor is an independent contractor of the Company to provide certain services to the Company as set forth in Article II of this Agreement (the "Services"). Contractor agrees to maintain its status and relationship as an independent contractor. Any provisions of this Agreement that may appear to give the Company a measure of control over the details of the Services shall be deemed to mean that the Contractor shall follow the general desires of the Company, but that the Contractor shall have the authoritative control as to the details of performing the Services. Except as expressly set forth herein, Contractor shall not be deemed to be the agent, representative or employee of the Company. Nothing in this Agreement is intended to (a) create a partnership, joint venture, agency or other relationship creating fiduciary or quasi fiduciary duties or similar duties or (b) subject to the Parties to joint and several or vicarious liability.

1.2    Policy Direction.  The Company shall provide Contractor with general guidelines, instructions and budgets upon which it will provide the Services contemplated by Section 2.1.  Subject to compliance with all laws, regulations or orders of governmental bodies having jurisdiction, Contractor will provide the Services under this Agreement.

1.3    Standard of Performance.  Contractor shall provide or cause to be provided to Company the Services under this Agreement in compliance with all applicable laws, regulations and government authorizations and with the same degree of care, skill and diligence with which Contractor performs similar services for its own account or the account of its affiliates.  EXCEPT AS MAY BE OTHERWISE SET FORTH ABOVE, CONTRACTOR MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICES TO BE PROVIDED UNDER THIS AGREEMENT.

1.4    Devotion of Time and Efforts.  Contractor shall be obliged to devote only as much of its time to the Company's business as shall be required to meet its obligations under this Agreement and in light of the Company's business and objectives. Tom Atkins shall be the initial representative of Contractor responsible for providing the permitting services set forth in Section 2.1.  Contractor shall have the right to replace Tom Atkins as its representative responsible for such permitting services subject to the approval of the Company, which shall not be unreasonably withheld.

## ARTICLE II

### SERVICES

2.1    Permitting Services.  Contractor shall make and process all necessary applications to procure and maintain all federal, state and local licenses, permits and approvals necessary for the construction and operation of the Plant, including without limitation permits associated with water, sewer, gas and electrical interconnections ("Approvals").  Contractor shall provide copies of drafts of all material applications and correspondence associated with such Approvals for the Company's approval. Contractor shall report on the status of such Approvals on a monthly basis to the Company.

2.2    Governmental Affairs Services.  In addition to providing the services in Section 2.1 above, from and after the date of this Agreement, Contractor will manage and direct the governmental, community and public relations of the Company.

## ARTICLE III

### COMPENSATION AND EXPENSES

3.1    Compensation of Contractor.  For the period from the date of execution of this Agreement until the earlier of the commercial operations date of the Plant or January 1, 2001 (the "Initial Period"), the Company shall pay Contractor a fee of

2

$20,000 per month. Commencing upon the expiration of the Initial Period and for a period of two years thereafter, the Company shall pay Contractor a fee of $10,000 per month. Such a monthly fee shall compensate for all costs and expenses, including internal employee costs and travel expenses, that are incurred to perform the Services, unless the Company otherwise agrees in advance in writing.

  3.2 <u>Statements and Billings</u>. On or after the fifteenth day of each month, Contractor shall submit to the Company an invoice (in reasonable detail and with adequate explanation and support) for all Services performed and materials delivered during the previous month.

  3.3 <u>Payment</u>. Company shall pay to Contractor the amounts invoiced within ten days of receipt of such invoice. If Company fails to make timely payments of any invoice, then Contractor shall be entitled to collect the amount of such unpaid invoice together with interest at the prime or reference rate quoted or announced from time to time by the Chase Manhattan Bank, N.A. plus two percent per annum for successive 30 day periods commencing on the date of default and, if not paid when due, shall bear interest in accordance with this section (not to exceed the maximum allowable usurious rate permitted by applicable law) on any unpaid disputed amount. If the Company's failure to pay is a result of a good faith dispute of any such charges, then interest will be payable only on the disputed portion that is found to be ultimately due. Interest shall accrue on unpaid amounts beginning on the payment due date of the Contractor's invoice to the Company and shall terminate upon payment of the invoice. Payment and the failure to object to all or any portion of an invoice shall not be construed as an acceptance of defective work or improper materials or a waiver or any right under this Agreement by the Company.

## ARTICLE IV

## <u>TERM OF AGREEMENT</u>

  4.1 <u>Primary Term</u>. This Agreement shall become effective on the date hereof and shall continue in effect for a period of two years following the earlier of the commercial operations date of the Plant or January 1, 2001, unless terminated pursuant to another provisión of this Agreement.

  4.2 <u>Extension</u>. Subject to termination in accordance with Section 4.3, this Agreement shall remain in full force and effect from year to year after the primary term, unless and until terminated by either the Company or Contractor upon giving sixty days' prior written notice to the other Party.

NY3: 177348.01

4.3    <u>Removal Rights</u>.  The Company may terminate this Agreement or any portion of the Services provided under this Agreement upon sixty days' prior written notice for the following reasons:

(a)    for breaching any material obligations under this Agreement to the material detriment of the Company and, after written notice from the Company, failing to cure such remedy within 30 days or such longer period as is reasonable under the circumstances to remedy such default;

(b)    for performing or failing to perform its duties under this Agreement in a manner that is without authority to the material detriment of the Company and that is associated with the fraud, deceit, gross negligence, willful misconduct, or wrongful taking of Company property by Contractor.

(c)    for failing to comply with all applicable laws, rules and regulations, where the failure to so comply has a material adverse effect on the Company;

(d)    an order is made by a court or an effective resolution is passed for the dissolution, liquidation, winding up or reorganization of Contractor;

(e)    Contractor dissolves, liquidates or terminates its corporate existence,

(f)    Contractor becomes insolvent, bankrupt or makes an assignment for the benefit of creditors;

(g)    a receiver, guardian, trustee, conservator or other representative is appointed for a substantial part of Contractor's assets; or

(h)    Contractor sells more than 70% of its membership interest in Owner.

(i)    the Company and Contractor mutually agree to terminate all or a portion of the Services under this Agreement.

Subject to Section 4.4, any removal of the Contractor shall become effective as of the date specified by the Company and in a notice delivered to the Contractor (except that it cannot be effective on a date earlier than the date such notice is delivered to the Contractor).

4.4    <u>Contractor's Rights to Terminate</u>.  Contractor shall have the right to terminate this Agreement at any time upon ninety days' prior written notice to the Company.

**ARTICLE V**

**GENERAL OBLIGATIONS**

5.1    <u>Indemnification and Limitation of Liability</u>.

(a)    <u>Indemnification by Company</u>.  Subject to (b) below, the Company shall indemnify, reimburse and hold harmless Contractor when acting in accordance with this Agreement against expenses, reasonable attorneys' fees, losses, damages, claims, judgments and other liabilities ("Costs") arising from Contractor's acts or omissions on behalf of the Company under this Agreement; and

(b)    <u>Indemnification by Contractor</u>.  The Company shall not indemnify Contractor when such Costs arise as a result of Contractor's gross negligence, willful misconduct, fraud, or deceit. Subject to (c) below, Contractor shall indemnify, reimburse and hold harmless the Company against any expenses, reasonable attorneys' fees, losses, damages, claims, judgments and other liabilities arising from acts or omissions of Contractor set forth in this paragraph (b).

(c)    <u>Limitation of Damages</u>.  Neither the Company, its related companies, the representatives of the Company, nor the Contractor shall be liable to the other for any exemplary or punitive damages or for loss of profits, consequential losses or business loss, injury or damage arising in connection with this Agreement

5.2    <u>Assistance of Company</u>.  Contractor shall have the right, but not the obligation, to submit to the Company any matter within its authority under this Agreement for consideration, authorization or ratification by the Company. If the Contractor does not submit the matter to the Company, such an election by Contractor shall not be deemed to be negligence or a breach of the Contractor's obligations hereunder to the Company.

5.3    <u>Inspection of Books and Records</u>.  All of Contractor's books and records associated with the Services under this Agreement shall be made available at Contractor's offices upon reasonable notice during normal business hours for inspection, copying or audit by the Company, or an independent certified public accountant on behalf of and at the sole expense of the Company; provided that the Company shall not have access to any daily nomination, measurement and delivery information. Contractor will

NY3: 177348.01

maintain all necessary records at its accounting office, including backup data, all of which shall be complete to reflect all charges for reimbursable work. This inspection right may be exercised at any time within twelve (12) months following the end of the calendar year during which the applicable Services were performed.

## ARTICLE VI

## MISCELLANEOUS

6.1     Notices.  Any notice, payment, request, demand or other communications hereunder shall be in writing and shall be deemed to have been duly given when received by the party to be notified by appropriate means including personal delivery, courier, mail (postage prepaid), facsimile and/or electronic mail.  The Company and Contractor may change their address, fax number and/or representative at any time by giving at least ten (10) days prior written notice to the other.

6.2     Governing Law.  This Agreement shall be deemed to be made under and shall be construed in accordance with the laws of the State of Delaware.

6.3     No Third Party Beneficiaries.  Except as may be expressly provided for herein, no person or entity not a party to this Agreement shall have any rights or obligations hereunder.

6.4     Entire Agreement.  This Agreement and any subsequent written amendments thereto contain the entire understanding between and among the Parties and supersede any prior understandings and agreements between and among them.

6.5     Waiver.  No waiver by any Party of any default by any other Party in the performance of any provision, condition or requirement herein shall be deemed to be a waiver of, or in the any manner release such other Party from, performance of any other provision, condition or requirement herein, nor deemed to be a waiver of, or in any manner release the defaulting Party from, future performance of the same provision, condition or requirement; nor shall any delay or omission of either Party to exercise any right hereunder in any manner impair the exercise of such right or of any other right to which it is entitled.

6.6     Headings.  The titles to each of the various Articles or Sections in this Agreement are included for convenience or reference only and shall have no effect on, or be deemed as part of, the text of this Agreement.

NY3: 177348.01

6.7     <u>Assignment</u>. No Party shall assign its rights or interest under this Agreement to any other person without the express prior written consent of the other Party, which consent shall not be unreasonably withheld; provided that any Party shall have the right to (i) make an assignment to an affiliate, (ii) mortgage, pledge, encumber or otherwise impress a lien or security interest upon its rights and interest in and to this Agreement, or (iii) participate in a merger, consolidation, or other reorganization with another entity if the Party is the sole surviving entity.

6.8     <u>Reformation and Severability</u>.  If any provision of this Agreement is declared null and void by a court of competent jurisdiction, then that provision shall be considered severable at the option of the Parties; and if the severability option is exercised, the remaining provisions of this Agreement shall remain in full force and effect.

This Agreement is executed as of the date first above mentioned.


**MILFORD POWER COMPANY LLC**


By: _____
Title: _____


**POWER DEVELOPMENT COMPANY,**


By: _____
Title: _____

NY3: 177348.01

**EXHIBIT C**
**FORM OF CERTIFICATE**

BUSDOCS:728102.1

EXHIBIT C

NUMBER

MEMBERSHIP INTERESTS

**\*\*1\*\*4\***

**\*\*\*\*5\*\*\*\***

# MILFORD POWER COMPANY, L.L.C.

**This Certifies that** _____ **EL PASO MILFORD POWER I COMPANY** _____ is the

owner of _____ **\*\*\*\*\*\*\*\*\*\*\*\*FIVE\*\*\*\*\*\*\*\*\*\*\*\*** _____ fully paid and non-assessable

Membership Interests of the above Limited Liability Company transferable only on the books of the Limited Liability Company by the

holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

The Membership Interests represented by this Certificate have not been registered under the Securities Act of 1933 (the "Act") and are "restricted securities" as the term is defined in Rule 144 under the Act. The Membership Interests may not be offered for sale, sold or otherwise transferred except pursuant to an effective registration statement under the Act or pursuant to an exemption from registration under the Act, the availability of which is to be established to the satisfaction of the Limited Liability Company.

Transfer of these Membership Interests is subject to restrictions in the Regulations for this Limited Liability Company.

The Company will furnish without charge to each Membership Interest holder who so requests, the powers, designations, preferences and relative participation rights of Membership Interest holders and the qualifications, limitations or restrictions of such rights.

**In Witness Whereof**, the said Limited Liability Company has caused this Certificate to be signed by its duly authorized representative(s) and to be sealed with the Seal of the Limited Liability Company.

Dated _____ **March 25, 1999** _____

Michael Armitage

Randolph L. Wu

T. *Goody Legal* © 002 State St. So. Houston, TX 77347

THIS CERTIFIES THAT EL PASO MILFORD POWER I COMPANY IS THE OWNER OF A FULLY PAID AND NON-ASSESSABLE LLC INTEREST, SUBJECT TO THE ADJUSTMENT SET FORTH IN THE AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF MILFORD POWER COMPANY, LLC, DATED AS OF MARCH 25, 1999, AS AMENDED, MODIFIED AND SUPPLEMENTED FROM TIME TO TIME (THE "LLC AGREEMENT"), CONSISTING OF A 5% MEMBERSHIP INTEREST IN CONNECTION THEREWITH AND CERTAIN OTHER RIGHTS IN THE COMPANY, ALL AS SET FORTH IN THE LLC AGREEMENT. THIS LLC INTEREST CERTIFICATE, INCLUDING THE RIGHTS ATTENDANT THERETO, SHALL BE A SECURITY GOVERNED BY ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE IN ANY JURISDICTION (A) THAT HAS ADOPTED REVISIONS TO ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE SUBSTANTIALLY CONSISTENT WITH THE 1994 REVISIONS TO ARTICLE 8 ADOPTED BY THE AMERICAN LAW INSTITUTE AND THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS AND (B) THE LAWS OF WHICH MAY BE APPLICABLE, FROM TIME TO TIME, TO THE ISSUES OF PERFECTION, THE EFFECT OF PERFECTION OR NON-PERFECTION AND THE PRIORITY OF A SECURITY INTEREST IN MEMBERSHIP INTERESTS OF THE COMPANY.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations. Additional abbreviations may also be used though not in the list.

| TEN COM | - as tenants in common | UNIF GIFT MIN ACT - .................... Custodian .................... (Minor) |
| TEN ENT | - as tenants by the entireties | under Uniform Gifts to Minors Act ................................................ (State) |
| JT TEN | - as joint tenants with right of survivorship | |
| | and not as tenants in common | |

*For value received, the undersigned hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

_____
PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS OF ASSIGNEE

_____ *Membership Interests*

*represented by the within Certificate, and hereby irrevocably constitutes and appoints* _____

_____ *Attorney to transfer the said Membership Interests on the books of the within-named Limited Liability Company with full power of substitution in the premises.*
*Dated,* _____

*In presence of*

_____          _____

NOTICE: THE SIGNATURE TO THIS ASSIGN-MENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGE-MENT, OR ANY CHANGE WHATEVER.

EXHIBIT C



NUMBER
*••••2•••••

MEMBERSHIP INTERESTS
****90****

# MILFORD POWER COMPANY, L.L.C.

**This Certifies that** _____ **EL PASO MILFORD POWER II COMPANY** _____ is the

owner of _____ ***********NINETY*********** _____ fully paid and non-assessable

Membership Interests of the above Limited Liability Company transferable only on the books of the Limited Liability Company by the

holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

The Membership Interests represented by this Certificate have not been registered under the Securities Act of 1933 (the "Act") and are

"restricted securities" as the term is defined in Rule 144 under the Act. The Membership Interests may not be offered for sale, sold or

otherwise transferred except pursuant to an effective registration statement under the Act or pursuant to an exemption from registration

under the Act, the availability of which is to be established to the satisfaction of the Limited Liability Company.

Transfer of these Membership Interests is subject to restrictions in the Regulations for this Limited Liability Company.

The Company will furnish without charge to each Membership Interest holder who so requests, the powers, designations, preferences

and relative participation rights of Membership Interest holders and the qualifications, limitations or restrictions of such rights.

**In Witness Whereof**, the said Limited Liability Company has caused this Certificate to be signed by its duly authorized

representative(s) and to be sealed with the Seal of the Limited Liability Company.

**Dated** _____ **March 25, 1999**

_____
**Michael Armitage**

_____
**Randolph L. Wu**

Standard Legal © 602 State St. So. Houston, TX 77587

THIS CERTIFIES THAT EL PASO MILFORD POWER II COMPANY IS THE OWNER OF A FULLY PAID AND NON-ASSESSABLE LLC INTEREST, SUBJECT TO THE ADJUSTMENT SET FORTH IN THE AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF MILFORD POWER COMPANY, LLC, DATED AS OF MARCH 25, 1999, AS AMENDED, MODIFIED AND SUPPLEMENTED FROM TIME TO TIME (THE "LLC AGREEMENT"), CONSISTING OF A 90% MEMBERSHIP INTEREST IN CONNECTION THEREWITH AND CERTAIN OTHER RIGHTS IN THE COMPANY, ALL AS SET FORTH IN THE LLC AGREEMENT. THIS LLC INTEREST CERTIFICATE, INCLUDING THE RIGHTS ATTENDANT THERETO, SHALL BE A SECURITY GOVERNED BY ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE IN ANY JURISDICTION (A) THAT HAS ADOPTED REVISIONS TO ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE SUBSTANTIALLY CONSISTENT WITH THE 1994 REVISIONS TO ARTICLE 8 ADOPTED BY THE AMERICAN LAW INSTITUTE AND THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS AND (B) THE LAWS OF WHICH MAY BE APPLICABLE, FROM TIME TO TIME, TO THE ISSUES OF PERFECTION, THE EFFECT OF PERFECTION OR NON-PERFECTION AND THE PRIORITY OF A SECURITY INTEREST IN MEMBERSHIP INTERESTS OF THE COMPANY.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations. Additional abbreviations may also be used though not in the list.

| TEN COM | - as tenants in common | UNIF GIFT MIN ACT - .................. Custodian ................................. (Minor) |
| TEN ENT | - as tenants by the entireties | under Uniform Gifts to Minors Act .................. ...................................(State) |
| JT TEN | - as joint tenants with right of survivorship and not as tenants in common | |

*For value received, the undersigned hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

-----------------------------------------------------
PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS OF ASSIGNEE

-----------------------------------------------------

-------------------------------------------------------- *Membership Interests*

*represented by the within Certificate, and hereby irrevocably constitutes and appoints* --------

------------------------------------------- *Attorney to transfer the said Membership Interests on the books*

*of the within-named Limited Liability Company with full power of substitution in the premises.*

*Dated,* ..................................

*In presence of*

-------------------------------------------------------- ........................................

NOTICE: THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT, OR ANY CHANGE WHATEVER.

EXHIBIT C



NUMBER

**3**

MEMBERSHIP INTERESTS

## MILFORD POWER COMPANY, L.L.C.

**This Certifies that**    PDC MILFORD POWER LLC    is the

owner of    ***********FIVE***********    fully paid and non-assessable

Membership Interests of the above Limited Liability Company transferable only on the books of the Limited Liability Company by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

The Membership Interests represented by this Certificate have not been registered under the Securities Act of 1933 (the "Act") and are "restricted securities" as the term is defined in Rule 144 under the Act. The Membership Interests may not be offered for sale, sold or otherwise transferred except pursuant to an effective registration statement under the Act or pursuant to an exemption from registration under the Act, the availability of which is to be established to the satisfaction of the Limited Liability Company.

Transfer of these Membership Interests is subject to restrictions in the Regulations for this Limited Liability Company.

The Company will furnish without charge to each Membership Interest holder who so requests, the powers, designations, preferences and relative participation rights of Membership Interest holders and the qualifications, limitations or restrictions of such rights.

In Witness Whereof, the said Limited Liability Company has caused this Certificate to be signed by its duly authorized representative(s) and to be sealed with the Seal of the Limited Liability Company.

Dated    March 25, 1999

Michael Armitage            Randolph L. Wu

Goes & Co. State St. So. Houston, TX 77587

THIS CERTIFIES THAT PDC MILFORD POWER LLC IS THE OWNER OF A FULLY PAID AND NON-ASSESSABLE LLC INTEREST, SUBJECT TO THE ADJUSTMENT SET FORTH IN THE AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF MILFORD POWER COMPANY, LLC, DATED AS OF MARCH 25, 1999, AS AMENDED, MODIFIED AND SUPPLEMENTED FROM TIME TO TIME (THE "LLC AGREEMENT"), CONSISTING OF A 5% MEMBERSHIP INTEREST IN CONNECTION THEREWITH AND CERTAIN OTHER RIGHTS IN THE COMPANY, ALL AS SET FORTH IN THE LLC AGREEMENT. THIS LLC INTEREST CERTIFICATE, INCLUDING THE RIGHTS ATTENDANT THERETO, SHALL BE A SECURITY GOVERNED BY ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE IN ANY JURISDICTION (A) THAT HAS ADOPTED REVISIONS TO ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE SUBSTANTIALLY CONSISTENT WITH THE 1994 REVISIONS TO ARTICLE 8 ADOPTED BY THE AMERICAN LAW INSTITUTE AND THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS AND (B) THE LAWS OF WHICH MAY BE APPLICABLE, FROM TIME TO TIME, TO THE ISSUES OF PERFECTION, THE EFFECT OF PERFECTION OR NON-PERFECTION AND THE PRIORITY OF A SECURITY INTEREST IN MEMBERSHIP INTERESTS OF THE COMPANY.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations. Additional abbreviations may also be used though not in the list.

| TEN COM | – as tenants in common | UNIF GIFT MIN ACT – .................... Custodian .................... (Minor) |
| TEN ENT | – as tenants by the entireties | under Uniform Gifts to Minors Act .................... (State) |
| JT TEN | – as joint tenants with right of survivorship and not as tenants in common | |

For value received, the undersigned hereby sells, assigns and transfers unto

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

.................................................................................................
PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS OF ASSIGNEE

.................................................................................................

.................................................................... Membership Interests

represented by the within Certificate, and hereby irrevocably constitutes and appoints ....................

.................... Attorney to transfer the said Membership Interests on the books

of the within-named Limited Liability Company with full power of substitution in the premises.

Dated, ....................

In presence of

NOTICE: THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT, OR ANY CHANGE WHATEVER.

## Milford Power Company, LLC

### Officer's Certificate

Milford Power Company, LLC. a Delaware limited liability company (the "Borrower"), by the authorized representatives of each of its members signing below, DOES HEREBY CERTIFY. in connection with the Credit Agreement, dated as of March 25, 1999, among Borrower, the Lenders named therein, Trust Company of the West as Tranche C Institutional Agent, Teachers Insurance and Annuity Association of America as Tranche D Institutional Agent, and KBC Bank N.V., New York Branch, as Agent, Collateral Agent, Issuing Bank and Depository Bank (the "Credit Agreement", the terms defined therein being used herein as therein defined) that attached hereto is a true, complete and correct copy of the LLC Agreement, and that it is in full force and effect as of the date hereof.

IN WITNESS WHEREOF, the Borrower has caused this Certificate to be executed on its behalf by the undersigned on and as of this 25ᵗʰ day of March, 1999.

Very truly yours,

MILFORD POWER COMPANY, LLC

By: El Paso Milford Power I Company.
  Its Member

  By: _____
    Name: Randolph L. Wu
    Title: Senior Vice President

By: El Paso Milford Power II Company,
  Its Member

  By: _____
    Name: Randolph L. Wu
    Title: Senior Vice President

By: PDC Milford Power LLC
  Its Member

  By: _____
    Name: Michael J. Armitage
    Title: Manager

# EXHIBIT C

**EXECUTION COPY**

---

CREDIT AGREEMENT

Dated as of March 25, 1999

Among

MILFORD POWER COMPANY, LLC,

THE LENDERS NAMED HEREIN,

TRUST COMPANY OF THE WEST,
as Tranche C Institutional Agent,

TEACHERS INSURANCE AND ANNUITY
ASSOCIATION OF AMERICA,
as Tranche D Institutional Agent,

BANQUE NATIONALE DE PARIS,
as Arranger and as Documentation Agent

WESTDEUTSCHE LANDESBANK GIROZENTRALE,
as Arranger and as Syndication Agent

AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED,
as Arranger and as Technical Agent

and

KBC BANK N.V., NEW YORK BRANCH,
as Lead Arranger, as Agent, as Collateral Agent, as Issuing Bank and as Depository Bank

---

consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Letter of Credit, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of any Indemnitee. All amounts due under this Section 11.05 shall be payable on written demand therefor.

SECTION 11.06. Right of Setoff. If an Event of Default shall have occurred and be continuing, each of the Lenders is hereby authorized at any time and from time to time with prior written notice to the Borrower, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement and the other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although such obligations may be contingent or unmatured. The rights of each of the Lenders under this Section are in addition to other rights and remedies (including other rights of setoff) which it may have.

SECTION 11.07. (a) Applicable Law and Jurisdiction. THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK DETERMINED WITHOUT REFERENCE TO PRINCIPLES OF CONFLICTS OF LAWS (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

(b) New York Courts (i) Each party hereto hereby expressly and irrevocably agrees and consents that any suit, action or proceeding arising out of or relating to this Credit Agreement or any other Loan Document to which it is a party and the transactions contemplated therein may be instituted by any party hereto in any State or Federal court sitting in the County of New York, State of New York, United States of America and, by the execution and delivery of this Credit Agreement, expressly waives any objection which it may have now or hereafter to the laying of the venue or to the jurisdiction of any such suit, action or proceeding, and irrevocably submits generally and unconditionally to the jurisdiction of any such court in any such suit, action or proceeding.

(ii)    In the case of the courts of the State of New York or of the United States sitting in New York, the Borrower hereby irrevocably designates, appoints and empowers CT Corporation System (the "Process Agent"), which has consented thereto, with offices on the date hereof at 1633 Broadway, New York, New York 10019, as agent to receive for and on behalf of the Borrower service of process in the State of

New York. The Borrower further agrees that such service of process may be made on Process Agent by personal service on Process Agent of a copy of the summons and complaint or other legal process in any such suit, action or proceeding, or by any other method of service provided for under the applicable laws in effect in the State of New York, and Process Agent is hereby authorized to accept such service for and on behalf of the Borrower, and to admit service with respect thereto.

       (iii)    Upon service of process being made on Process Agent as aforesaid, a copy of the summons and complaint or other legal process served shall be mailed by the Process Agent to the Borrower by registered mail, return receipt requested, at its address referred to in Section 11.01, or to such other address as the Borrower may notify Process Agent in writing. Service upon Process Agent as aforesaid shall be deemed to be personal service on the Borrower and shall be legal and binding upon the Borrower for all purposes, notwithstanding any failure of Process Agent to mail a copy of such legal process to the Borrower, or any failure on the part of the Borrower to receive the same.

       (iv)    The Borrower agrees that it will at all times continuously maintain an agent to receive service of process in the County of New York on its behalf with respect to this Credit Agreement or any other Loan Document to which it is a party. In the event that for any reason Process Agent or any successor thereto shall no longer serve as agent for the Borrower to receive service of process in the County of New York, or shall have changed its address without notification thereof to the Agent, the Borrower will promptly but in no event later than five Banking Days after obtaining knowledge thereof, irrevocably designate and appoint a substitute agent acceptable to the Agent and advise the Agent thereof.

       (c)  Other Jurisdictions. Nothing contained in Section 11.07 shall affect the right to effect service of process in any manner provided for under applicable law or preclude any of the Secured Parties from bringing any suit, action or proceeding arising out of or relating to the Loan Documents in the courts of any place where the Borrower or any of its property or assets may be found or located. To the extent permitted by the applicable Laws of any such jurisdiction, the Borrower hereby irrevocably submits to the jurisdiction of any such court and expressly waives, in respect of any such suit, action or proceeding, the jurisdiction of any other court or courts which now or hereafter, by reason of its present or future domicile, or otherwise, may be available to it.

       SECTION 11.08. Waivers; Amendment. (a) No failure or delay of the Agent, the Institutional Agents, the Collateral Agent, the Depository Bank, the Issuing Bank, the Lead Arranger, the Arrangers, the Syndication Agent, the Technical Agent, the Documentation Agent or any Lender in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or

# EXHIBIT D

Execution Copy

PLEDGE AGREEMENT

between

EL PASO MILFORD POWER I COMPANY,
EL PASO MILFORD POWER II COMPANY
and
PDC MILFORD POWER LLC
(as Pledgors)


and


KBC BANK N.V., NEW YORK BRANCH
(as Collateral Agent)

Dated as of March 25, 1999

## TABLE OF CONTENTS

Page

1.  Definitions .......................................... 3
2.  Pledge ............................................... 3
3.  Obligations .......................................... 4
4.  Consent to Registration ............................. 5
5.  Representations and Warranties ...................... 5
6.  Covenants and Agreements ............................ 8
7.  Voting Rights; Dividends; Etc. ..................... 14
8.  Remedies; Rights Upon Event of Default ............. 15
9.  Application of Proceeds ............................ 18
10. Security Interest Absolute ......................... 18
11. The Collateral Agent Appointed Attorney-
    in-Fact .......................................... 19
12. The Collateral Agent May Perform ................... 21
13. No Duty on Collateral Agent's Part,
    Limitation on Collateral Agent's
    Obligations ...................................... 21
14. Reasonable Care .................................... 22
15. Role of Collateral Agent ........................... 22
16. Waiver of Trial by Jury ............................ 22
17. Notices ............................................ 23
18. Absence of Fiduciary Relation ...................... 23
19. Survival of Representations and Warranties ......... 23
20. No Waiver; Cumulative Remedies ..................... 24
21. Severability ....................................... 24
22. Exculpatory Provisions; Reliance by
    Collateral Agent ................................. 25
23. Amendment .......................................... 26
24. Successors and Assigns ............................. 26
25. Number and Gender .................................. 26
26. Subrogation, etc ................................... 26
27. Captions ........................................... 27
28. Applicable Law and Jurisdiction .................... 27
29. Continuing Security Interest;_Termination .......... 29
30. Payments Set Aside ................................. 29
31. Limitation of Recourse ............................. 29
32. Counterparts ....................................... 30
33. Counterparts ....................................... 30

PLEDGE AGREEMENT

This PLEDGE AGREEMENT (this "Pledge Agreement"), dated as of March 25, 1999 by and among EL PASO MILFORD POWER I COMPANY, a Delaware corporation ("El Paso I"), EL PASO MILFORD POWER II COMPANY, a Delaware corporation ("El Paso II", and together with El Paso I, collectively, the "El Paso Pledgors"), PDC MILFORD POWER LLC, a limited liability company organized under the laws of the Commonwealth of Massachusetts (the "PDCM Pledgor", and together with the El Paso Pledgors, collectively, the "Pledgors") and KBC BANK N.V., NEW YORK BRANCH, a Belgian banking corporation, as collateral agent (the "Collateral Agent") on behalf of and for the benefit of the Secured Parties under the Credit Agreement (as defined below).

W I T N E S S E T H :

WHEREAS, the Pledgors are party to that certain Amended and Restated Limited Liability Agreement dated as of March 25, 1999 (the "LLC Agreement"), pursuant to which the Pledgors have agreed to the terms and conditions upon which the business affairs of Milford Power Company LLC (the "Borrower") will be conducted;

WHEREAS, the Pledgors collectively own of record all of the right, title and interest in the membership interests of the Borrower, which interests, in the case of each Pledgor, is represented by a security certificate ("Security Certificate") issued by the Borrower;

WHEREAS, as of the date hereof, El Paso I owns 5% of the issued and outstanding member interests in the Borrower;

WHEREAS, as of the date hereof, El Paso II owns 90% of the issued and outstanding member interests in the Borrower;

WHEREAS, as of the date hereof, the PDCM Pledgor owns 5% of the issued and outstanding member interests in the Borrower;

WHEREAS, the Borrower intends to construct, own and operate an approximately 540 MW (net) gas-fired combined cycle merchant power plant to be located in Milford, Connecticut (the "Project");

WHEREAS, the Borrower simultaneously herewith is entering into the Credit Agreement, dated as of the date hereof, among the Borrower, various Lenders named therein, Trust Company of the West ("TCW"), not in its individual capacity but only as trustee of the trust established pursuant to an Individual Trust Agreement, dated as of January 31, 1987, as amended, between the Boilermaker-Blacksmith National Pension Trust and TCW ("Trustee"), as Tranche C Institutional Agent, Teachers Insurance and Annuity Association of America, as Tranche D Institutional Agent, Banque Nationale de Paris, as Arranger and Documentation Agent, Westdeutsche Landesbank Girozentrale, as Arranger and Syndication Agent and Australia and New Zealand Banking Group Limited, as Arranger and Technical Agent, and KBC Bank N.V., New York Branch, as Lead Arranger, as Agent, as Collateral Agent, as Issuing Bank and as Depository Bank (as the same may be amended, modified or supplemented from time to time, the "Credit Agreement") pursuant to which the Lenders have agreed to make certain loans to the Borrower and the Issuing Bank has agreed to issue, and the Lenders have agreed to participate in, certain letters of credit for the account of the Borrower, all on the terms and conditions set forth therein to finance the construction of the Project;

WHEREAS, the Pledgors, as the current members of the Borrower, shall derive substantial benefit from the extensions of credit to the Borrower by the Lenders, and the issuance of letters of credit for the account of the Borrower by the Issuing Bank, pursuant to the Credit Agreement; and

WHEREAS, it is a condition precedent to the Lenders, the Tranche C Institutional Agent, the Tranche D Institutional Agent, the Agent, the Collateral Agent, the Issuing Bank and the Depository Bank entering into the Credit Agreement that the Pledgors enter into this Pledge Agreement and collaterally pledge all of their member interest in the Borrower and the Security Certificates representing such member interest to the Secured Parties in order to secure the Borrower's obligations under the Credit Agreement and the other Loan Documents;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce the Lenders, the Tranche C Institutional Agent, the Tranche D Institutional Agent, the Agent, the Collateral Agent, the

2

Issuing Bank and the Depository Bank to enter into the Credit Agreement with the Borrower, the parties hereto hereby agree as follows:

Section 1. <u>Definitions</u>. Unless otherwise defined herein, all capitalized terms used herein which are defined in the Credit Agreement shall have their respective meanings as therein defined. All references to sections, schedules and exhibits in or to this Pledge Agreement are to sections, schedules and exhibits in or to this Pledge Agreement, unless otherwise specified. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Pledge Agreement shall refer to this Pledge Agreement as a whole and not to any particular provision of this Pledge Agreement. Any references herein to any agreement include all amendments, modifications and supplements thereto. For purposes of this Pledge Agreement, all other terms used herein and not otherwise defined herein which are defined in Articles 8 or 9 of the Uniform Commercial Code (as the same may be in effect in the State of New York or any other applicable jurisdiction, the "Code"), shall have their respective meanings as therein defined.

Section 2. <u>Pledge</u>. As collateral security for the Obligations (as hereinafter defined), each Pledgor hereby pledges, assigns and transfers to the Collateral Agent, and hereby grants to the Collateral Agent as agent and representative for the equal and ratable benefit of the Secured Parties, a security interest (the "Security Interest") in its respective right, title and interest in and to the following, whether now owned or hereafter acquired (the "Pledged Collateral"):

(a)  its member interests in the Borrower and all options, warrants and rights to purchase member interests in the Borrower and any Security Certificates or other documents, instruments or certificates representing its member interests in the Borrower and all of its rights under the LLC Agreement and all dividends, distributions, cash, securities, instruments and other property from time to time paid, payable or otherwise distributed in respect of or in exchange for all or any part of its member interests in the Borrower and all proceeds thereof; and

(b)  to the extent not otherwise included, all proceeds, products and accessions of and to any and all of the foregoing, including, without limitation, "proceeds" as defined in Section 9-306(1) of the Code, including whatever is received upon any sale, exchange,

3

collection or other disposition of any of the Pledged Collateral, and any property into which any of the Pledged Collateral is converted, whether cash or noncash proceeds, and any and all other amounts paid or payable under or in connection with any of the Pledged Collateral;

provided, notwithstanding the foregoing, any distributions, payments or releases (whether in the form of cash, instruments or otherwise) properly made to the Borrower pursuant to (A) Article X of the Credit Agreement, or (B) any other provision of the Credit Agreement expressly providing for distribution, payment or release of funds to the Borrower, as long as such distribution, payment or release is made in accordance with the Credit Agreement, shall be released from the Security Interest granted hereunder and shall no longer be part of the Pledged Collateral upon the making of such distribution.

Section 3.  Obligations.  This Pledge Agreement secures, in accordance with the provisions hereof, the following obligations, now existing or hereafter arising (collectively, the "Obligations"):

(a)  payment and performance of the Borrower's Obligations (as defined in the Credit Agreement) and each and every obligation, indebtedness, covenant and agreement of the Pledgors now or hereafter existing contained in any of the Loan Documents, including, without limitation, the Equity Funding Agreement, this Pledge Agreement and any amendments or supplements thereto, extensions or renewals thereof or replacements therefor;

(b)  payment of all sums advanced in accordance herewith or in accordance with any other Loan Document by or on behalf of the Secured Parties (or any of them) to protect, retake, hold, prepare for sale or lease or otherwise dispose of or realize upon any of the Pledged Collateral, with interest thereon at a rate equal to the default interest rate specified in Section 2.07 of the Credit Agreement from the date of demand therefor;

(c)  performance of every obligation, covenant and agreement of the Pledgors contained in any agreement now or hereafter executed by the Pledgors which expressly recites that the obligations thereunder are secured by this Pledge Agreement; and

4

(d)   payment of all sums, with interest thereon at a rate equal to the default interest rate specified in Section 2.07 of the Credit Agreement from the date of demand therefor, that becomes due and payable to or for the benefit of the Secured Parties (or any of them) pursuant to the terms of this Pledge Agreement or any other Loan Document;

in each case whether direct or indirect, joint or several, absolute or contingent, liquidated or unliquidated, now or hereafter existing, renewed or restructured, reinstated, created or incurred, and, including, without limitation, all indebtedness of the Pledgors under any instrument now or hereafter evidencing or securing any of the foregoing.

Section 4.   Consent to Registration. Each Pledgor hereby agrees that upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the right, at any time in its discretion, to transfer to or to register in the name of, the Collateral Agent or any of its nominees any or all of the Pledged Collateral.  In addition, the Collateral Agent shall have the right at any time as it may reasonably request to exchange certificates, instruments or documents representing or evidencing the Pledged Collateral for certificates, instruments or documents of smaller or larger denominations.

Section 5.   Representations and Warranties.

Each of the Pledgors, with regard to itself, hereby represents and warrants to the Collateral Agent, for the benefit of the Secured Parties as follows:

(a)   Representations Incorporated by Reference. Each Pledgor hereby makes each and every representation and warranty made by it in Article 8 of the Equity Funding Agreement to the same extent as if each such representation and warranty had been set forth in full herein, and each such representation and warranty is hereby incorporated by reference in this Section 5.

(b)   Title; No Other Liens.  Each Pledgor is the legal and beneficial owner of the Pledged Collateral in existence on the date hereof and listed as being owned by it on Schedule 5(a) hereto and will be the sole owner of the Pledged Collateral hereafter acquired by it, free and clear of any and all Liens or claims of others except for the Liens referenced in clauses (b) and (f) of the definition of Permitted Encumbrances set forth in the

5

Credit Agreement and the Liens created by this Pledge Agreement and except for a subordinate lien on distributions granted by one Pledgor to another Pledgor to secure fees paid in advance to the Pledgor granting such lien, and such Pledgor has full power and authority to grant the Liens and Security Interests in and to the Pledged Collateral owned by it hereunder.  No security agreement, financing statement or other public notice with respect to all or any part of the Pledged Collateral owned by such Pledgor is on file or of record in any public office, and no Lien or security interest on or in the Pledged Collateral owned by such Pledgor has been registered in the registration book maintained by the Borrower in which member interests of the Borrower are recorded, except such as may have been filed in favor of the Collateral Agent for the benefit of the Secured Parties pursuant to this Pledge Agreement and in favor of the Fuel Manager pursuant to the terms of the Subordination Agreement.

(c)   <u>Security Certificates; Perfection</u>.  The Security Certificates have been duly authorized and are validly issued, fully-paid and non-assessable.  The Security Certificates constitute all of the issued and outstanding membership interests in the Borrower, and there are no other member, ownership or equity interests in the Borrower, rights to acquire or subscribe for any such interests, or securities or instruments convertible into or exchangeable or exercisable for any such interests.  Each Pledgor has delivered its Security Certificate to the Collateral Agent, accompanied by a transfer instrument duly executed in blank.  All other action by such Pledgor and, to such Pledgor's best knowledge, by any other Person necessary or desirable to perfect the Security Interests in each item of the Pledged Collateral owned by it has been duly taken.  With respect to each Pledgor, this Pledge Agreement constitutes a valid and continuing Lien on and perfected Security Interest in the Pledged Collateral owned by it in favor of the Collateral Agent for the equal and ratable benefit of the Secured Parties, superior and prior to the rights of all Persons, whether the Pledged Collateral owned by it subject to the Security Interest is now owned by such Pledgor or is hereafter acquired.

(d)   <u>Governmental Authority</u>.  No authorization, approval or other action by, and no notice to or filing with, any Governmental Authority, any regulatory body or any other Person is required of such Pledgor with respect to the exercise by the Collateral Agent of the rights provided in this Pledge Agreement or the remedies in

6

respect of the Pledged Collateral pursuant to this Pledge Agreement.

(e) <u>Taxes</u>. Each Pledgor has filed or caused to be filed all tax returns that are required to be filed by it and has paid all taxes shown to be due and payable on said returns or on any assessments made against it or any of its assets and properties and all other taxes, fees or other charges imposed on it by any Governmental Authority to the extent due (except taxes, fees and charges which are being contested in good faith and by appropriate proceedings by such Pledgor, for which adequate reserves have been established in accordance with GAAP). Neither the execution and delivery of this Pledge Agreement or any other Operative Document to which such Pledgor is a party nor the consummation of the transactions contemplated hereby or thereby will affect the Borrower's status as a limited liability company for federal income tax purposes.

(f) <u>Chief Executive Office and Principal Place of Business</u>. For each of the El Paso Pledgors, the chief executive office and principal place of business and the place where the records concerning the Pledged Collateral are kept is 1001 Louisiana Street, Houston, Texas 77002. The PDCM Pledgor's chief executive office and principal place of business and the place where the PDCM Pledgor's records concerning the Pledged Collateral are kept is 200 High Street, 5th Floor, Boston, Massachusetts 02110.

(g) <u>Not an Investment Company</u>. The Borrower is not an "investment company" or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

(h) <u>Governed by Article 8</u>. The terms of the LLC Agreement provide that each member's interest in the Borrower must be represented by a certificate and shall be a security governed by Article 8 of the Code. The terms of each Security Certificate provide that it is a security governed by Article 8 of the Code. Each Pledgor's interest in the Borrower is represented by a Security Certificate in registered form (the transfer of which may be registered upon books maintained by the Borrower), is a medium for investment as provided in Article 8 of the Code, and by its terms expressly provides that it is a security governed by Article 8 of the Code.

(i) <u>Not Dealt on Securities Market</u>. As regards each Pledgor, none of such Pledgor's member

7

interests in the Borrower is dealt in or traded on any securities exchange or in any securities market.

Section 6.  <u>Covenants and Agreements</u>.  Each of the Pledgors, with regard to itself, hereby covenants and agrees that it shall faithfully observe and fulfill, and shall cause to be observed and fulfilled, each and all of the following covenants applicable to it until all Obligations have been paid and performed in full and the Commitments and the Letters of Credit have terminated or expired:

(a)  <u>Notice of Adverse Claims</u>.  Such Pledgor shall, promptly and in no event later than five days after the Pledgors become aware or should have become aware of any information of any adverse claim against the Pledged Collateral, deliver to the Collateral Agent notice of each such claim.

(b)  <u>Consent</u>.  Each Pledgor hereby consents to the execution and delivery by the other Pledgors of this Pledge Agreement and any other Security Document to which such Pledgor is a party, and further consents to the granting by such other Pledgors of the Liens and security interests on and in the Pledged Collateral and the Collateral pursuant to this Agreement and such other Security Documents; provided, however, that nothing in this Pledge Agreement shall be construed as giving a Pledgor authority to act for or bind another Pledgor.

(c)  <u>Further Assurances</u>.  Each Pledgor shall, from time to time at such Pledgor's expense, and upon request by the Collateral Agent on behalf of the Secured Parties, promptly execute and deliver all further instruments and documents, and take all further action that may be necessary, or that the Collateral Agent reasonably determines may be necessary, in order to perfect and protect the Security Interests granted or purported to be granted hereby or to enable the Collateral Agent to exercise and enforce its rights and remedies hereunder with respect to the Pledged Collateral owned by it or as required in connection with one of the Institutional Agents becoming the Collateral Agent as required by the fourth to last paragraph of Section 9.01 of the Credit Agreement.

(d)  <u>Matters Concerning LLC Agreement</u>.  The Pledgors shall not (without the consent of the Agent and the Institutional Agents) (i) directly or indirectly, terminate, cancel or suspend, or consent to any termination, cancellation or suspension of the LLC

8

Agreement under applicable state law, (ii) directly or indirectly amend, modify or supplement, or consent to the amendment, modification or supplement of, any of the provisions of the LLC Agreement (other than ministerial and administrative amendments), (iii) waive any default under or breach of any provision of the LLC Agreement or waive, fail to enforce, forgive or release any right, interest or entitlement of any kind, howsoever arising, under or in respect of any provision of the LLC Agreement or vary or agree to the variation in any way of any of the provisions of the LLC Agreement, or of the performance of any other Person under the LLC Agreement, unless otherwise permitted pursuant to Section 7.04 of the Credit Agreement, (iv) vote to enable, or take any other action to permit (A) any additional Persons to become a member of the Borrower or (B) the Borrower to issue to any Person any membership interest (of any nature) or to issue any other interests convertible into or granting the right to purchase or exchange for any membership interest (of any nature), in each case, unless the Collateral Agent continues to have a first lien on and security interest in the Pledged Collateral and the restrictions on transfer in the Equity Funding Agreement are not violated, or (v) petition, request or take any other legal or administrative action that seeks, or may be expected to result in, the rescission, termination or suspension of the LLC Agreement; further, the Pledgors shall not take any action under the LLC Agreement that would violate the terms of this Pledge Agreement, the Credit Agreement, the Equity Funding Agreement or any other Loan Document or that would cause an Event of Default.  Each Pledgor at its expense shall perform and comply with the terms and provisions of the LLC Agreement to be performed or complied with by it (except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect), shall maintain the LLC Agreement in full force and effect, and shall take all such action to that end as from time to time may be reasonably requested in writing by the Collateral Agent.  Each Pledgor agrees that it shall not withdraw from the Borrower pursuant to Section 11.9 of the LLC Agreement without obtaining the prior written consent of the Collateral Agent, such consent not to be unreasonably withheld; _provided_ that no consent of the Collateral Agent shall be required in connection with a transfer permitted by Section 6(m).

     (e)  _Fees and Expenses_.  Each Pledgor shall upon demand pay or cause to be paid to the Collateral Agent the amount of any and all out-of-pocket costs and expenses (including, without limitation, the reasonable

9

fees and expenses of its counsel, any special consultants reasonably engaged, and any local counsel who might reasonably be retained by the Collateral Agent), in connection with the transactions contemplated hereby, which the Collateral Agent may incur in connection with (i) the sale of, collection from, custody or preservation of, or other realization upon, any of the Pledged Collateral pursuant to the exercise or enforcement of any of the rights of the Collateral Agent hereunder or (ii) the failure by the Pledgors to perform or observe any of the provisions hereof, or (iii) the execution, delivery and performance of this Pledge Agreement (subject to the limitations described in the Credit Agreement), any agreement supplemental hereto and any instruments of further assurance reasonably required by the Collateral Agent. Any amounts payable by the Pledgors pursuant to this Section 6(e) shall be payable on demand and shall constitute Obligations, together with interest thereon at the default interest rate specified in Section 2.07 of the Credit Agreement from the date of demand therefor.

(f) <u>Filing Fees, Taxes, etc</u>. The Pledgors shall pay or cause to be paid all filing, registration and recording fees or re-filing, re-registration and re-recording fees, and all federal, state, county and municipal stamp taxes and other similar taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Pledge Agreement, any agreement supplemental hereto and any instruments of further assurance reasonably required by the Collateral Agent.

(g) <u>Certificated Interest</u>. If any Pledgor shall become entitled to receive or shall receive any certificate, instrument, option or rights, whether as an addition to, in substitution of, or in exchange for the Pledged Collateral or any part thereof, or otherwise, such Pledgor shall accept any such certificate, instrument, option or rights as the Collateral Agent's agent, shall hold them in trust for the Collateral Agent, and shall deliver them forthwith to the Collateral Agent in the exact form received, with the Pledgor's endorsement when necessary, or accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance consistent with this Pledge Agreement and reasonably satisfactory to the Collateral Agent, to be held by the Collateral Agent, subject to the terms hereof, as further Pledged Collateral for the Obligations.

10

(h)  <u>Indemnification</u>.  Each Pledgor shall severally and not jointly defend, indemnify and hold harmless the Collateral Agent and the Secured Parties and their officers, directors and employees, from and against any and all costs, expenses, disbursements, liabilities, obligations, losses, damages, injunctions, judgments, suits, actions, causes of action, fines, penalties, claims and demands, of every kind or nature (including, without limitation, reasonable attorney's fees and expenses) incurred by such Person which are occasioned by or result from (i) this Pledge Agreement or any other Operative Document to which such Pledgor is a party and (ii) any proceeding or action brought by the Collateral Agent pursuant to this Pledge Agreement or any other Operative Document to which such Pledgor is a party or which arise out of any such agreement except to the extent due to the gross negligence or willful misconduct of the Collateral Agent or the Person to be indemnified or from the breach by the Collateral Agent or such Person of its obligations hereunder.

(i)  <u>Change in Location, Name, Etc</u>.  Without prior written notice to the Collateral Agent, the Pledgors shall not change their name or the location of their chief executive offices, principal place of business or the place where their records concerning the Pledged Collateral are kept.  Without prior written notice to the Collateral Agent, the Pledgors shall not adopt any trade name or fictitious business name.  At all times each Pledgor shall keep and maintain at its own cost and expense complete records of the Pledged Collateral reasonably satisfactory to the Collateral Agent.  Such records will be kept at the Pledgor's principal place of business set forth in Section 5(f).  Each Pledgor shall furnish to the Collateral Agent statements and schedules further identifying and describing the Pledged Collateral in reasonable detail at Collateral Agent's request.  Subject to Section 6.05 of the Credit Agreement, the Collateral Agent and the Secured Parties may inspect the Pledged Collateral.

(j)  <u>Maintenance of Existence, Privileges, etc</u>.  Each Pledgor shall preserve and maintain in full force and effect its legal existence and all of its rights, privileges and franchises necessary for the fulfillment of its obligations under each of the Loan Documents and Material Project Documents to which it is a party.

(k)  <u>Financial Statements</u>.  Each Pledgor shall provide to the Borrower the financial statements and other documentation of such Pledgor in such a manner so

NY3.177169.01

as to enable the Borrower to fully comply with, Section 6.13 of the Credit Agreement.

(l)  <u>Limitation on Liens on the Pledged Collateral</u>.  The Pledgors shall not create, incur or permit to exist, shall defend the Pledged Collateral now owned or hereafter acquired by it against, and shall take such other action as is necessary to remove, any Lien or claim on or to the Pledged Collateral, other than the Liens created under this Pledge Agreement and the Liens referred to in clauses (b) and (f) of the definition of Permitted Encumbrances set forth in the Credit Agreement and subordinate liens on distributions granted by one Pledgor to another Pledgor to secure fees paid in advance to the Pledgor granting such lien (the "Subordinate Liens"), and shall defend the right, title and interest of the Collateral Agent in and to any of the Pledged Collateral owned by it against the claims and demands of all Persons whomsoever.  Each of the Pledgors hereby agrees that notwithstanding any law or other circumstance, the Lien created in favor of the Collateral Agent for the benefit of the Secured Parties in respect to the Pledged Collateral shall be prior and superior to the Subordinate Liens.  Until payment in full of the Obligations, no Pledgor shall exercise remedies with respect to its Subordinate Lien.

(m)  <u>Prohibition Against Transfers of Pledged Collateral</u>.  The Pledgors shall not exchange, sell, assign or otherwise transfer or permit to be sold, assigned or otherwise transferred any of the Pledged Collateral, except as permitted pursuant to the Equity Funding Agreement.  To the extent permitted pursuant to Section 9(c) of the Equity Funding Agreement, upon a transfer of all or any portion of a Pledgor's membership interest to another Person, the Collateral Agent shall relinquish the applicable Security Certificate to the Pledgor simultaneously in exchange for a new Security Certificate evidencing the then current membership interest of such Pledgor (if any) and of the transferee.

(n)  <u>Bankruptcy Filing, etc</u>.  The Pledgors shall not authorize or permit the Borrower (i) to commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to the Borrower or the Borrower's debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of the Borrower or any substantial part of the Borrower's property, (ii) to consent to any such relief

12

or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against the Borrower, or (iii) to make a general assignment for the benefit of the Borrower's creditors. None of the Pledgors shall commence or join with any other Person (other than the Secured Parties) in commencing any proceeding against the Borrower under any bankruptcy, reorganization, liquidation or insolvency law or statute now or hereafter in effect in any jurisdiction.

(o)  <u>The Borrower Obligations</u>.  Each Pledgor acknowledges and agrees that its rights to receive any payments from the Borrower arising out of or in connection with the Pledgors' member interests in the Borrower or their rights under the LLC Agreement shall be payable by the Borrower only from funds available to the Borrower for distributions pursuant to Article X of the Credit Agreement or from distributions, payments or releases (whether in the form of cash, instruments or otherwise) received by the Borrower pursuant to any other provision of the Credit Agreement expressly providing for distribution, payment or release of funds to the Borrower (including, without limitation, fees constituting Operating Expenses), as long as such distribution, payment or release is made in accordance with the Credit Agreement, and agrees that any distributions made by the Borrower to such Pledgor that do not comply with the Credit Agreement shall be restored to the Borrower by such Pledgor by deposit into an account designated by the Collateral Agent, promptly upon demand by the Collateral Agent or the Borrower or upon such Pledgor's becoming aware of receipt of such non-complying distribution.

(p)  Each Pledgor shall take all actions available to it to cause the Borrower and, in the event of a merger or consolidation of the Borrower with any other entity, such other entity, not to issue any member interests or other securities whether in addition to, by dividend or other distribution upon, or in substitution or exchange for, member interests or otherwise, other than such member interests or other securities issued to the Pledgors and promptly delivered to the Collateral Agent pursuant to Section 6(g) hereof in which the Collateral Agent, as agent and representative for the Secured Parties, has a valid and perfected first priority security interest free and clear of all other Liens and with respect to which no other party has any interest, except in each case as permitted pursuant to clauses (b) and (f) of the definition of Permitted Encumbrances set forth in the Credit Agreement and Subordinate Liens.

13

Section 7.   <u>Voting Rights; Dividends; Etc</u>.

(a)  So long as no Event of Default shall have occurred and be continuing:

(i)  Each of the Pledgors shall be entitled to exercise any and all voting and other consensual rights pertaining to the Pledged Collateral, or any part thereof, for any purpose not prohibited by the terms of this Agreement or the Credit Agreement; and

(ii)  except as otherwise provided in Sections 4 and 7(c) hereof and Section 7.10 and Article X of the Credit Agreement, the Pledgors shall be entitled to receive, retain and distribute, free and clear of the Security Interest granted hereunder, any dividends, distributions, cash, securities and other property from time to time paid, payable or otherwise distributed in respect of the Pledged Collateral.

(b)  Each Pledgor hereby irrevocably appoints the Collateral Agent as the Pledgor's proxyholder with respect to the member interests and any other voting interests or other securities forming a part of the Pledged Collateral with full power and authority to vote such member interests and other voting interests or securities and otherwise to act with respect to such member interests or other voting interests or securities on behalf of each Pledgor, provided that this proxy shall only be operative upon the occurrence of an Event of Default and so long as such Event of Default continues. This proxy shall be irrevocable for so long as any of the Obligations or any of the Commitments remain in existence or any Letters of Credit remain issued and outstanding. Each Pledgor shall execute and deliver (or cause to be executed and delivered) to the Collateral Agent all proxies and other instruments as the Collateral Agent may reasonably request for the purpose of enabling the Collateral Agent to exercise the voting and other rights which it is entitled to exercise pursuant to this Section 7(b).

(c)  Upon the occurrence and so long as an Event of Default continues, all rights of the Pledgors to receive and retain dividends, distributions, cash and other property, which it would otherwise be authorized to receive and retain pursuant to Section 7(a)(ii), shall cease and all such rights shall thereupon be vested in the Collateral Agent, who shall thereupon have the sole right to receive and hold as Pledged Collateral such

14

dividends, distributions, cash and other property. All cash and other property received by the Pledgors contrary to the provisions of this Section 7(c) shall be received in trust for the benefit of the Collateral Agent, shall be segregated from other property or funds of the Pledgors and shall be forthwith delivered to the Collateral Agent as Pledged Collateral in the same form as so received (with any necessary transfer documents or endorsements).

Section 8.  Remedies; Rights Upon Event of Default.  Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent, for the equal and ratable benefit of and on behalf of the Secured Parties may, and upon the request of the Required Lenders, shall, do one or more of the following:

(a)  declare, without presentment, demand, protest or notice of any kind, all of which each Pledgor hereby expressly waives, the entire amount of Obligations to be immediately due and payable, whereupon all of such Obligations declared due and payable shall be and become immediately due and payable; provided, however, if, with respect to the Borrower, an Event of Default occurs pursuant to Section 8.01(d) of the Credit Agreement the acceleration provided for in this Section 8(a) shall be deemed to have been made upon the occurrence of such Event of Default without declaration or any other action by the Collateral Agent;

(b)  upon notice to the Pledgors, which notice need not be in writing, make such payments and do such acts as the Collateral Agent may deem necessary to protect, perfect or continue the perfection of the Secured Parties' Security Interest in the Pledged Collateral, including, without limitation, paying, purchasing, contesting or compromising any Lien which is, or purports to be, prior to or superior to the Security Interest granted hereunder, and commencing, appearing or otherwise participating in or controlling any action or proceeding purporting to affect the Secured Parties' Security Interest in or ownership of the Pledged Collateral;

(c)  foreclose on the Pledged Collateral as herein provided or in any manner permitted by law and exercise any and all of the rights and remedies conferred upon the Secured Parties by the Loan Documents either concurrently or in such order as the Collateral Agent may determine without affecting the rights or remedies to which the Secured Parties may be entitled under any Loan

NY3 177169.01

Documents.  Each Pledgor hereby waives, to the extent
permitted by applicable law, notice and judicial hearing
in connection with the Collateral Agent's taking
possession or collection, recovery, receipt,
appropriation, repossession, retention, set-off, sale,
leasing, conveyance, assignment, transfer or other
disposition of or realization upon any or all of the
Pledged Collateral, including, without limitation, any
and all prior notice and hearing for any prejudgment
remedy or remedies and any such right which the Pledgors
would otherwise have under the constitution or any
statute or other law of the United States of America or
of any state;

        (d)  without notice, except as specified below,
sell the Pledged Collateral, or any part thereof, in one
or more parcels at public or private sale, at any of the
Collateral Agent's offices or elsewhere, at such time or
times, for cash, on credit or for future delivery, and at
such price or prices and upon such other terms as the
Collateral Agent may deem commercially reasonable.  Each
Pledgor agrees that, to the extent notice of sale shall
be required by law, at least 10 days' notice to the
Pledgors of the time and the place of any public sale or
the time after which any private sale is to be made shall
constitute reasonable notification.  At any sale of the
Pledged Collateral, if permitted by law, the Collateral
Agent may bid (which bid may be, in whole or in part, in
the form of cancellation of indebtedness) for the
purchase of the Pledged Collateral or any portion thereof
for the account of the Collateral Agent on behalf of the
Secured Parties.  The Collateral Agent shall not be
obligated to make any sale of the Pledged Collateral
regardless of notice of sale having been given.  The
Collateral Agent may adjourn any public or private sale
from time to time by announcement at the time and place
fixed therefor, and such sale may, without further
notice, be made at the time and place to which it was so
adjourned.  To the extent permitted by applicable law,
the Collateral Agent shall incur no liability as a result
of the manner of sale of the Pledged Collateral, or any
part thereof, at any private sale conducted in a
commercially reasonable manner.  Each Pledgor hereby
waives, to the extent permitted by applicable law, any
claims against the Collateral Agent arising by reason of
the fact that the price at which the Pledged Collateral,
or any part thereof, may have been sold at a private sale
was less than the price which might have been obtained at
public sale or was less than the aggregate amount of the
Obligations, even if the Collateral Agent accepts the
first offer received which the Collateral Agent in good

16

faith deems to be commercially reasonable under the circumstances and does not offer the Pledged Collateral to more than one offeree. To the full extent permitted by law, each Pledgor shall have the burden of proving that any such sale of the Pledged Collateral was conducted in a commercially unreasonable manner. To the extent permitted by law, each Pledgor hereby specifically waives all rights of redemption, stay or appraisal which it has or may have under any law now existing or hereafter enacted. Each Pledgor authorizes the Collateral Agent, at any time and from time to time after the occurrence of and during the continuance of an Event of Default, to execute, in connection with a sale of the Pledged Collateral pursuant to the provisions of this Pledge Agreement, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Pledged Collateral;

(e)   upon notice to the Pledgors, register the Pledged Collateral in the name of the Collateral Agent or its nominee as pledgee or otherwise take such action as the Collateral Agent shall in its sole discretion deem necessary or desirable with respect to the Pledged Collateral, and the Collateral Agent or its nominee may thereafter, in its sole discretion, without further notice, exercise all voting, consent, managerial and other rights relating to the Pledged Collateral and exercise any and all rights of conversion, exchange, subscription or any other rights, privileges or options pertaining to the Pledged Collateral as if it were the absolute owner thereof, including, without limitation, all rights of the Pledgors under the LLC Agreement, including, without limitation, the right to (i) receive all permitted distributions, if any, made for the account of the Pledgors under the LLC Agreement and (ii) exchange any and all of the Pledged Collateral upon the merger, consolidation, reorganization, recapitalization or other readjustment of the Borrower, all without liability except to act in a commercially reasonable manner to the extent required by the Code and to account for property actually received by the Collateral Agent, but the Collateral Agent shall have no duty to exercise any of the aforesaid rights, privileges or options and shall not be responsible for any failure to do so or delay in so doing, except to the extent that such failure or delay constitutes gross negligence or willful misconduct; and

(f)   exercise in respect of the Pledged Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the

17

rights and remedies of a secured party after default under the Code.

Section 9. <u>Application of Proceeds</u>. The net proceeds of any foreclosure, collection, recovery, receipt, appropriation, realization or sale of the Pledged Collateral shall be applied in the following order:

(a) To the repayment of the out-of-pocket costs and expenses of retaking, holding and preparing for the sale and the selling of the Pledged Collateral (including, without limitation, attorneys' fees and expenses and court costs and those amounts payable to the Collateral Agent pursuant to Section 6(e)) and the discharge of all assessments, encumbrances, charges or liens, if any, on the Pledged Collateral prior to the lien hereof;

(b) To the payment in full of the Obligations in accordance with the priority of application specified in Section 10.03 of the Credit Agreement, <u>provided</u> that if any Letters of Credit are outstanding, the Aggregate Maximum Available Amount under such Letters of Credit shall be cash collateralized ratably with the payment of any Construction Loans (in the case of Construction Letters of Credit) and any Working Capital Loans (in the case of Working Capital Letters of Credit); and

(c) If all Obligations have been indefeasibly paid, satisfied and discharged in full and the Aggregate Maximum Available Amount under all Letters of Credit has been fully cash collateralized, any surplus then remaining shall be paid to the Pledgors, <u>subject</u>, <u>however</u>, to the rights of the holders of any then existing liens on the Pledged Collateral of which the Collateral Agent has actual notice (without investigation).

Section 10. <u>Security Interest Absolute</u>. All the rights of the Collateral Agent and the Secured Parties hereunder and the Security Interest and all obligations of each of the Pledgors hereunder shall be absolute and unconditional irrespective of:

(i) any lack of validity or enforceability of any Operative Documents (including, without limitation, the LLC Agreement) or any other agreement or instrument relating thereto;

18

(ii) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Operative Documents (including, without limitation, the LLC Agreement);

(iii) any exchange or release of any Pledged Collateral or any other Collateral, or the non-perfection of any of the Security Interest, or any release or amendment or waiver of or consent to or departure from any guaranty, for all or any of the Obligations; or

(iv) to the full extent permitted by law, any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Pledgors or any third party pledgor.

Section 11. The Collateral Agent Appointed Attorney-in-Fact

(a) Powers. The Pledgors hereby irrevocably constitute and appoint the Collateral Agent and any officer or agent thereof, with full power of substitution, as their true and lawful attorney-in-fact (which appointment as attorney-in-fact shall be coupled with an interest), with full authority in the place and stead of the Pledgors and in the name of the Pledgors or otherwise, from time to time upon the occurrence and during the continuance of any Event of Default in the Collateral Agent's discretion, to take any action and to execute any and all documents and instruments which the Collateral Agent may deem necessary or advisable to accomplish the purposes of this Pledge Agreement in a commercially reasonable manner to the extent required by the Code, without notice to the Pledgors, including, without limitation:

(i)  to exercise all membership rights, powers and privileges to the same extent the Pledgors shall have been entitled under the LLC Agreement and in accordance with applicable law and this Pledge Agreement, including, without limitation, all voting rights of the Pledgors as members of the Borrower;

(ii)  to receive, endorse and collect all instruments made payable to the Pledgors representing any interest payment or other distribution in respect of the Pledged Collateral or any part thereof and to give full discharge for the

19

same and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Collateral Agent for the purpose of collecting any and all of such dividends, payments or other distributions;

(iii)     to pay or discharge taxes and liens levied or placed on the Pledged Collateral; and

(iv) (A) to direct any party liable for any payment in respect of or arising out of any of the Pledged Collateral to make payment of any and all moneys due or to become due in connection therewith directly to the Collateral Agent or as the Collateral Agent shall otherwise direct, (B) to ask or make demand for, collect, receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Pledged Collateral, (C) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Pledged Collateral or any part thereof and to enforce any other right in respect of any Pledged Collateral, (D) to defend any suit, action or proceeding brought against the Pledgors with respect to any Pledged Collateral, (E) to settle, compromise or adjust any suit, action or proceeding described in clause (D) above and, in connection therewith, to give such discharges or releases as the Collateral Agent acting in good faith may deem appropriate and (F) generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Pledged Collateral as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes, and (G) to do, at the Collateral Agent's option and at the Pledgors expense, at any time, or from time to time, all acts and things which the Collateral Agent acting in good faith deems necessary to protect, preserve or realize upon the Pledged Collateral and the Security Interest granted herein and to effect the intent of this Pledge Agreement, all as fully and effectively as the Pledgors might do.

(b)  Other Powers.  Each Pledgor further authorizes the Collateral Agent, at any time and from time to time upon notice (i) to execute, in connection with any sale permitted under this Agreement, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Pledged

20

Collateral and (ii) to the full extent permitted by
applicable law, to file one or more financing or
continuation statements, and amendments thereto, relative
to all or any part of the Pledged Collateral without the
signature of the Pledgors.

Section 12. <u>The Collateral Agent May Perform</u>.
Upon the occurrence and during the continuance of an
Event of Default, with prior notice to the Pledgors, the
Collateral Agent, without releasing the Pledgors from any
obligation, covenant or condition hereof, itself may make
any payment or perform, or cause the performance of, any
such obligation, covenant, condition or agreement or any
other action in such manner and to such extent as the
Collateral Agent may deem necessary to protect, perfect
or continue the perfection of the Secured Parties'
Security Interest in the Pledged Collateral.  Any costs
or expenses incurred by the Collateral Agent in
connection with the foregoing shall be governed by the
Loan Documents, constitute a part of the Indebtedness
secured by the Security Documents, shall bear interest at
a rate equal to the default interest rate specified in
Section 2.07 of the Credit Agreement and be payable by
the Pledgors upon demand by the Collateral Agent.

Section 13. <u>No Duty on the Collateral Agent's
Part, Limitation on the Collateral Agent's Obligations</u>.

(a)  <u>No Duty on the Collateral Agent's Part</u>.
The powers conferred on the Collateral Agent hereunder
are solely to protect the Collateral Agent's interests in
the Pledged Collateral and shall not impose any duty upon
it to exercise any such powers. The Collateral Agent
shall be accountable only for amounts that it actually
receives as a result of the exercise of such powers.

(b)  <u>Limitations on Obligations</u>.  Anything
herein to the contrary notwithstanding, each Pledgor
shall remain liable under the LLC Agreement and any other
Operative Documents to which it is a party to the extent
set forth therein to perform all of its duties and
obligations thereunder, to the same extent as if this
Pledge Agreement had not been executed.  The exercise by
the Collateral Agent of any of the rights or remedies
hereunder shall not release any Pledgor from any of its
duties or obligations under the LLC Agreement or any
other Operative Document to which it is a party.  All of
the Pledged Collateral is hereby assigned to the
Collateral Agent solely as security, and, except as set
forth in Sections 8(e) and 14, the Collateral Agent shall
have no duty, liability or obligation whatsoever with

21

NY3: 177169.01

respect to any of the Pledged Collateral, unless the Collateral Agent so elects in writing consistent with its rights under this Pledge Agreement or fails to act in a commercially reasonable manner to the extent acting in a commercially reasonable manner is required by the Code.

Section 14. <u>Reasonable Care</u>. The Collateral Agent shall exercise the same degree of care hereunder as it exercises in connection with similar transactions for its own account. The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Pledged Collateral in its possession if the Pledged Collateral is accorded treatment substantially equal to that which the Collateral Agent accords or would accord collateral held by the Collateral Agent in similar transactions for its own account. Without limiting the generality of the foregoing and except as otherwise provided by applicable law, the Collateral Agent shall not be required to marshall any collateral, including, without limitation, the Pledged Collateral subject to the Security Interest created hereby and any guaranties of the Obligations, or to resort to any item of Pledged Collateral or guaranties in any particular order; and all of the Collateral Agent's rights hereunder and in respect of such Pledged Collateral and guaranties shall be cumulative and in addition to all other rights, however existing or arising. To the extent that the Pledgors lawfully may, each Pledgor hereby (a) agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Collateral Agent's rights under this Pledge Agreement or under any other instrument evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or guaranteed and (b) irrevocably waives the benefits of all laws and any and all rights to equity of redemption or other rights of redemption that it may have in equity or at law with respect to the Pledged Collateral.

Section 15. <u>Role of the Collateral Agent</u>. The rights, duties, liabilities and immunities of the Collateral Agent and its appointment and replacement hereunder shall be governed by the provisions contained in this Agreement and the other Loan Documents.

Section 16. <u>Waiver of Trial by Jury</u>. WITH REGARD TO THIS PLEDGE AGREEMENT, EACH OF THE PLEDGORS AND THE COLLATERAL AGENT HEREBY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING AND FOR ANY COUNTERCLAIM THEREIN.

22

Section 17. <u>Notices</u>.  All notices, demands, requests and other communications required or permitted hereunder shall be in writing, and shall be given in accordance with Section 11.01 of the Credit Agreement and the information set forth immediately below shall apply to the Pledgors:

If to El Paso Pledgors:

1001 Louisiana Street
Houston, Texas  77002
Attention:  Director - Treasury

If to PDCM Pledgor:

200 High Street
5th Floor
Boston, Massachusetts 02110
Attention:  Michael Armitage,
Manager, and
Kevin Joyce

Section 18. <u>Absence of Fiduciary Relation</u>.  The Collateral Agent undertakes to perform or to observe only such of its agreements and obligations as are specifically set forth in this Pledge Agreement or any other Loan Document, and no implied agreements, covenants or obligations with respect to the Pledgors, any Affiliate of the Pledgors or any other party to the LLC Agreement or any other Operative Documents to which the Pledgors are a party shall be read into this Pledge Agreement against the Collateral Agent or any of the Secured Parties; neither the Collateral Agent nor any of the Secured Parties in its and their capacity as such is a fiduciary of and shall not owe or be deemed to owe any fiduciary duty to the Pledgors, any Affiliate of the Pledgors or any other party to the LLC Agreement or any other Operative Document to which the Pledgors are a party, except as otherwise specifically required by law.

Section 19. <u>Survival of Representations and Warranties</u>.  All agreements, representations and warranties made herein shall survive the execution and delivery of this Pledge Agreement and the other Loan Documents and repayment or prepayment of the Obligations, termination of the Commitments and expiration of the Letters of Credit, and shall be deemed to be material and to have been relied upon by the Collateral Agent and the Secured Parties, regardless of any investigation made by or on behalf of any of the Collateral Agent and the Secured Parties.  Notwithstanding anything in this Pledge

23

NY3 177169.01

Agreement or implied by law to the contrary, the
agreements and obligations of the Pledgors set forth in
Sections 6(e), 6(f) and 6(h) shall survive the repayment
or prepayment of the Obligations, termination of the
Commitments, the expiration of the Letters of Credit and
the termination of this Pledge Agreement.

Section 20. <u>No Waiver; Cumulative Remedies</u>.  By
exercising or failing to exercise any of its rights,
options or elections hereunder (without also expressly
waiving the same in writing), the Collateral Agent, on
behalf of the Secured Parties, shall not be deemed to
have waived any breach or default on the part of the
Pledgors or to have released the Pledgors from any of
their respective obligations secured hereby.  No failure
on the part of the Collateral Agent to exercise, and no
delay in exercising (without also expressly waiving the
same in writing) any right, power or privilege hereunder
shall operate as a waiver thereof, nor shall any single
or partial exercise of any such right, power or privilege
preclude any other or further exercise thereof, or the
exercise of any other right, power or privilege.  The
remedies provided herein are cumulative and not exclusive
of any remedies provided by law.  The Collateral Agent,
acting on behalf of the Secured Parties, shall have all
of the rights and remedies granted under the Credit
Agreement or any other Loan Document, and available at
law or in equity, and these same rights and remedies may
be pursued separately, successively or concurrently
against the Pledgors or any Pledged Collateral, at the
discretion of the Collateral Agent.

Section 21. <u>Severability</u>.  Any provision of
this Pledge Agreement which is prohibited, unenforceable
or not authorized in any jurisdiction shall, as to such
jurisdiction, be ineffective to the extent of such
prohibition, unenforceability or non-authorization,
without invalidating the remaining provisions hereof or
affecting the validity, enforceability or legality of
such provision in any other jurisdiction.  Where
provisions of any law or regulation resulting in such
prohibition or unenforceability may be waived they are
hereby waived by the Pledgors and the Collateral Agent to
the full extent permitted by law so that this Pledge
Agreement shall be deemed a valid, binding agreement, and
the Security Interest created hereby shall constitute a
continuing first lien on and first perfected security
interest in the Pledged Collateral, in each case
enforceable in accordance with its terms.

24

Section 22. <u>Exculpatory Provisions; Reliance by the Collateral Agent</u>.

(a) <u>Exculpatory Provisions</u>. Neither the Collateral Agent nor any Secured Party, nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates shall be liable to the Pledgors for any action taken or omitted to be taken by it or them under or in connection with this Pledge Agreement, the LLC Agreement or any other Operative Document to which the Pledgors are a party (except as otherwise provided herein or therein), or responsible in any manner to any Person for any recitals, statements, representations or warranties made by the Pledgors or any officer thereof contained in this Pledge Agreement, the LLC Agreement or any other Operative Document to which the Pledgors are a party or in any certificate, report, statement or other document referred to or provided for in, or received by the Collateral Agent or any Secured Party under or in connection with, this Pledge Agreement, the LLC Agreement or any other Operative Document to which the Pledgors are a party or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Pledge Agreement, the LLC Agreement or any other Operative Document to which the Pledgors are a party or for any failure of the Pledgors to perform any of the Obligations. Neither the Collateral Agent nor any Secured Party shall be under any obligation to any Person to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Pledge Agreement, the LLC Agreement or any other Operative Document to which the Pledgors are a party, or to inspect the properties or records of the Pledgors. Notwithstanding anything to the contrary contained herein neither the Collateral Agent nor any Secured Party nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be exonerated from its or their own gross negligence or willful misconduct or breach of its obligations hereunder.

(b) <u>Reliance by the Collateral Agent</u>. The Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document or conversation believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel

25

to the Pledgors), independent accountants and other experts selected by the Collateral Agent. The Collateral Agent shall have no obligation to any Person to act or refrain from acting or exercising any of its rights under this Pledge Agreement.

Section 23. <u>Amendment</u>. No modification or waiver of any of the provisions of this Pledge Agreement shall be binding on the Collateral Agent or the Pledgors, except as expressly set forth in a writing duly signed and delivered by the Collateral Agent and each of the Pledgors.

Section 24. <u>Successors and Assigns</u>. This Pledge Agreement shall be binding upon and inure to the benefit of the Pledgors and the Collateral Agent for the benefit of the Secured Parties and their respective successors and permitted assigns. In the event of any assignment or transfer by any Secured Party of any instrument evidencing all or any part of the Obligations, the holder of such instrument shall, subject to the Credit Agreement, be entitled to the benefits of this Pledge Agreement.

Section 25. <u>Number and Gender</u>. Whenever used in this Pledge Agreement, the singular number shall include the plural and the plural the singular, and the use of any gender shall be applicable to all genders.

Section 26. <u>Subrogation, etc</u>. Notwithstanding any payment or payments made by the Pledgors or the exercise by the Collateral Agent of any of the remedies provided under this Pledge Agreement, the Credit Agreement or any of the other Loan Documents, the Pledgors shall have no claim (as defined in 11 U.S.C. § 101(5)) of subrogation to any of the rights of the Secured Parties against the Borrower, the Pledgors or any Pledged Collateral or guaranty held by the Secured Parties for the satisfaction of any of the Obligations, nor shall the Pledgors have any claims (as defined in 11 U.S.C. § 101(5)) for reimbursement, indemnity, exoneration or contribution from the Borrower in respect of payments made by the Pledgors hereunder until indefeasible payment in full of the Obligations, termination of the Commitments and expiration of the Letters of Credit. Notwithstanding the foregoing, if any amount shall be paid to the Pledgors on account of such subrogation, reimbursement, indemnity, exoneration or contribution rights at any time, such amount shall be held by the Pledgors in trust for the Secured Parties, segregated from other funds of the Pledgors, and shall be

26

turned over to the Collateral Agent for the benefit of the Secured Parties, in the exact form received by the Pledgors (duly endorsed by the Pledgors to the Collateral Agent for the benefit of the Secured Parties, if required), to be applied against such amounts in such order as the Collateral Agent may elect.

Section 27. <u>Captions</u>. The captions, headings and table of contents used in this Pledge Agreement are for convenience only and do not and shall not be deemed to affect, limit, amplify or modify the terms and provisions hereof.

Section 28. <u>Applicable Law and Jurisdiction</u>.

(a) <u>Applicable Law</u>. THIS PLEDGE AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PROVISIONS OF SUCH STATE (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

(b) <u>New York Courts</u>.

(i) Each of the Pledgors and the Collateral Agent hereby expressly and irrevocably agree and consent that any suit, action or proceeding arising out of or relating to this Pledge Agreement or any other Loan Document to which it is a party and the transactions contemplated therein may be instituted by any of the Pledgors or the Secured Parties in any State or Federal court sitting in the County of New York, State of New York, United States of America and, by the execution and delivery of this Pledge Agreement, the Pledgors and the Collateral Agent expressly waive any objection which they may have now or hereafter to the laying of the venue or to the jurisdiction of any such suit, action or proceeding, and irrevocably submit generally and unconditionally to the jurisdiction of any such court in any such suit, action or proceeding.

(ii) In the case of the courts of the State of New York or of the United States sitting in New York, each of the Pledgors hereby irrevocably designates, appoints and empowers CT Corporation System (the "Process Agent"), which has consented thereto) with offices on the date hereof at 1633 Broadway, New York, New York 10019, as agent to receive for and on behalf of each Pledgor service of process in the State of New York. Each Pledgor

27

NY3: 177169.01

further agrees that such service of process may be made on Process Agent by personal service on Process Agent of a copy of the summons and complaint or other legal process in any such suit, action or proceeding, or by any other method of service provided for under the applicable laws in effect in the State of New York, and Process Agent is hereby authorized to accept such service for and on behalf of each Pledgor, and to admit service with respect thereto.

(iii) Upon service of process being made on Process Agent as aforesaid, a copy of the summons and complaint or other legal process served shall be mailed by the Process Agent to the Pledgors by registered mail, return receipt requested, at its address referred to in Section 17, or to such other address as the Pledgors may notify Process Agent in writing. Service upon Process Agent as aforesaid shall be deemed to be personal service on the Pledgors and shall be legal and binding upon the Pledgors for all purposes, notwithstanding any failure of Process Agent to mail a copy of such legal process to the Pledgors, or any failure on the part of the Pledgors to receive the same.

(iv) Each Pledgor agrees that it will at all times continuously maintain an agent to receive service of process in the County of New York on its behalf with respect to this Pledge Agreement or any other Loan Document to which it is a party. In the event that for any reason Process Agent or any successor thereto shall no longer serve as agent for the Pledgors to receive service of process in the County of New York, or shall have changed its address without notification thereof to the Collateral Agent, the Pledgors will promptly but in no event later than five Business Days after obtaining knowledge thereof, irrevocably designate and appoint a substitute agent acceptable to the Collateral Agent and advise the Collateral Agent thereof.

(c) <u>Other Jurisdictions</u>. Nothing contained in this Section 28 shall affect the right to effect service of process in any manner provided for under applicable law or preclude any of the Secured Parties from bringing any suit, action or proceeding arising out of or relating to the Loan Documents in the courts of any place where the Pledgors or any of their property or assets may be found or located. To the extent permitted by the

28

applicable laws of any such jurisdiction, each Pledgor
hereby irrevocably submits to the jurisdiction of any
such court and expressly waives, in respect of any such
suit, action or proceeding, the jurisdiction of any other
court or courts which now or hereafter, by reason of its
present or future domicile, or otherwise, may be
available to it.

Section 29. <u>Continuing Security Interest;
Termination</u>. This Pledge Agreement shall create a
continuing assignment, pledge and first priority Security
Interest in the Pledged Collateral and shall remain in
full force and effect for the benefit of the Collateral
Agent and the Secured Parties until all Obligations have
been indefeasibly paid and performed in full and each of
the Commitments have terminated and all Letters of Credit
have expired. Upon the happening of all of such events,
the Security Interest granted hereby shall terminate.
Upon such termination, the Collateral Agent shall, upon
the request and at the expense of the Pledgors, execute
and deliver to the Pledgors such documents as the
Pledgors shall reasonably request to evidence such
termination or expiration.

Section 30. <u>Payments Set Aside</u>. To the extent
that the Pledgors or the Borrower or any other Person on
behalf of the Pledgors or the Borrower makes a payment or
payments of the Obligations to the Collateral Agent
and/or any Secured Party, or the Collateral Agent and/or
any Secured Party enforce the Security Interests or
exercise their rights of set-off, and such payment or
payments or the proceeds of such enforcement or set-off
or any part thereof are subsequently invalidated,
declared to be fraudulent or preferential, set aside
and/or required to be repaid to a trustee, receiver or
any other party under any bankruptcy law, state or
federal law, common law or equitable cause, then to the
extent of such recovery, the Obligations or any part
thereof originally intended to be satisfied, and this
Pledge Agreement and all Liens, rights and remedies
therefor, shall be revived and continued in full force
and effect as if such payment had not been made or such
enforcement or set-off had not occurred.

Section 31. <u>Limitation of Recourse</u>. Anything
herein to the contrary notwithstanding, the obligations
of each Pledgor under this Pledge Agreement are special
obligations of such Pledgor payable only to the extent of
the Pledged Collateral and do not constitute an
obligation of (and no recourse shall be had with respect
thereto to) any shareholder, member, partner, officer,

29

agent, employee, manager, director or Affiliate of such
Pledgor, or any shareholder, member, partner, officer,
agent, employee or director of any shareholder, member or
Affiliate of such Pledgor as such; and no judgment for
any personal liability or deficiency upon or with respect
to, or otherwise in connection with, the obligations
under this Pledge Agreement shall be obtainable by any of
the Secured Parties (or any Person claiming by, through
or under such party) against any shareholder, member,
partner, officer, agent, employee, manager, director or
Affiliate of such Pledgor, or any shareholder, member,
partner, officer, agent, employee or director of any
thereof absent fraud, misrepresentation or willful
misconduct on the part of such Person; provided, however,
nothing contained in this Section shall (a) impair the
validity of the indebtedness evidenced by the Credit
Agreement and the Notes and secured by this Pledge
Agreement, prevent the taking of any action permitted by
law against such Pledgor or the assets of such Pledgor or
the proceeds of such assets, or in any way affect or
impair the right of any Secured Party to take any action
permitted by law to realize upon any of the Pledged
Collateral or any other security which may secure the
Obligations, (b) be deemed to release any shareholder,
member or any Affiliate of such Pledgor, or any past,
present or future shareholder, member, partner, officer,
employee, director or agent of any thereof, from
liability for its fraudulent actions, knowing
misrepresentations or willful misconduct or from any of
its obligations or liabilities, under any agreement,
document, instrument or certificate executed by such
Person in connection with the transactions contemplated
by the Credit Agreement and any other Operative Document,
or (c) limit the right of any Secured Party to initiate
judicial proceedings against any shareholder or any
Affiliate of such Pledgor or of any other person solely
to the extent necessary to obtain jurisdiction over such
Pledgor.

Section 32. Consent to Assignment of LLC
Agreement . El Paso I hereby acknowledges and
irrevocably consents to the pledge and assignment by the
Borrower of all of the Borrower's right, title and
interest in, to and under the LLC Agreement to the
Collateral Agent, as agent on behalf of the Secured
Parties, as security pursuant to the Security Agreement.

Section 33. Counterparts. This Pledge
Agreement may be executed in any number of counterparts,
each of which shall be an original, with the same effect

30

as if the signatures thereto and hereto were upon the
same instrument.

31

NY3· 177169.01

IN WITNESS WHEREOF, the parties hereto have caused this Pledge Agreement to be duly executed as of the day and year first written above.

EL PASO MILFORD POWER I
COMPANY

By: _____
Name: Randolph L. Wu
Title: Senior Vice
        President


EL PASO MILFORD POWER II
COMPANY

By: _____
Name: Randolph L. Wu
Title: Senior Vice
        President


PDC MILFORD POWER LLC

By: _____
Name: Michael S. Armitage
Title: Manager


KBC BANK N.V., NEW YORK
BRANCH, as the Collateral
Agent

By: _____
Name: ERIC L. MCCARTNEY
Title: HEAD OF PROJECT FINANCE
        THE AMERICAS

By: _____
Name:
Title: SUSAN M. SILVER
        VICE PRESIDENT
        & TEAM LEADER

Schedule 5(a) to
<u>Pledge Agreement</u>

| <u>Pledgor</u> | <u>Membership Interest</u> |
|---|---|
| El Paso I | 5% |
| El Paso II | 90% |
| PDCM Pledgor | 5% |

# EXHIBIT E

----- Forwarded by Susan Silver/U32713/KB/KredAlm on 06/11/2004 05:17
PM
-----

                      "Douglas Corbett"
                      <Corbett29@msn.co        To:      "B.J.
O'Rourke" <accurate@argolink.net>, "Al Hutton"
                      m>                       <ALBERTHUTTON@cs.com>,
"Anthony D'Artista" <AnthonyD@fdcpa.com>,
                                               "atkins10"
<atkins10@earthlink.net>, "Barry Curtiss-Lusher"
                      07/01/2003 10:54
<barry@nexusresources.com>, "BaysideEnergy"
                      AM
<BaysideEnergy@aol.com>, "ELIZABETH WIGGINS" <EWIGGINS@bkd.com>,
                                               "Neeley, William F"
<Bill.Neeley@ElPaso.com>, "B.J. & Julie
                                               O'Rourke"
<bjj@argolink.net>, "Baker, Bob" <Bob.Baker@elpaso.com>,
                                               "Kokstein, Robert"
<Robert.Kokstein@ElPaso.com>, "Soto, Carlos"

<Carlos.Soto@ElPaso.com>, "Chenhuei S \(Chennie\) Huang"

<Chennie.Huang@ElPaso.com>, "Brazee, Claudine"

<Claudine.Brazee@ElPaso.com>, "Dave-Roadrunner"

<dellis@houston.rr.com>, "Derek D'Antilio" <DerekD@fdcpa.com>,
                                               "Eric McCartney"
<eric.mccartney@kbc.be>, "Filosa, Richard M."

<richard.filosa@bingham.com>, "rick Filosa" <filosarm@bingham.com>,
                                               "David Fixler"
<dfixler@rubinrudman.com>, "FrankBasile"

<Frank.Basile@ElPaso.com>, "Gene Osborne" <geneo@fdcpa.com>,
                                               "Jacqueline Weir"
<jackiew@fdcpa.com>, "jdetore"

<jdetore@rubinrudman.com>, "Moore, Jeffery"

<Jeffery.Moore@ElPaso.com>, "gerald.hill" <grhill@tds.net>, "Wyzik,
                                               Joseph J\(Joe\)"
<Joe.Wyzik@ElPaso.com>, "John F. Brown"
                                               <jfbbwsq@aol.com>,
"O'Rourke, John" <John.ORourke@ElPaso.com>,
                                               "John Schwartzenburg"
<john.schwartzenburg@power.alstom.com>,
                                               "Joseph Chriqui"
<joseph.chriqui@power.alstom.com>, "Ken & Heather

Roberts"
<hroberts@snet.net>, "megawat567"

<megawat567@prodigy.net>, "Corley, Kimberly A"

<Kim.Corley@ElPaso.com>, "koksteinr" <koksteinr@elpaso.com>,
"LenShapiro"
<LenShapiro@aol.com>, "'Marc A. Reardon \(E-mail\)'"
<mreardon@bingham.com>,
"'Mark Segel \(E-mail\)'"
<msegel@eifgroup.com>,
"Murphy, Martin F."

<marty.murphy@bingham.com>, "Matthew Schreck" <matt@neosoft.com>,
"Meal, Meg A."
<Meg.Meal@ElPaso.com>, "Ron And Gloria Melbye"
<gm43249@navix.net>,
"Michael Armitage"

<M.Armitage@electrastor.com>, "Peter Abt"

<pabt@pendulumenergy.com>, "Taylor, Pamela"

<Pamela.Taylor@ElPaso.com>, "Peter J. Abt" <pabt@houston.rr.com>,
"AbtP"
<AbtP@PaceGlobal.com>, "Rick Carlson"

<RCarlson@EIFGroup.com>, "Richard E. Scrimale"

<rscrimale@scolaro.com>, "rscolaro" <rscolaro@scolaro.com>,
"Szlachetka, Sandy"
<Sandy.Szlachetka@elpaso.com>, "Susan Silver"
<susan.silver@kbc.be>,
"Stephen Karotkin"

<stephen.karotkin@weil.com>, "Cotner, Tim" <Tim.Cotner@ElPaso.com>,
"Thomas E. Atkins"
<powerdev@att.net>, "Tom Kilgore"

<Tom.Kilgore@elpaso.com>, "Tomasz J. Sikora Esq. \(E-mail\)"

<Tom.Sikora@ElPaso.com>, "Walter Horlacher"

<walter.horlacher@power.alstom.com>, "Warren Buhle"

<warren.buhle@weil.com>, "Michael S. Zarin" <Wellinvest@aol.com>,
"Wendy Carlson"
<Wendy.Carlson@ElPaso.com>, "Werner Lieberherr"

<werner.lieberherr@power.alstom.com>
cc:

2

Subject:   Power
Development Company-Change of Address

Please note a new mailaing and package address for Power Development
Company and its subsidiaries and affiliates:
Power Development company
1900 West Loop South, Suite 770
Houston, Texas 77027

Phone numbers and fax remain the same.

Thank you.
Douglas Corbett

---

DISCLAIMER

This e-mail and any attached files are confidential and may be legally
privileged. If you are not the addressee, any disclosure, reproduction,
copying, distribution, or other dissemination or use of this
communication is strictly prohibited. If you have received this
transmission in error please notify KBC immediately and then delete
this e-mail.
KBC does not accept liability for the correct and complete transmission
of the information, nor for any delay or interruption of the
transmission, nor for damages arising from the use of or reliance on
the information.
All e-mail messages addressed to, received or sent by KBC or KBC
employees are deemed to be professional in nature. Accordingly, the
sender or recipient of these messages agrees that they may be read by
other KBC employees than the official recipient or sender in order to
ensure the continuity of work-related activities and allow supervision
thereof.

3